UNITED STATES BANKRUPTCY COURT
DISTRICT OF OREGON

In re                                    )
                                         )    Case No. _____
                                         )
                                         )    NOTICE OF *FINAL*
                                         )    HEARING ON MOTION
                                         )        FOR USE OF CASH COLLATERAL
                                         )        TO OBTAIN CREDIT
Debtor(s)                                )    *(Check One)*

YOU ARE NOTIFIED THAT:

1.    The undersigned moving party, _____, filed a
Motion      For Use of Cash Collateral      To Obtain Credit *(check one)*.  A copy of the motion, which
INCLUDES the statement required by Local Form #541.7, is attached.

2.    The name and service address of the moving party's attorney (or moving party, if no attorney) are:
_____.

3.    A *FINAL* HEARING on the motion WILL BE HELD ON _____ AT_____
IN _____,
and testimony will be received if offered and admissible.

4.    If you WISH TO OBJECT to the motion, YOU SHALL, WITHIN 11 DAYS OF THE SERVICE DATE
SHOWN in pt. 5 BELOW, FILE with the Clerk of Court (i.e., if the 5-digit portion of the Case No. begins
with "3" or "4", mail to 1001 SW 5th Ave. #700, Portland OR 97204; OR if it begins with "6" or "7", mail
to 405 E 8th Ave #2600, Eugene OR 97401), BOTH:  (1) a written response, which states the facts upon
which you will rely, AND (2) a certificate showing a copy of the response has been served on the U.S.
Trustee and the party named in pt. 2 above.  See Local Form #541.50 for details.

5.    On _____ copies of BOTH this notice AND the motion, were served pursuant to FRBP 7004
on the debtor(s); any debtor's attorney; any trustee; any trustee's attorney; members of any committee
elected pursuant to 11 U.S.C. §705; any Creditors' Committee Chairperson [or, if none serving, on all
creditors listed on the list filed pursuant to FRBP 1007(d)]; any Creditors' Committee attorney; the U.S.
Trustee; and all affected lien holders whose names and addresses used for service are as follows:

_____
Signature

_____
(If debtor is movant) Debtor's Address & Taxpayer ID#(s) (last 4 digits)

541 (3/1/09)    **Local Form #541.50 ATTACHED IF this NOTICE served on PAPER**

MOTIONS AND *FINAL* HEARINGS  RE USE OF CASH COLLATERAL, OR TO OBTAIN CREDIT

1.  <u>Motion</u> - Each motion must include the statement required by Local Form #541.7.

2.  <u>Notice of *FINAL* Hearing on Motion</u> - The moving party shall <u>COMPLETELY</u> fill out Local Form #541 [NOTE: LOCAL FORM #541 REQUIRES YOU TO OBTAIN THE DATE, TIME AND ADDRESS OF HEARING FROM THE COURT <u>BEFORE</u> SERVICE!]

3.  <u>Service of Motion AND Notice</u> - The moving party shall SIMULTANEOUSLY serve copies of <u>BOTH</u> the motion AND the NOTICE (Local Form #541) on all of the parties listed in pt. 5 of the Notice.

    **NOTE:  THIS SERVICE SHALL BE MADE WITHIN 2 BUSINESS DAYS AFTER RECEIVING THE HEARING DATE, ETC., <u>OR ELSE</u> THE COURT SHALL BE NOTIFIED AND A NEW DATE, ETC. REQUESTED.  SANCTIONS MAY BE IMPOSED FOR FAILURE TO COMPLY!**

4.  <u>Filing of Motion AND Notice with Clerk's Office</u> - On the same date as copies are served as provided in pt. 5 of the Notice, the moving party will mail to, or directly file with, the Clerk of Court <u>BOTH</u>:  (a) the completely filled out original Notice of Motion WITH (b) the original Motion <u>attached</u> thereto.

541.50 (12/18/06)

| Address |
| --- |
| **Debtor:** |
| Mr. Mark Andersen<br>Country Coach LLC<br>PO Box 400<br>Junction City, OR  97448 |
| **Attorney for US Trustee:** |
| P. Rebecca Kamitsuka<br>Attorney for the United States Trustee<br>Office of the United States Trustee<br>District Court/Federal Bldg.<br>405 East Eighth Avenue, Room 1100<br>Eugene, OR  97401 |
| **Creditor's Committee** |
| Mr. Randall Lay<br>Lazy Days RV Supercenter<br>6130 Lazy Days Blvd.<br>Seffner, FL 33584-2968 |
| Mr. Dan Boddicker<br>HWH Corporation<br>2096 Moscow Rd.<br>Moscow, IA 52760 |
| Mr. C.J. Lewis<br>Farwest Steel Fabrication Co.<br>9PO Box 889<br>Eugene, OR 97440 |
| Ms. Dawn R. Kosinski<br>The Bill Benetreu Company<br>1635 N 30th Street<br>Springfield, OR 97478 |
| Mr. Fred VanDenBerg<br>Buddy Gregg Motors Homes, Inc.<br>11730 Snyder Road<br>Knoxville, TN 37932 |
| Ms. Kristin Kernutt<br>Pacific Source Health Plan<br>PO Box 7068<br>Eugene, OR  97401 |
| Mr. Brendan Gardiner<br>Caterpillar Inc.<br>Legal Services Division<br>100 NE Adams Street<br>Peoria, IL   61629 |
| Mr. Steven Montgomery<br>Ridewell Corporation<br>PO Box 4586<br>Springfield, MO  65808 |

Mr. Douglas Schultz
Gleaves Swearingen
975 Oak Street, Suite 800
PO Box 1147
Eugene, OR   97440

**Manual Notice List**

ASE Supply Inc.
Attn: Brent Gabinger
2321 N.E. Argyle Street, Suite C
Portland, OR  97211-1962

Mr. John J. Dyer
Greenberg Traurig
3290 Northside Parkway, #400
Atlanta, GA  30327

DaimlerChrysler Ins Co/Dealerguard
c/o Melinda A. Davis Esq.
Deneberg Tuffley PLLC
28411 Northwestern Hwy #600
Southfield, MI 48034

Mr. Lawrence B. Hunt
Hunt & Associates PC
101 SW Main Street
Ste. 805
Portland, OR 97204

Internal Revenue Service
Attention:  Ms. Susan Anderson
300 Country Club Road, #260
Eugene, OR  97401

Mr. David B. Kurzweil
Greenberg Traurig
3290 Northside Parkway, #400
Atlanta, GA   30327

Lundy-Medlin, Inc., dba The Art of Glass
790 Blair Blvd.
Eugene, OR 97402

Tree Products Hardwoods Inc.
c/o Mr. Les Oliver
4965 S Nickel Creek Ave
Meridian, ID  83642

**Affected Lienholders:**

Wells Fargo Bank, National Association
c/o Corporation Service Company,
Registered Agent
285 Liberty Street NE
Salem, OR  97301

Prevost Car (US) Inc.
The Corporation Trust Company, Registered
Agent
1209 Orange Street
Wilmington, DE  19801

| |
|---|
| NMHG Financial Services, Inc.<br>10 Riverview Drive<br>Danbury, CT   06810 |
| NMHG Financial Services, Inc.<br>CT Corporation System, Registered Agent<br>388 State Street, Suite 420<br>Salem, OR   97301 |
| Mr. Bryant Riley, Registered Agent<br>Riley Investment Management LLC<br>11100 Santa Monica Blvd., Suite 810<br>Los Angeles, CA   90025 |
| Cummins Northwest, LLC<br>PO Box 2710<br>Portland, OR   97208-2710 |
| Cummins Northwest, LLC<br>Mr. Richard A. Stillmock, Registered Agent<br>4711 N Basin Avenue<br>Portland, OR 97217 |
| **Judgments** |
| Richard L. Richards<br>(Agent for Michael C. Phillips)<br>PO Box 71305<br>Eugene, OR 97401 |
| John P. Emanuel<br>1915 W. 11th Avenue<br>Junction City, OR 97448 |
| Damon K. Rapozo<br>89060 Old Mohawk Rd<br>Springfield, OR 97478 |
| Molly Anne Caulk<br>Gaydos Churnside & Balthrop<br>(Attorney for Dew Enterprises)<br>440 E Broadway Ste 300<br>Eugene OR  97401 |
| R Scott Palmer<br>Watkinson Laird et al<br>Attorney for William Gary Carmichael Sr.<br>and Megal Delancy Carmichael<br>101 E Broadway Ste 200<br>PO Box 10567<br>Eugene OR  97440 |
| Laura T. Z. Montgomery<br>Gleaves Swearingen et al<br>(Attorney for TNT Speciality Advertising<br>Inc.)<br>975 Oak St Ste 800<br>PO Box 1147<br>Eugene OR  97440 |

Allen E. Garden
(Attorney for Mckinley Properties)
Gardner Honsowetz Potter
725 Country Club Rd
Eugene OR  97401

Rossitunes Inc.
425 W. 3rd Avenue
Junction City, OR 97448

Brandy A. Sargent, OSB No. 045713
David B. Levant, *pro hac vice application pending*
Stoel Rives LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480
basargent@stoel.com
dblevant@stoel.com

Thomas A. Huntsberger, OSB No. 761804
Thomas A. Huntsberger PC
870 West Centennial Boulevard
Springfield, OR 97477
Telephone: (541) 746-6574
Facsimile: (541) 746-3201
tahunts@callatg.com

PROPOSED ATTORNEYS FOR DEBTOR

### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF OREGON

| | |
|---|---|
| In re:<br><br>**Country Coach, LLC**,<br><br>             Debtor. | Case No. **09-60419-aer11**<br><br>**DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR (A) TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364 (d)(1) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. §363, (II) GRANTING ADEQUATE PROTECTION TO LENDER PURSUANT TO 11 U.S.C. §§ 361, 362 AND 363, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(B)  AND (C)** |

# I.  INTRODUCTION

Country Coach, LLC ("**Country Coach**," the "**Debtor**" or "**Borrower**") requests by this

motion (this "**Motion**"), pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3),

Page 1    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

364(d)(1), 503, 507(b) and 1146(c) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et. seq.* (the "**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), that the Court enter the Interim Order referred to below and attached hereto:

(a)    authorizing the Debtor to obtain post-petition financing (hereinafter, the "**DIP Financing**"), in connection with the DIP Financing, not to exceed an aggregate principal amount of $11,500,000 on a revolving basis (the actual available principal amount at any time being subject to conditions precedent as set forth herein and in the DIP Credit Agreement (as defined below)),[1] from Wells Fargo Bank, National Association (the "**Senior Lender**") acting through its Wells Fargo Business Credit operating division, and the granting of a super-priority administrative claim and priming lien for amounts advanced by the Senior Lender to the Debtor under the DIP Financing pursuant to the terms of that certain Debtor-In-Possession Credit and Security Agreement, dated as of March 19, 2009, by and among the Debtor and the Senior Lender, in substantially the form attached hereto as <u>Exhibit A</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "**DIP Credit Agreement**");

(b)    authorizing the Debtor to execute, deliver and enter into the DIP Credit Agreement and other DIP Loan Documents executed in connection therewith (collectively, the "**DIP Loan Documents**") and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(c)    granting security interests, liens, and super-priority claims (including a super-priority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, liens pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to Section 364(d) of the Bankruptcy Code) to the Senior Lender, to secure all obligations of the Debtor under and with respect to the DIP Financing;

(d)    authorizing the Debtor's limited use of Cash Collateral, solely on the terms and conditions set forth in the Interim Order and in the DIP Loan Documents;

(e)    granting adequate protection to the Senior Lender, in its capacity as pre-petition lender of the Debtor, and Junior Creditor (as defined below) as more fully set forth in the Interim Order;

(f)    modifying the automatic stay imposed under Section 362 of the Bankruptcy Code;

---

[1] All capitalized terms not otherwise defined in this Emergency Motion, but defined in the Interim Order or the DIP Credit Agreement shall have the meanings provided for in the Interim Order or the DIP Credit Agreement, as applicable.

Page 2    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

(g)    scheduling, pursuant to Rule 4001 of the Bankruptcy Rules and the applicable Local Bankruptcy Rules of this Court, an emergency interim hearing (the "**Interim Hearing**") on the Motion be held before this Court to consider entry of an interim order in substantially the form of <u>Exhibit B</u> attached hereto (the "**Interim Order**");

(h)    requesting, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Bankruptcy Rules of this Court, that this Court (i) schedule a final hearing (the "**Final Hearing**") on the Motion to consider entry of a final order authorizing the balance of the borrowings and letter of credit issuances under the DIP Loan Documents on a final basis (the "**Final Order**"); and

(i)    approving the notice procedures with respect thereto.

Debtor recognizes the extensive nature of the relief requested by the Motion and the shortness of time for its consideration but urges the Court to recognize both the true exigency of the Debtor's situation (*i.e.,* that it has no significant operating funds, no ability to borrow under any other terms, and but for this Motion would be facing an uncontested motion by the Senior Lender for relief from stay to liquidate all of the estate's personal property assets) and the absence of prejudice to third parties that would appear to result from approval of the Motion. Approval of this Motion and the Interim Order in a form satisfactory to Wells Fargo Bank is, simply, the only way that Country Coach believes it can survive as an enterprise.

## II.  BACKGROUND RELATING TO THE CREDIT AGREEMENT

In order to understand the terms of the Credit Agreement or the Rule 4001 "Statement of the Relief Requested" that follows in Part III of this Motion, it is first necessary to review certain background facts and terms relating to Country Coach's existing debt structure.

**<u>Senior Lender</u>**

(i)    Pursuant to that certain Credit and Security Agreement, dated as of May 18, 2007 (as amended, restated, supplemented or otherwise modified from time to time, the "**Pre-Petition Credit Agreement**"), by and between the Debtor and the Senior Lender, the Senior Lender made certain advances of funds to the Debtor. The Pre-Petition Credit

Page 3    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

Agreement, along with any other agreements and documents executed or delivered in connection therewith, are collectively referred to herein as the "**Existing Senior Credit Agreements**" (as the same may be amended, restated, supplemented or otherwise modified from time to time).  All obligations of the Debtor arising under the Pre-Petition Credit Agreement (including, without limitation, the "Obligations" as defined therein) or any other Existing Senior Credit Agreements shall collectively be referred to herein as the "**Senior Lender Pre-Petition Debt**."

(ii)     Pursuant to the Existing Senior Credit Agreements, the Debtor granted to the Senior Lender a first priority security interest in and continuing lien on substantially all of the Debtor's personal property assets and property, and all proceeds, products, accessions, rents and profits thereof (the "**Senior Lender Pre-Petition Collateral**") and a subordinated lien on the Junior Creditor Pre-Petition Real Property Collateral (as defined below) (collectively, the liens and security interests granted in favor of the Senior Lender pursuant to the Existing Senior Credit Agreements shall be referred to as the "**Senior Lender Pre-Petition Liens**").

(iii)     As of the Petition Date, the Debtor was indebted to the Senior Lender in an amount exceeding $9,000,000 <u>plus</u> accrued fees, costs, expenses, and credit card obligations (collectively, the "**Senior Lender Pre-Petition Debt**").

## Junior Creditor and Junior Lenders

(i)     Pursuant to that certain Note and Securities Purchase Agreement, dated as of April 8, 2008, by and among the Borrower, Riley Investment Management, LLC ("**Junior Agent**" or "**Junior Creditor**"), as collateral agent and lender, and certain other entities that extended credit to the Debtor thereunder (together with Junior Agent, the "**Junior Lenders**") (as amended and modified from time to time, the "**Junior Loan Agreement**"), the Debtor executed promissory notes in favor of each of the Junior Lenders in the original aggregate principal amount of $7,000,000 (as amended and modified from time to time, the "**Junior Notes**").  The Junior Agent, each of the other Junior Lenders, and Senior Lender are parties to the certain Debt Subordination and Intercreditor Agreement dated as of April 8, 2008 (the "**Subordination Agreement**").  The Junior Loan Agreement, the Junior Notes and the Subordination Agreement, along with any other documents executed or delivered in connection therewith, including, without limitation, the "Loan Documents" as defined therein, are collectively referred to herein as the "**Existing Junior Credit Agreements**" (as the same may be amended, restated, supplemented or otherwise modified from time to time).

(ii)     All obligations of the Debtor arising under the Junior Loan Agreement or any other Existing Junior Credit Agreement shall collectively be referred to herein as the "**Junior Creditor Pre-Petition Debt**."

(iii)     Pursuant to the Existing Junior Credit Agreements the Debtor granted to the Junior Creditor, for the benefit of itself and the Junior Lenders, a security interest in and

Page 4    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

continuing lien in the Senior Lender Pre-Petition Collateral. The Junior Agent's security interest and lien in the Senior Lender Pre-Petition Collateral is subordinated to the Senior Lender Pre-Petition Liens. In addition, the Debtor granted the Junior Creditor a lien on certain real property located in Lane County, Oregon (as more particularly described in the Subordination Agreement) (the "**Junior Creditor Pre-Petition Real Property Collateral**") to secure the Junior Creditor Pre-Petition Debt. The Senior Lender's lien in the Junior Creditor Real Property Collateral is subordinate to the Junior Creditor's lien in the Junior Creditor Real Property Collateral.

(iv)    As of the Petition Date, the Debtor was indebted to the Junior Lenders pursuant to the Existing Junior Credit Agreements in the aggregate principal amount of not less than $15,000,000.

# III. BANKRUPTCY RULE 4001 STATEMENT OF RELIEF REQUESTED

A.    **Concise Statement of the Relief Requested**

Pursuant to Rule 4001, Debtor provides the following summary[2] of the Material Terms of the DIP Financing to be approved by the Interim Order and the Adequate Protection to be granted in the Interim Order for the Pre-Petition Claims.

1.    **Summary of Material Terms of Credit Agreement**

(i)    **Interest rate**: The contract rate equals the prime rate plus 3.25%, default rate equals the applicable contract rate plus 2.0%. **DIP Credit Agreement, § 2.5(a), 1.1 "Default Rate".**

(ii)    **Fees**: $180,000 Commitment Fee payable in nine monthly installments of $20,000. **DIP Credit Agreement, § 2.6(a)**. Unused Line Fee of 0.25%. **DIP Credit Agreement, § 2.6(b)**. Letter of Credit Fee of 2.0% per annum (increase to 4.0% per annum after default).

(iii)    **Maturity Date:** The DIP Financing shall mature on the earlier of December 31, 2009, the date of the confirmation of a Chapter 11 plan acceptable to the Senior Lender, or upon an Event of Default. **DIP Credit Agreement § 1.1 "Maturity Date"; Interim Order ¶ 5(d).**

(iv)    **Events of Default:** Any breach by the Debtor under the Interim Order or the Final Order or any event of default under the DIP Credit Agreement. **DIP Credit Agreement, § 7.1.**

---

[2] The terms of the Interim Order and DIP Credit Agreement control to the extent of any conflict with this summary.

Page 5    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

(v)        **Liens:**  As security for the DIP Financing, the Senior Lender will be granted post-petition liens and security interests in virtually all of the Debtor's real and personal property (the "**DIP Liens**").   The DIP Liens will encumber all currently owned or hereafter acquired property and assets of the Debtor of any kind or nature, whether real or personal, tangible or intangible (excluding the Avoidance Actions other than avoidance actions regarding the fraudulent transfer of the Senior Lender Pre-Petition Collateral), as described in more detail below in Part III.B(i) below.  **Interim Order, ¶ 7(a); DIP Credit Agreement, § 3.1.**

(vi)        **Borrowing Limits**: $11,500,000.  **Interim Order,  ¶ 5(a).**

(vii)        **Borrowing Conditions:**  Entry of an Interim Order and a Final Order acceptable to Senior Lender, payment of all fees, minimum availability, execution of an acceptable landlord agreement relating to Debtor's premises, execution of an amendment to the Subordination Agreement, compliance with Interim and Final Orders, DIP Loan Documents, and DIP Budget by Debtor. **DIP Credit Agreement, § 4.1.**

## 2.        Adequate Protection (Including Liens) for Pre-Petition Claims

The Interim Order separately provides for the adequate protection of the Senior Lender and

the Junior Lenders as follows:

(i)        Senior Lender Adequate Protection.  Until the indefeasible repayment in full in cash of the Senior Lender Pre-Petition Debt, as adequate protection for the Senior Lender's interest in the Pre-Petition Collateral, the Senior Lender is granted the following by the Interim Order:

1.        Replacement Liens.  Pursuant to Sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Senior Lender, is hereby granted by Debtor continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the DIP Collateral (the "**Senior Lender Adequate Protection Liens**").  The Senior Lender Adequate Protection Liens shall (a) be subordinate only to the Prior Liens; and (b) be senior and superior to: (a) the Junior Creditor Adequate Protection Liens; and (b) the DIP Liens.  The Senior Lender Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment or avoidance, for all purposes in the Case and any subsequent or successor case of the Debtor (any such case shall be referred to as a "**Successor Case**").  Except as described in clause (a) above, no other liens or security interests, whether for adequate protection or otherwise, shall be senior or equal to or pari passu with the Senior Lender Adequate Protection Liens in the Case or any Successor Case without the prior written consent of the Senior Lender (which consent may be withheld in Senior Lender's sole discretion).

2.        Senior Lender Adequate Protection Claim.  Pursuant to Section 507(b) of the Bankruptcy Code, the Senior Lender shall have an allowed super-priority administrative expense claim (the "**Senior Lender Adequate Protection Claim**")

Page 6     -     DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

against the Debtor and its estate.  The Senior Lender Adequate Protection Claim shall be senior and superior to the Junior Creditor Adequate Protection Claim and the Junior Agent Adequate Protection Lien.  No cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in the Case or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or pari passu with, the Senior Lender Adequate Protection Claim.

       3.     <u>Current Payment</u>.  As further adequate protection, and without limiting any rights of the Senior Lender under section 506(b) of the Bankruptcy Code which are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Senior Lender to the entry of the Interim Order and the Debtor's consensual use of Cash Collateral as provided herein, the Debtor shall, on upon the entry of the Interim Order and on a monthly basis thereafter, pay or reimburse the Senior Lender for any and all of its accrued and past-due fees, costs, expenses and charges payable under the Existing Senior Lender Credit Agreements and the DIP Credit Agreement, including without limitation, the reasonable attorneys' and other fees and expenses of the Senior Lender, whether accrued pre-petition or post-petition, all without further notice, motion or application to, order of, or hearing.

       4.     <u>Senior Lender Adequate Protection Obligations</u>.  The Senior Lender Adequate Protection Liens and Senior Lender Adequate Protection Claim shall secure the payment of the Senior Lender Pre-Petition Debt in an amount equal to any diminution in the value of the Senior Lender's interests in the Pre-Petition Collateral from and after the Petition Date (the amount of such diminution, the "**Senior Lender Adequate Protection Obligations**") including, without limitation, any such diminution resulting from the following: (i) the use by the Debtor of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code or (iii) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Pre-Petition Collateral or otherwise.

      (ii)     <u>Junior Agent Adequate Protection</u>.  Until the indefeasible repayment in full in cash of the Junior Agent Pre-Petition Debt, as adequate protection for Junior Agent's interest in the Pre-Petition Collateral, Junior Agent is granted the following by the Interim Order:

       1.     <u>Replacement Liens</u>.  Pursuant to Sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, Junior Agent, for its benefit and the benefit of the Junior Lenders, is hereby granted by the Debtor continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the DIP Collateral (the "**Junior Creditor Adequate Protection Liens**"; collectively, the Senior Lender Adequate Protection Liens and the Junior Creditor Adequate Protection Liens shall be referred to as the "**Adequate Protection Liens**").  The Junior Creditor Adequate Protection Liens shall be entitled to the same rights, priorities, benefits and protections granted to or conferred

Page 7   -   DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

upon the Senior Lender Adequate Protection Liens under the Interim Order, except that such Junior Creditor Adequate Protection Liens shall be junior and subordinate to the Senior Lender Pre-Petition Liens in the Senior Lender's Pre-Petition Collateral, the Senior Lender Adequate Protection Liens, and the DIP Liens.

      2.    <u>Junior Creditor Adequate Protection Claim</u>.  Pursuant to Section 507(b) of the Bankruptcy Code, Junior Agent, for itself and for the benefit of the Junior Lenders, shall have an allowed super-priority administrative expense claim (the "**Junior Creditor Adequate Protection Claim**") against the Debtor and its estate.  The Junior Creditor Adequate Protection Claim shall be entitled to the same rights, priorities, benefits and protections granted to or conferred upon the Senior Lender Adequate Protection Claim under the Interim Order, except that such Junior Creditor Adequate Protection Claim shall be junior and subordinate to the Senior Lender Adequate Protection Claim.

      3.    <u>Current Payment</u>.  There is no provision in the Interim Order for current payments to the Junior Agent or the Junior Creditor.

      4.    <u>Junior Creditor Adequate Protection Obligations</u>.  The Junior Creditor Adequate Protection Liens and Junior Creditor Adequate Protection Claim shall secure the payment of the Junior Agent Pre-Petition Debt in an amount equal to any diminution in the value of Junior Agent's interests in the Pre-Petition Collateral from and after the Petition Date (the amount of such diminution, the "**Junior Creditor Adequate Protection Obligations**") including, without limitation, any such diminution resulting from the following: (i) the use by the Debtor of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the DIP Liens, which will prime the Junior Creditor Pre-Petition Liens in the Senior Lender Pre-Petition Collateral, (iii) the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code or (iv) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Pre-Petition Collateral or otherwise **Interim Order, ¶ 18(b).**

## B.    **Identification and Description of Certain Provisions Requiring Disclosure**

Debtor discloses the following specific terms of the DIP Credit Agreement and the

Interim Order pursuant to Bankruptcy Rule 4001(c)(1)(B).

    (i)  **<u>DIP Liens to be Granted Under § 364(c) and (d)</u>:**  There are four aspects of the DIP Liens granted under these sections (**Interim Order, ¶ 7(a); DIP Credit Agreement, § 3.1**):

      **1.**    Pursuant to section 364(c)(2) of the Bankruptcy Code, security interests in and liens on all DIP Collateral and Pre-Petition Collateral that is not otherwise subject to any Prior Lien which security interest and lien shall be subordinate to the Senior Lender Adequate Protection Liens;

Page 8   -   DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

**2.**      pursuant to section 364(d)(1) of the Bankruptcy Code, senior to and prime (i) the Junior Creditor Pre-Petition Liens on the Senior Lender Pre-Petition Collateral, and (ii) the Junior Creditor Adequate Protection Liens (the liens described in clauses (i) and (ii) above, collectively, the "**Primed Liens**");

**3.**      pursuant to section 364(c)(3) of the Bankruptcy Code, immediately junior in priority to any and all Prior Liens (other than the Primed Liens) on or in the DIP Collateral; and

**4.**      except to the extent otherwise expressly set forth in the Interim Order, no other security interest or lien shall be senior, or equal to, or *pari passu* with, the DIP Liens.

(ii)  **Adequate Protection:**   Please see above, Part III.A.2 for disclosure of the relevant adequate protection terms contained in the Interim Order. **Interim Order, ¶ 10.**

(iii)  **Determination of the Validity of Pre-Petition Claims and Liens:** The Debtor acknowledges the amount and validity of its indebtedness in favor of Senior Lender as well as the validity and priority of the Senior Lender Pre-Petition Liens in the Pre-Petition Collateral, without prejudice to the challenge rights granted in favor of the Committee or another party in interest under Paragraph 15 of the Interim Order.  **Interim Order, ¶¶ 3(a) - (f).**

(iv)  **Waivers of Automatic Stay:**   Pursuant to the Interim Order, the automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Senior Lender to exercise all rights and remedies against the DIP Collateral and the Senior Lender Pre-Petition Collateral provided for in the DIP Credit Agreement and/or the Existing Senior Credit Agreements upon the occurrence of any Event of Default after the expiration of any applicable notice and cure period as required by the DIP Credit Agreement and the giving of two (2) business days' prior written notice to the Debtor, Junior Agent, the United States Trustee, and any official committee of unsecured creditors appointed in the Case (the "**Committee**").  In any hearing after the giving of the aforementioned notice, the only issue that may be raised by the Debtor in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Debtor hereby waives its right to seek to reimpose the automatic stay or obtain other injunctive relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Senior Lender as set forth in the Interim Order or the DIP Credit Agreement and/or the Existing Senior Credit Agreements. In no event shall the Senior Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or any collateral subject to any Senior Lender Pre-Petition Lien.  Subject to the entry of the Final Order, the automatic stay shall be further vacated and modified to allow Senior Lender to take possession of the Senior Lender Pre-Petition Proceeds and to apply such amounts to the Senior Lender Pre-Petition Debt, and the Debtor is hereby authorized and directed to take any and all action requested by the Senior Lender to facilitate the Senior Lender taking possession of such funds. **Interim Order, ¶¶ 8(b) & (c); DIP Credit Agreement, § 7.2(k).**

Page 9   -   DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

(v) **Waiver of Plan Rights:**  It is an Event of Default if the Debtor files a plan without the Senior Lender's consent.  **DIP Credit Agreement, § 7.1(r).**

(vi) **Plan Deadlines:** N/A

(vii) **Waivers of Nonbankruptcy Perfection Process:**  The DIP Liens and the Senior Lender Adequate Protection Liens and Junior Creditor Adequate Protection Liens are deemed duly perfected and recorded under all applicable federal or state or other laws as of the date of the Interim Order.  **Interim Order, ¶ 13; DIP Credit Agreement, § 3.2.**  This provision allows the Senior Lender and the Junior Creditor to avoid the expense and effort of perfecting their security interests granted under the Interim Order.  In addition, the Senior Lender and Junior Creditor are already perfected in the same types of collateral in which they are granted liens pursuant to the Interim Order.

(viii) **Waiver and Release of Claims Against Senior Lender:**  In the Interim Order, the Debtor waives and release any and all claims and causes of action against the Senior Lender, subject to the challenge rights of the Creditors' Committee contained therein.  **Interim Order, ¶¶ 3(a) and 30.**  This provision is justified because the Interim Order preserves Committee's and all other parties' rights to bring causes of action against the Senior Lender.  A similar waiver and release by the Debtor is required in the DIP Credit Agreement as a condition to borrowing.  **DIP Credit Agreement, § 4.2(f).**

(ix) **Indemnification:**  Except for liabilities resulting from its own gross negligence or willful misconduct, the Senior Lender is indemnified by the Debtor for all liabilities, including fees, costs, and expenses.  **DIP Credit Agreement, §§ 8.5 and 8.6.**

(x) **Waiver of Surcharge Right:**  The Debtor waives its right to seek a surcharge against the DIP Collateral or the Pre-Petition Collateral under § 506(c).  **Interim Order, ¶ 17; DIP Credit Agreement, § 2.18.**  This provision is justified because the Senior Lender has already agreed to fund the reasonable administrative expenses of the Debtor's estate pursuant to the DIP Budget.  Under these circumstances, the Senior Lender should not be required to guarantee the payment of potentially unnecessary  administrative expenses of the Debtor's estate or incur unnecessary litigation costs in connection with frivolous 506(c) claims.

## IV.  DECLARATION OF PROVISIONS REQUIRED BY BANKRUPTCY LOCAL FORM 541.7

Bankruptcy Local Form 541.7 requires that this Motion clearly either (1) state that is does

not contain any of twelve separate types of  provisions that the Court will not normally approve or

(2) identify which of the provisions are contained in the Motion and the justification for the

Page 10  -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

provision(s).  A description of each of the relevant provisions contained in the Interim Order and

DIP Credit Agreement (in the order in which identified in Local Form 541.7) follows:

1.  <u>Cross-Collateralization</u>.  The Senior Lender is granted the Senior Lender Adequate Protection Liens as adequate protection for the Senior Lender Adequate Protection Claims.   Similarly, the Junior Creditors are granted the Junior Creditor Adequate Protection Liens as adequate protection for the Junior Creditor Adequate Protection Claims.  These provisions are necessary to assure that the interests of the Senior Lender and Junior Creditors are adequate protected as part of the extension of post-petition credit and consent to the DIP Financing.

2.  <u>Extraneous Findings of Fact</u>.   Certain of the findings of fact in paragraph 4 of the Interim Order (e.g., that the Debtor is unable to obtain adequate unsecured credit allowable under Section 503(b)(l) of the Bankruptcy Code as an administrative expense) may be extraneous to the relief proposed to be granted.  The Debtor believes these findings are accurate and required to induce the Senior Lender to extend the DIP Facility.

3.  <u>Provisions that Bind the Debtor</u>.   In paragraph 3 of the Interim Order the Debtor acknowledges the amount and validity of its indebtedness in favor of Senior Lender as well as the validity and priority of the Senior Lender Pre-Petition Liens in the Pre-Petition Collateral, but without prejudice to the challenge rights granted in favor of the Committee or another party in interest under Paragraph 15 of the Interim Order.   The Debtor has previously conceded these terms in certain District Court litigation with the Senior Lender.

4.  <u>Language that Characterizes Post-Petition Payments as Payments of Pre-Petition Obligations</u>.   In paragraph 10(A)(3) of the Interim Order the Debtor agrees to make payments of all fees, costs, and expenses incurred by the Senior Lender in connection with the Existing Senior Credit Agreements and the DIP Financing on a monthly basis without further notice or hearing.  This provision is necessary and justified because the Lender has incurred significant expense in connection with the Existing Credit Agreements and DIP Financing and entitled to receive payment of such amounts from the Debtor pursuant to the Existing Senior Credit Agreements and the DIP Credit Agreement.  In addition, the payment of such expenses constitute a portion of the Senior Lender's adequate protection.

5.  <u>Waiver of Section 506(c)</u>.  Please refer to clause (x) immediately above this Part IV.

6.  <u>Security Interest in Avoidance Powers</u>: The Senior Lender shall have a lien on all avoidance actions to recover any of the Senior Lender Pre-Petition Collateral, but shall not have a lien on any other avoidance actions.  Interim Order, ¶ 7(a).  This provision is justified as a continuance of the Senior Lender's non-bankruptcy rights to recover its collateral.

Page 11   -   DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

7.   <u>Waiver and Release of Claims</u>:  Please refer to clause (viii) immediately above this Part IV.

8.   <u>Waiver of Priming Rights</u>:  The Debtor has waived this right in order to induce the Senior Lender to provide the DIP Financing.  This provision is justified as a necessary part of the certainty that the Senior Lender's is entitled to when committing to providing funding to a debtor in bankruptcy.  Certainty of the Senior Lender's lien priority is integral to the Senior Lender's ability to underwrite the DIP Financing.

9.   <u>Priming Other Parties' Liens Without Consent</u>:  N/A

10.   <u>Waiver of Nonbankruptcy Law Perfection Requirements</u>:  Please refer to clause (vii) immediately above this Part IV.

11.   <u>Automatic Relief from Stay</u>:  Please refer to clause (iv) immediately above this Part IV.

12.   <u>Waiver of Right to Seek Use of Cash Collateral</u>:  As with the right to seek priming liens, the Debtor has waived this right in order to induce the Senior Lender to provide the DIP Financing.

The Debtor submits that the facts and circumstances of this case are truly exceptional in that (i) Country Coach completely exhausted any alternative means of operating as a Chapter 11 debtor in possession and restarting its business before agreeing to the terms required by the Senior Lender; (ii) as a consequence, the Debtor would not have any substantial basis for opposing the Senior Lender's pending motion for relief from stay to foreclose substantially all of the Debtor's personal property, absent the proposed DIP Financing; and (iii) given the amounts of the Senior Lender Pre-Petition Debt and the Junior Lender Pre-Petition Claims and the perceived validity, perfection and priority of the Senior Lender Pre-Petition Liens and the Junior Creditor Pre-Petition Liens, Country Coach does not perceive any scenario under which any prepetition creditor could possibly be prejudiced by the granting of the protections to the Senior Lender described above.

Page 12   -   DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

# V.  MOTION

## Necessity for Relief

1.      Prompt entry of the Interim Order is essential to avoid immediate and irreparable harm to the Debtor's estate.  Obtaining the DIP Financing is urgently needed to continue operations so that a sale of the substantially all of the Debtor's assets, as a going concern may be concluded, as further explained below.  As all of the Debtor's cash constitutes the Senior Lenders' cash collateral, it is swept daily into a concentration account pursuant to the terms of the Existing Senior Credit Agreements and the Debtor has no unencumbered cash  (or free personal property not already subject to liens), the Debtor do not have sufficient available sources of working capital and financing to carry on the operation of its business without the DIP Financing and use of cash collateral.

## Jurisdiction

2.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363, and 364(c) and (d) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, and 9014.

## Background

3.      On February 6, 2009 (the "**Petition Date**") the Junior Creditor joined in filing an involuntary Chapter 11 petition against the Debtor.  On March 5, 2009 the Court entered an order for relief commencing this case under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**").    The Debtor is authorized to operate their businesses as Debtor-in-

Page 13   -   DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  A creditors committee has recently been appointed in the bankruptcy case.

4.      The Debtor is headquartered in Junction City, Oregon, and is a leading manufacturer of Class A motor coaches.   Information regarding the Debtor's history and operations is set forth in the Omnibus Declaration of Mark D. Andersen, CFO of Country Coach, filed herewith.

## The DIP Credit Agreement

5.      The Debtor and Senior Lender have agreed to terms of the DIP Credit Agreement subject to approval by the Court.  Pursuant to the terms of the DIP Credit Agreement, the Debtor will be permitted to borrow funds from the Senior Lender by reference to the limitations contained in the DIP Credit Agreement and the Initial DIP Budget, in substantially the form attached hereto as Exhibit C (together with any subsequent budget approved by the Senior Lender, the "DIP Budget" (as defined below)), to make certain adequate protection payments to Senior Lender and to fund Debtor's business operations pending the confirmation of a plan of reorganization.  The Senior Lender has advised the Debtor that the Senior Lender will not lend funds without authorization from the Court as requested herein.

## Additional Details Regarding DIP Financing

6.      In addition to the provisions contained in the Rule 4001 Statement *supra*, the DIP Financing contains the following principal provisions:

    (a)    Debtor:  Country Coach, LLC

    (b)    Events of Default:

        (i)    Any Event of Default under the DIP Credit Agreement, including, without limitation, the Events of Default described in Section 7.1 of the DIP Credit Agreement.

Page 14    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

   (ii) If Debtor fail to duly and punctually observe, perform or discharge any obligation or duty imposed upon it by the Interim Order or the Final Order.

7. As described above, the Senior Lender Pre-Petition Debt is secured by valid perfected liens on virtually all of the Debtor's personal property assets.  Pursuant to the Interim Order and the DIP Credit Agreement, the Debtor is required to ratify all Senior Lender Pre-Petition Debt and all Senior Lender Pre-Petition Liens and release the Senior Lender from any claims the Debtor may have against it related thereto.

8. Provided that no Event of Default occurs under the terms of the DIP Credit Agreement, or the Interim or Final Orders of the Bankruptcy Court, and subject to the borrowing formula applicable thereto and the other conditions set forth in the DIP Credit Agreement, the Senior Lender will advance the funds requested by the Debtor as set forth in the DIP Budget, with certain permitted variances.

**Relief Requested**

9. By this Motion, the Debtor respectfully requests entry of the Interim Order, the scheduling of the Final Hearing, and, after such hearing, the entry of the Final Order authorizing the Debtor to obtain the DIP Financing pursuant to the terms of the DIP Credit Agreement.

**Legal Basis for Approval of DIP Financing**

10. The Debtor has attempted, but has been unable to obtain post-petition financing in the form of unsecured debt allowable under Section 503(b)(1) of the Bankruptcy Code.  The circumstances of this case instead requires the Debtor to obtain their financing under Sections 364(c) and (d) of the Bankruptcy Code and satisfy the requirements thereof.

Page 15 - DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

11.    Generally, sections 364(c) and (d) of the Bankruptcy Code require a Debtor to demonstrate that alternative sources of credit are not available under the other provisions of section 364.    See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990). Although there is "no duty to seek credit from every possible lender before concluding that such credit is unavailable," the statute obligates a Debtor to show "by a good faith effort that credit was not available without the senior lien."    Bray v. Shenandoah Fed. Says, and Loan Assoc. (In re Snowshoe Co., Inc.), 789 F.2d 1085, 1088 (4th Cir. 1986).    Also important is the Debtor's showing that "the credit acquired is of significant benefit to the Debtor's estate and that the terms of the proposed loans are within the bounds of reason, irrespective of the inability of the Debtor to obtain comparable credit elsewhere."    In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991).    Against this statutory backdrop, courts will evaluate the facts and circumstances of the Debtor's case, and will accord significant weight to the necessity for obtaining the financing and its benefit to the estate.    See In re Snowshoe, 789 F.2d at 1088; Ames, 115 B.R. at 40.

12.    As set forth below, the Debtor has represented to the Court that it is unable to obtain post-petition financing on an unsecured or administrative claim basis pursuant to section 364(a) or 364(b) of the Bankruptcy Code.    Thus, the circumstances of this case require the Debtor to obtain financing under Sections 364(c) and (d) of the Bankruptcy Code.

13.    Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtor has negotiated the DIP Credit Agreement at arm's length and pursuant to its business judgment with the Senior Lender.    In negotiating debtor-in-possession financing arrangements, courts "permit debtors-in-possession to exercise their basic

Page 16    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

business judgment consistent with their fiduciary duties." <u>Ames</u>, 115 B.R. at 38.  Courts will evaluate the facts and circumstances of a Debtor's case, and will accord significant weight to the necessity for obtaining the financing so long as it does not run afoul of the provisions of and policies underlying the Bankruptcy Code.  <u>See</u>, <u>e.g.</u>, <u>In re Snowshoe Co.</u>, 789 F.2d at 1088 (approving debtor in possession financing necessary to sustain seasonal business); <u>Ames</u>, 115 B.R. at 40 ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").  Courts will not override the Debtor's prudent and responsible exercise of its basic business judgment consistent with its fiduciary duties to the estate and its creditors in negotiating an appropriate financing package.  <u>See</u> <u>In re Simasko Prod. Co.</u>, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court.").

14.    Authorizing the Debtor to proceed with the DIP Credit Agreement is in the best interests of the Debtor, its estate and its creditors.  The DIP Financing is the best and only means available at this time of preserving and enhancing the Debtor's ability to remain a going concern.  Without the funding that the Senior Lender will make available under the DIP Credit Agreement, the Debtor could not continue to conduct its business.  Indeed, without the financing provided for in the DIP Credit Agreement and the use of cash collateral, the Debtor will be entirely unable to restart its operations and will suffer irreparable harm.

15.    The Senior Lender has required as a condition to the DIP Financing, a priming of the Junior Creditor Pre-Petition Liens in the Senior Lender Pre-Petition Collateral.  Priming of

Page 17    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

liens pursuant to section 364(d) of the Bankruptcy Code requires either that the Debtor adequately protect the interests of the lienholders being primed by the DIP Financing or obtain their consent.  The Junior Creditor, for itself and on behalf of the Junior Lenders, has consented to the relief granted in the Interim Order.

16.    As described above, without the DIP Financing, the Debtor would have no ability to reorganize and the value of its assets would quickly evaporate, including those assets that could potentially be subject to the Pre-Petition Liens at issue.  With the DIP Financing, however, the Debtor will be able to preserve the opportunity to successfully reorganize.

17.    Accordingly, this Court should authorize the Debtor to obtain the DIP Financing to the extent and pursuant to the terms contained herein, the DIP Credit Agreement and in the proposed Interim Order.

18.    The Debtor believes that the terms and conditions of the DIP Credit Agreement are fair and reasonable under the extraordinary circumstances of this case, and were negotiated by the parties in good faith and at arm's length.  Accordingly, the Senior Lender should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of the arrangements contemplated by the DIP Credit Agreement.

## **Cash Collateral**

19.    In addition to the need for the DIP Financing, the Debtor's other pressing concern is the need for immediate use of Cash Collateral pending the Final Hearing.  The Debtor requires use of Cash Collateral to pay present operating expenses including payroll and to pay vendors to ensure a continued supply of goods essential to the Debtor's continued viability.

Page 18    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING
AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL
HEARING

Seattle-3503553.2 0049218-00002

20.    Pursuant to Section 363(c)(2) of the Bankruptcy Code, the Debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section."  11 U.S.C. § 363(c)(2).  Section 363(e) of the Bankruptcy Code provides that upon the request of an entity that has an interest in property to be used by a Debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest.  Additionally, Section 364(d) of the Bankruptcy Code requires that adequate protection be provided where, as here, the Junior Creditor Pre-Petition Liens in the Senior Lender Pre-Petition Collateral are being primed to secure the obligations under the DIP Credit Agreement.

21.    The Senior Lender and Prepetition Junior Creditor consent to the use of Cash Collateral in accordance with the DIP Budget and the other covenants set forth in the DIP Credit Agreement and Interim and Final Orders, if as provided in the Interim Order, such parties receive the following as adequate protection for any post-petition diminution in the value of the Pre-Petition Collateral:

(a)    As proposed in the Interim Order and the Final Order, the Debtor is authorized and required to make all payments with respect fees and expenses incurred by the Senior Lender in connection with the Senior Lender Pre-Petition Debt or the DIP Financing.

(b)    Cash proceeds from the Senior Lender Pre-Petition Collateral are subject to the Senior Lender Pre-Petition Liens and Prepetition Junior Liens and may only be used in accordance with the DIP Credit Agreement and the Interim and Final Orders.

(c)    The Senior Lender shall have Senior Lender Adequate Protection Liens on the DIP Collateral;

Page 19    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

(d)     The Junior Creditor shall have the Junior Creditor Adequate Protection Liens on the DIP Collateral which shall be junior only to the Carve-Out, the DIP Liens, and the Senior Lender Adequate Protection Liens;

(e)     The Senior Lenders shall be entitled to the Senior Lender Adequate Protection Claim;

(f)     The Junior Creditor shall be entitled to the Junior Creditor Adequate Protection Claim;

(g)     If an Event of Default occurs under the DIP Credit Agreement, the consent of the Senior Lender to the use of Cash Collateral terminates.

Notwithstanding anything contained herein, the consent of the Senior Lender to the use of Cash Collateral is limited to the DIP Financing presently before this Court, with Wells Fargo Bank, National Association as Senior Lender, and shall not be deemed to extend to any other post-petition financing or to any modified version of this DIP Financing with any party other than Wells Fargo Bank, National Association as Senior Lender.  Furthermore, the consent of the Senior Lender to the Debtor's use of Cash Collateral as provided in the Interim and/or Final Order does not constitute, and shall not be construed as constituting, an acknowledgment or stipulation by the Senior Lender that its interests in the Senior Lender Pre-Petition Collateral are adequately protected pursuant to the Interim and/or Final Order or otherwise.  Nothing in the Interim and/or Final Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interests of the Senior Lender are or will be adequately protected with respect to any non-consensual use of Cash Collateral or non-consensual priming of the Senior Lender Pre-Petition Liens.

Page 20    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

**Interim Relief**

22.    The urgent need to preserve the Debtor's business and avoid irreparable harm to the estate, as set forth in this motion, makes it imperative that the Debtor be authorized to obtain authority to borrow funds and use Cash Collateral pursuant to the terms and conditions of the DIP Credit Agreement pending the Final Hearing.

23.    At this stage of the Chapter 11 case, it is critical that the Debtor regain and maintain the confidence of employees, suppliers and customers in the Debtor's ability to meet its obligations and to continue to conduct its business.  Continued cash availability is essential to the Debtor's ability to achieve this important aim.  The denial of interim DIP Financing and use of Cash Collateral for these purposes would result in irreparable harm to the Debtor's ability to reorganize, and foreclose any possibility of the Debtor reorganizing.  Conversely, approval of the DIP Financing would not appear to prejudice the Debtor's estate or any of its creditors because they presently have no prospect of payment in a liquidation.

24.    Accordingly, this Court should authorize the Debtor to enter into the DIP Credit Agreement and obtain post-petition financing pursuant to the terms contained therein.

**Notice With Respect To Interim Hearing**

25.    Each of the parties set forth below has been provided with telephonic, e-mail and/or facsimile notice of the interim hearing on this motion and, upon request, hard copies of this motion pursuant to Bankruptcy Rules 4001(c)(1) and 1007(d): (i) the Office of the United States Trustee for the District of Oregon; (ii) the Debtor's twenty (20) largest unsecured creditors; (iii) counsel to the Senior Lender; (iv) counsel to the Junior Creditor; (v) counsel to Prevost (U.S.) Inc. (vi) all other known parties with liens of record on assets of the Debtor as of the Petition Date; (vii) all financial institutions at which the Debtor maintain deposit accounts;

Page 21   -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

Seattle-3503553.2 0049218-00002

(viii) the landlords for all non-residential real properties occupied by the Debtor as of the Petition Date, including, without limitation, counsel for Lee Joint Venture; and (ix) the local office for the Internal Revenue Service.

### Notice With Respect To Final Hearing

26.    No trustee, examiner or statutory committee has yet been appointed in this Chapter 11 case.  Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that the Court authorize it to provide notice of the Final Hearing by serving (i) a notice of entry of the Interim Order together with the Interim Order and the proposed Final Order, by first-class mail (or for those set up to receive electronic transmissions, by electronic transmission), upon: (i) the Office of the United States Trustee for the District of Oregon; (ii) the Debtor's twenty (20) largest unsecured creditors; (iii) counsel to the Senior Lender; (iv) counsel to the Junior Creditor; (v) counsel to Prevost (U.S.) Inc. (vi) all other known parties with liens of record on assets of the Debtor as of the Petition Date; (vii) all financial institutions at which the Debtor maintain deposit accounts; (viii) the landlords for all non-residential real properties occupied by the Debtor as of the Petition Date, including, without limitation, counsel for Lee Joint Venture; and (ix) the local office for the Internal Revenue Service; and (ix) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.

27.    The cost of mailing notice to all creditors in these Chapter 11 cases would be extremely expensive, and would not, in the Debtor's view, confer any substantial benefit on the Debtor, their estates, or their creditors. Accordingly, and in light of the urgency of the relief requested, the Debtor respectfully request that any further notice of the Final Hearing and of the relief requests, other than as provided for in the motion, be dispensed with and waived.

Page 22    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL HEARING

**Amendments/Modifications**

28.    The Debtor expects that the terms of the DIP Credit Agreement may be amended or supplemented prior to the Final Hearing.  Any such modifications or supplements will be filed and served in the same manner as this Motion prior to the Final Hearing.

29.    No previous motion for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor requests that the Court enter an order, substantially in the form attached hereto: (i) authorizing the Debtor to obtain DIP Financing on an interim and final basis and to use Cash Collateral; (ii) granting senior liens and priority administrative expense status; (iii) granting adequate protection liens and authorizing adequate protection payments; (iv) authorizing the Debtor to enter into DIP Credit Agreement with the Senior Lender; and (v) granting such other and further relief as is just and proper.

DATED:  March 19, 2009.

Stoel Rives LLP

/s/ Brandy A. Sargent
Brandy A. Sargent, OSB No. 045713
David B. Levant, *pro hac vice pending*
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480
basargent@stoel.com
dblevant@stoel.com

Proposed Attorneys for Debtor

Page 23    -    DEBTOR'S EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING
POST-PETITION FINANCING, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING
AUTOMATIC STAY, (IV) PROVIDING OTHER RELIEF, AND (V) SCHEDULING FINAL
HEARING

EXHIBIT A

**DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT**

**BY AND BETWEEN**

**COUNTRY COACH LLC**

**AND**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

**Acting through its Wells Fargo Business Credit operating division**

**As of March 19, 2009**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS ..................................................................................2

    Section 1.1    Definitions...............................................................2
    Section 1.2    Other Definitional Terms; Rules of Interpretation....................16

ARTICLE II AMOUNT AND TERMS OF THE CREDIT FACILITY ......................16

    Section 2.1    Revolving Advances ..................................................16
    Section 2.2    Procedures for Requesting Advances ...............................17
    Section 2.3    Letters of Credit. .....................................................17
    Section 2.4    Special Account. ......................................................18
    Section 2.5    Interest; Default Interest Rate; Application of Payments;
                        Participations; Usury...............................................18
    Section 2.6    Fees. ..................................................................19
    Section 2.7    Time for Interest Payments; Payment on Non-Business Days;
                        Computation of Interest and Fees ..................................21
    Section 2.8    Lockbox and Collateral Account; Sweep of Funds. ..................21
    Section 2.9    Voluntary Prepayment; Termination of the Credit Facility by the
                        Borrower .............................................................22
    Section 2.10   Mandatory Prepayment...............................................22
    Section 2.11   Revolving Advances to Pay Indebtedness; Protective Advances. ...........22
    Section 2.12   Use of Proceeds......................................................22
    Section 2.13   Liability Records.....................................................22
    Section 2.14   Single Loan ...........................................................23
    Section 2.15   Grants, Rights and Remedies.........................................23
    Section 2.16   Perfection ............................................................23
    Section 2.17   Waiver of any Priming Rights and Violative Use of Cash
                        Collateral.............................................................23
    Section 2.18   Waiver of Claims to Surcharge......................................23

ARTICLE III SECURITY INTEREST; OCCUPANCY; SETOFF.............................23

    Section 3.1    Grant of Security Interest............................................23
    Section 3.2    Lien Perfection; Further Assurances.................................23
    Section 3.3    Superpriority Administrative Expense Claim..........................24
    Section 3.4    Notification of Account Debtors and Other Obligors..................25
    Section 3.5    Assignment of Insurance.............................................25
    Section 3.6    Occupancy.............................................................25
    Section 3.7    License ...............................................................26
    Section 3.8    Financing Statement..................................................26
    Section 3.9    Further Assurances...................................................26
    Section 3.10   Setoff.................................................................27
    Section 3.11   Collateral.............................................................27
    Section 3.12   Survival ..............................................................27

Seattle-3503554.2 0049218-00002
ATL 17,092,721v6

ARTICLE IV CONDITIONS OF LENDING ............................................................28

Section 4.1    Conditions Precedent to the Initial Advances and Letters of Credit..........28
Section 4.2    Additional Conditions Precedent to the Initial Advances.........................29
Section 4.3    Conditions Precedent to All Advances and Letters of Creditt:..................30

ARTICLE V REPRESENTATIONS AND WARRANTIES ........................................30

Section 5.1    Existence and Power; Name; Chief Executive Office; Inventory
               and Equipment Locations; Federal Employer Identification
               Number and Organizational Identification Number ...................................30
Section 5.2    Capitalization .......................................................................................31
Section 5.3    Authorization of Borrowing; No Conflict as to Law or Agreements ........31
Section 5.4    Legal Agreements .................................................................................31
Section 5.5    Subsidiaries .........................................................................................31
Section 5.6    Financial Condition; No Adverse Change. ..............................................31
Section 5.7    Litigation ..............................................................................................31
Section 5.8    Regulation U ........................................................................................32
Section 5.9    Taxes ....................................................................................................32
Section 5.10   Titles and Liens.....................................................................................32
Section 5.11   Intellectual Property Rights ...................................................................32
Section 5.12   Plans ....................................................................................................33
Section 5.13   Default...................................................................................................34
Section 5.14   Environmental Matters...........................................................................34
Section 5.15   Submissions to Lender ...........................................................................34
Section 5.16   Financing Statements .............................................................................35
Section 5.17   Rights to Payment .................................................................................35
Section 5.18   Administrative Priority; Lien Priority......................................................35
Section 5.19   Appointment of Trustee or Examiner; Liquidation ..................................36
Section 5.20   The Chapter 11 Case .............................................................................36

ARTICLE VI COVENANTS .................................................................................36

Section 6.1    Reporting Requirements .........................................................................36
Section 6.2    Compliance with Budget; Updated Budget; Variance Reports;
               Minimum Sales. .....................................................................................39
Section 6.3    Permitted Liens; Financing Statements. ..................................................40
Section 6.4    Capital Expenditures; Indebtedness.........................................................41
Section 6.5    Guaranties .............................................................................................42
Section 6.6    Investments and Subsidiaries ..................................................................42
Section 6.7    Dividends and Distributions. ..................................................................43
Section 6.8    Books and Records; Collateral Examination, Inspection and
               Appraisals. ............................................................................................43
Section 6.9    Account Verification...............................................................................43
Section 6.10   Compliance with Laws. ..........................................................................44
Section 6.11   Payment of Taxes and Other Claims .......................................................44

-ii-

Section 6.12    Maintenance of Properties ........................................................44
Section 6.13    Insurance ................................................................................45
Section 6.14    Preservation of Existence..........................................................45
Section 6.15    Delivery of Instruments, etc.......................................................45
Section 6.16    Sale or Transfer of Assets; Suspension of Business Operations................45
Section 6.17    Consolidation and Merger; Asset Acquisitions ...........................46
Section 6.18    Sale and Leaseback ..................................................................46
Section 6.19    Restrictions on Nature of Business ............................................46
Section 6.20    Accounting ..............................................................................46
Section 6.21    Discounts, etc...........................................................................46
Section 6.22    Plans.......................................................................................46
Section 6.23    Place of Business; Name...........................................................46
Section 6.24    Constituent Documents; Limited Liability Company Status ....................46
Section 6.25    Adequate Protection Payments ..................................................47
Section 6.26    Financing Orders; Administrative Priority; Lien Priority; Payment
                of Claims..................................................................................47
Section 6.27    Escrowed Funds .......................................................................29
Section 6.28    Performance by the Lender.........................................................47

ARTICLE VII EVENTS OF DEFAULT, RIGHTS AND REMEDIES .......................................48

Section 7.1     Events of Default ......................................................................48
Section 7.2     Rights and Remedies..................................................................51
Section 7.3     Certain Notices.........................................................................52
Section 7.4     Waiver of Marshaling. ...............................................................53

ARTICLE VIII MISCELLANEOUS .........................................................................53

Section 8.1     No Waiver; Cumulative Remedies; Compliance with Laws ....................53
Section 8.2     Amendments, Etc......................................................................53
Section 8.3     Notices; Communication of Confidential Information; Requests for
                Accounting ..............................................................................53
Section 8.4     Further Documents....................................................................55
Section 8.5     Costs and Expenses...................................................................55
Section 8.6     Indemnity ................................................................................55
Section 8.7     Participants...............................................................................56
Section 8.8     Execution in Counterparts; Telefacsimile or E-Mail Execution...............56
Section 8.9     Retention of Borrower's Records. ...............................................56
Section 8.10    Binding Effect; Assignment; Complete Agreement; Sharing
                Information ..............................................................................57
Section 8.11    Severability of Provisions ..........................................................57
Section 8.12    Headings .................................................................................57
Section 8.13    Governing Law; Jurisdiction, Venue. ..........................................57
Section 8.14    Release of Claims. ....................................................................58
Section 8.15    Lender as Party-in-Interest........................................................58
Section 8.16    Waiver of Right to Obtain Alternative Financing......................................58

-iii-

Section 8.17    Credit Bids .................................................................................................58

Seattle-3503554.2 0049218-00002
ATL 17,092,721v6

## DEBTOR-IN-POSSESSION CREDIT AND SECURITY AGREEMENT

This Debtor-in-Possession Credit and Security Agreement is dated as of March 19, 2009 and is by and between COUNTRY COACH LLC, a Delaware limited liability company, as a debtor and debtor-in-possession (the "Borrower"), and WELLS FARGO BANK, NATIONAL ASSOCIATION (as more fully defined in **Article I** herein, the "Lender"), acting through its Wells Fargo Business Credit operating division.

## RECITALS

WHEREAS, on February 6, 2009 (the "Petition Date"), an involuntary bankruptcy case was commenced with respect to the Borrower (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the District of Oregon (together with any other court which has jurisdiction over the Chapter 11 Case, the "Bankruptcy Court"), and on March 5, 2009, the Bankruptcy Court entered an order granting relief under the involuntary petition. The Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its business as debtor-in-possession; and

WHEREAS, the Borrower and the Lender are parties to that certain Credit and Security Agreement dated as of May 18, 2007 (as amended and otherwise modified, the "Pre-Petition Credit Agreement"; the Lender, in its capacity as the "Lender" under the Pre-Petition Credit Agreement, is referred to herein as the "Pre-Petition Lender"), pursuant to which the Pre-Petition Lender has made, and the Borrower is indebted to the Pre-Petition Lender for, certain pre-petition loans and advances thereunder (together with all other Indebtedness under and as defined in the Pre-Petition Credit Agreement, the "Pre-Petition Obligations"); and

WHEREAS, the Borrower is unable to obtain funds or credit on any other terms; and

WHEREAS, the Borrower has asked the Lender to make Post-Petition loans and advances to the Borrower consisting of a debtor-in-possession credit facility as Revolving Advances in an aggregate principal amount not to exceed $11,500,000 at any time outstanding; and

WHEREAS, the Lender is willing to provide such financing, subject to the terms and conditions set forth herein, including that all of the Indebtedness hereunder and under the other Loan Documents constitute allowed superpriority administrative expense claims pursuant to Section 364(c)(1) of the Bankruptcy Code in the Chapter 11 Case as set forth herein and are secured by a Lien on substantially all of the Borrower's personal property and all of the Borrower's real property and fixtures pursuant to Section 364(d)(1) of the Bankruptcy Code.

NOW THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

# ARTICLE I

# DEFINITIONS

Section 1.1 <u>Definitions</u>.  Except as otherwise expressly provided in this Agreement, the following terms shall have the meanings given them in this Section:

"Acceptable Plan" shall mean a Reorganization Plan which provides for Full Payment of all Indebtedness and any then-outstanding Pre-Petition Obligations on the effective date of such Reorganization Plan, provides for an effective date no later than 30 days after the date of entry of the Confirmation Order with respect to such Reorganization Plan, and provides for a full and complete release of any and all claims that the Borrower or the Estate might have or assert against the Lender or the Pre-Petition Lender (whether arising prior to or after the Petition Date), or which is otherwise acceptable to the Lender and the Pre-Petition Lender, in their sole and absolute discretion.

"Accounts" shall have the meaning given it under the UCC.

"Accounts Advance Rate" means up to eighty-five percent (85%); <u>provided</u> that, as of any date of determination, the Accounts Advance Rate shall be reduced by one (1) percentage point for each percentage by which Dilution is in excess of five percent (5.0%).

"Advance" means a Revolving Advance.

"Affiliate" or "Affiliates" means Country Coach Holdings LLC, Riley Investment Partners Master Fund, L.P., Riley Investment Management LLC, Bryant Riley and any other Person controlled by, controlling or under common control with the Borrower, including any Subsidiary of the Borrower.  For purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.

"Aggregate Face Amount" means the aggregate amount that may then be drawn under each outstanding Letter of Credit, assuming compliance with all conditions for drawing.

"Agreement" means this Debtor-in-Possession Credit and Security Agreement.

"Agreement Date" means the date as of which this Agreement is dated.

"Availability" means the amount, if any, by which the Borrowing Base exceeds the sum of (a) the aggregate outstanding principal balance of Revolving Advances, and (b) the L/C Amount.

"Bankruptcy Code" means Title 11, United States Code, as amended from time to time, as applicable to the Chapter 11 Case.

"Bankruptcy Court" has the meaning set forth in the Recitals of this Agreement.

-2-

"Bidding Procedures Order" a final non-appeallable order approved by the Bankruptcy Court granting the Borrower's motion to establish bidding procedures for a sale of all or substantially all of the Borrower's assets, all in form and substance satisfactory to the Lender in its sole discretion.

"Borrowing Base" means at any time the lesser of:

(a)    the Maximum Line Amount; or

(b)    the sum of:

    (i)    the product of the Accounts Advance Rate times the dollar amount of Eligible Accounts, plus

        (ii)    the sum of:

            (1)    the lesser of (y) the product of the Inventory Advance Rate with respect to raw materials times Eligible Inventory which constitutes raw materials, or (z) eighty percent (80%) of the Net Orderly Liquidation Value of Eligible Inventory which constitutes raw materials, plus

            (2)    the lesser of (y) the product of the Inventory Advance Rate with respect to work in process times Eligible Inventory which constitutes work in process, or (z) eighty percent (80%) of the Net Orderly Liquidation Value of Eligible Inventory which constitutes work in process, plus

            (3)    the lesser of (y) the product of the Inventory Advance Rate with respect to finished goods times Eligible Inventory which constitutes finished goods, or (z) eighty percent (80%) of the Net Orderly Liquidation Value of Eligible Inventory which constitutes finished goods, plus

        (iii)    the Permitted Overadvance Amount, less

        (iv)    the Borrowing Base Reserve, less

        (v)    Indebtedness that the Borrower owes to the Lender that has not yet been advanced as a Revolving Advance, and an amount that the Lender in its reasonable discretion finds on the date of determination to be equal to the Borrower's credit exposure with respect to any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement offered to the Borrower by the Lender that is not described in **Article II** of this Agreement, less

        (vi)    the aggregate outstanding amount of the Pre-Petition Obligations (including any undrawn amounts with respect to letters of credit issued by the Lender under or in connection with the Pre-Petition Credit Agreement and all fees, costs and expenses with respect thereto).

-3-

"Borrowing Base Certificate" means a written certificate signed by an Officer of the Borrower in substantially in the form of **Exhibit A** annexed hereto and made a part hereof, setting forth the calculation of the Borrowing Base and Availability and certifying that no Default or Event of Default has occurred, or, if a Default or an Event of Default has occurred, describing such Default or Event of Default and the action(s) taken or to be taken by the Borrower with respect thereto.

"Borrowing Base Reserve" means, as of any date of determination, such amounts (expressed as either a specified amount or as a percentage of a specified category or item) as the Lender, in its reasonable discretion, may from time to time establish and adjust in reducing Availability (a) to reflect events, conditions, contingencies or risks which, as determined by the Lender, do or may affect (i) the Collateral or its value, (ii) the assets, business or prospects of the Borrower, or (iii) the security interests and other rights of the Lender in the Collateral (including the enforceability, perfection and priority thereof), or (b) to reflect the Lender's judgment that any collateral report or financial information furnished by or on behalf of the Borrower to the Lender is or may have been incomplete, inaccurate or misleading in any material respect, or (c) in respect of any state of facts that the Lender determines constitutes a Default or an Event of Default. The Borrowing Base Reserve shall also include rent reserves in amounts determined by the Lender with respect to each of the Borrower's leased locations and vendor/processor locations for which the Lender has not received a landlord's waiver or bailee's waiver in form and substance acceptable to the Lender in its reasonable discretion.

"Budget" means any set of projections approved by the Lender showing all projected cash receipts and all projected cash disbursements (with detail as to sources of cash receipts and identification of cash disbursements) for the Borrower delivered to the Lender pursuant to Section 5.6(b) or Section 6.2(b). The initial Budget shall be substantially in the form of **Exhibit B** annexed hereto and made a part hereof, and all Budgets thereafter shall be in form and detail acceptable to the Lender and shall show all facets of the Borrower's operations.

"Business Day" means a day on which the Federal Reserve Bank of New York is open for business.

"Capital Expenditures" means for a period, any expenditure of money during such period for the purchase, lease or construction of assets, or for improvements or additions thereto, which are capitalized on the Borrower's balance sheet.

"Change of Control" means the occurrence of any of the following events:

(a)      Bryant Riley, Riley Investment Management LLC and Riley Investment Partners Master Fund, LP and their respective affiliates shall cease to collectively own, directly or indirectly, more than 50% of the membership interests of the Borrower or shall cease to collectively have direct or indirect voting control of the Borrower; or

(b)      Jay Howard shall cease to be the Chief Executive Officer of the Borrower or shall cease to actively manage the Borrower's day-to-day business activities, and in either such case, a replacement reasonably satisfactory to the Lender shall not be in place within 60 days; or

-4-

(c)     Jim Howard shall cease to be the Senior Vice President of Sales of the Borrower or shall cease to perform the tasks associated with such position, and, in either such case, a replacement reasonably satisfactory to the Lender shall not be in place within 60 days; or

(d)     Mark Andersen shall cease to be the Chief Financial Officer of the Borrower or shall cease to perform the tasks associated with the position of chief financial officer, and, in either such case, a replacement reasonably satisfactory to the Lender shall not be in place within 60 days.

"Chapter 11 Case" has the meaning set forth in the Recitals of this Agreement.

"Closing Date" means the date upon which the Interim Borrowing Order has been entered and all then-applicable conditions precedent to the Advances under this Agreement have been satisfied or waived in writing by the Lender.

"Collateral" means all of the Borrower's Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, all sums on deposit in the Collateral Account and all other bank accounts, any items in the Lockbox or any other lockbox, and the Real Property; together with (a) all substitutions and replacements for and products of any of the foregoing; (b) in the case of all goods, all accessions; (c) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (d) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (e) all collateral subject to the Lien of any Security Document; (f) any money, or other assets of the Borrower that now or hereafter come into the possession, custody, or control of the Lender; (g) all sums on deposit in the Special Account; (h) proceeds of any and all of the foregoing; (i) books and records of the Borrower, including all mail or electronic mail addressed to the Borrower; and (j) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Borrower now has or hereafter acquires any rights.

"Collateral Account" means the "Lender Account" as defined in the Lockbox Agreement.

"Commitment" means the Lender's commitment to make Advances to, and to issue Letters of Credit for the account of, the Borrower.

"Compliance Certificate" means a certificate of the Borrower's chief financial officer, substantially in the form of **Exhibit C** hereto.

"Confirmation Order" shall mean an order entered by the Bankruptcy Court confirming a Reorganization Plan.

"Constituent Documents" means with respect to any Person, as applicable, such Person's certificate of incorporation, articles of incorporation, by-laws, certificate of formation, articles of organization, limited liability company agreement, management agreement, operating agreement, shareholder agreement, partnership agreement or similar document or agreement governing such

-5-

Person's existence, organization or management or concerning disposition of ownership interests of such Person or voting rights among such Person's owners.

"Credit Facility" means the credit facility under which Revolving Advances and Letters of Credit may be made available to the Borrower by the Lender under **Article II**.

"Cut-off Time" means 1:00 p.m. Atlanta, Georgia time.

"Default" means an event that, with giving of notice or passage of time or both, would constitute an Event of Default.

"Default Period" means any period of time beginning on the day a Default or Event of Default occurs and ending on the date identified by the Lender in writing as the date that such Default or Event of Default has been cured or waived.

"Default Rate" means an annual interest rate in effect during a Default Period or following the Termination Date, which interest rate shall be equal to two percent (2%) over the interest rate otherwise applicable to Advances, as such rate may change from time to time.

"Dilution" means, as of any date of determination for a period determined by the Lender (which period shall in any event be at least one month), a percentage which is the result of dividing (a) actual bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to the Accounts as determined by Lender in its sole discretion during such period, by (b) the Borrower's net sales during such period (excluding extraordinary items) plus the amount of clause (a).

"Director" means a director if the Borrower is a corporation, a governor or manager if the Borrower is a limited liability company, or a general partner if the Borrower is a partnership.

"Eligible Accounts" means any Account approved in writing by the Lender, net of any credits. Without limiting the generality of the foregoing, Eligible Accounts shall not include any Accounts having any of the following characteristics:

        (a)      that portion of Accounts unpaid 90 days or more after the invoice date;

        (b)      that portion of Accounts related to goods or services with respect to which the Borrower has received notice of a claim or dispute, which are subject to a claim of offset or a contra account, or which reflect a reasonable reserve for warranty claims or returns;

        (c)      that portion of Accounts not yet earned by the final delivery of goods or rendition of services, as applicable, by the Borrower to the customer, including progress billings, and that portion of Accounts for which an invoice has not been sent to the applicable account debtor;

        (d)      Accounts constituting (i) proceeds of copyrightable material unless such copyrightable material shall have been registered with the United States Copyright

Office, or (ii) proceeds of patentable inventions unless such patentable inventions have been registered with the United States Patent and Trademark Office;

(e)    Accounts owed by any unit of government, whether foreign or domestic (provided, however, that there shall be included in Eligible Accounts that portion of Accounts owed by such units of government for which the Borrower has provided evidence satisfactory to the Lender that (i) the Lender has a first-priority perfected security interest and (ii) such Accounts may be enforced by the Lender directly against such unit of government under all applicable laws);

(f)    Accounts denominated in any currency other than United States dollars;

(g)    Accounts owed by an account debtor located outside the United States or Canada;

(h)    Accounts owed by an account debtor that is insolvent or the subject of bankruptcy proceedings or that has gone out of business;

(i)    Accounts owed by an Owner, Subsidiary, Affiliate, Officer or employee of the Borrower;

(j)    Accounts not subject to a duly perfected security interest in the Lender's favor or which are subject to any Lien in favor of any Person other than the Lender;

(k)    that portion of Accounts that has been restructured, extended, amended or modified;

(l)    that portion of Accounts that constitutes advertising, finance charges, service charges or sales or excise taxes;

(m)    Accounts owed by an account debtor, regardless of whether otherwise eligible, to the extent that the aggregate balance of such Accounts exceeds thirty-five percent (35%) of the aggregate amount of all Accounts;

(n)    Accounts owed by an account debtor, regardless of whether otherwise eligible, if twenty-five percent (25%) or more of the total amount of Accounts due from such debtor is ineligible under clauses (a), (b), or (k) above;

(o)    Accounts arising from the sale of Inventory that is on consignment from Prevost Car Inc. or any other Person or on consignment to any Person; or

(p)    Accounts, or portions thereof, otherwise deemed ineligible by the Lender in its reasonable discretion.

"Eligible Inventory" means all Inventory of the Borrower, valued at the lower of cost or market in accordance with GAAP; but excluding any Inventory having any of the following characteristics:

(a)    Inventory that is in-transit or located at any warehouse, job site or other premises, other than: (i) Inventory located at the Borrower's Junction City, Oregon Premises, but only to the extent that, for each such Premises, the Lender has either received a landlord's waiver with respect thereto in form and substance acceptable to the Lender or established a Borrowing Base Reserve in an amount determined by the Lender in its discretion; (ii) Inventory in the possession of local vendors or processors located in the continental United States, but only to the extent that, for each such vendor or processor, the Lender has established a Borrowing Base Reserve for such vendor or processor in an amount determined by the Lender in its discretion, or (A) the Lender has received a duly executed bailee's waiver and such creditor's acknowledgements as the Lender may require from secured creditors of such vendor or processor, in each case in form and substance acceptable to the Lender, and (B) the Lender has filed appropriate UCC notice filings with respect to such vendor or processor which are duly authorized by such vendor or processor, and (C) the Lender has determined in its discretion that the Borrower and the Lender have ready access to all Inventory stored with such vendor or processor; and (iii) Inventory consisting of finished motor coaches in transit to or located at a temporary trade show in the continental United States, but only to the extent that such Inventory remains fully insured and under the control of the Borrower;

(b)    Inventory that is not subject to a duly perfected, first-priority security interest in the Lender's favor;

(c)    Inventory that is subject to any Lien or other encumbrance other than a security interest in favor of the Lender;

(d)    Inventory that is covered by any negotiable or non-negotiable warehouse receipt, bill of lading or other document of title;

(e)    Inventory that is on consignment from Prevost Car Inc. or any other Person, on consignment to any Person or subject to any bailment (except as permitted under clause (a) above);

(f)    supplies, packaging, parts or sample Inventory, or customer-supplied parts or Inventory;

(g)    Inventory that is damaged, defective, obsolete, slow moving or not currently saleable in the normal course of the Borrower's operations, or the amount of such Inventory that has been reduced by shrinkage;

(h)    Inventory that the Borrower has returned, has attempted to return, is in the process of returning or intends to return to the vendor thereof;

(i)    Inventory that is perishable or live;

(j)    Inventory manufactured by the Borrower pursuant to a license, unless the applicable licensor has agreed in writing to permit the Lender to exercise its rights and remedies against such Inventory;

-8-

(k)    Inventory that consists of used coaches (other than used coaches which are included in the borrowing base under the Pre-Petition Credit Agreement as of the Agreement Date); or

(l)    Inventory otherwise deemed ineligible by the Lender in its reasonable discretion.

"Environmental Law" means any federal, state, local or other governmental statute, regulation, law or ordinance dealing with the protection of human health and the environment.

"Equipment" shall have the meaning given it under the UCC.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is a member of a group which includes the Borrower and which is treated as a single employer under Section 414 of the IRC.

"Estate" shall mean the estate created in the Chapter 11 Case pursuant to 11 U.S.C. § 541(a).

"Event of Default" is defined in <u>Section 7.1</u>.

"Final Borrowing Order" means a final order of the Bankruptcy Court pursuant to Section 364 of the Bankruptcy Code approving this Agreement and the other Loan Documents, confirming the Interim Borrowing Order and authorizing the incurrence by the Borrower of permanent Post-Petition secured and super priority indebtedness in accordance with this Agreement, and as to which no stay has been entered and which has not been reversed, modified, vacated or overturned, in substantially the form of **Exhibit D** hereto and which is in form and substance satisfactory to the Lender.

"Financing Order" means the Interim Borrowing Order or the Final Borrowing Order, and "Financing Orders" means the Interim Borrowing Order and the Final Borrowing Order.

"Full Payment" shall mean, with respect to the Indebtedness and all Pre-Petition Obligations, full, final and indefeasible payment of such Indebtedness and all Pre-Petition Obligations in immediately available funds and, in the case of any contingent obligations (including any outstanding letters of credit issued pursuant to the Pre-Petition Credit Agreement), the Lender's receipt of either cash or a direct pay letter of credit naming the Lender as beneficiary and in form and substance, and from an issuing bank, acceptable to the Lender, in each case in an amount not less than 105% of the aggregate amount of all such contingent obligations.

"GAAP" means generally accepted accounting principles, applied on a basis consistent with the accounting practices applied in the financial statements described in <u>Section 5.6</u>.

"General Intangibles" shall have the meaning given it under the UCC.

-9-

"Guarantor" means any Person who now or in the future agrees to guaranty all or any portion of the Indebtedness.

"Guaranty" means any guaranty executed by a Guarantor in favor of the Lender.

"Hazardous Substances" means pollutants, contaminants, hazardous substances, hazardous wastes, petroleum and fractions thereof, and all other chemicals, wastes, substances and materials listed in, regulated by or identified in any Environmental Law.

"Indebtedness" is used herein in its most comprehensive sense and means any and all Revolving Advances, the Obligation of Reimbursement and other advances, debts, obligations and liabilities of the Borrower to the Lender, in each case heretofore, now or hereafter made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including under any swap, derivative, foreign exchange, hedge, deposit, treasury management or other similar transaction or arrangement at any time entered into by the Borrower with the Lender, and whether the Borrower may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or hereafter becomes unenforceable.

"Indemnified Liabilities" is defined in Section 8.6.

"Indemnitees" is defined in Section 8.6.

"Infringement" or "Infringing" when used with respect to Intellectual Property Rights means any infringement or other violation of Intellectual Property Rights.

"Intellectual Property Rights" means all actual or prospective rights arising in connection with any intellectual property or other proprietary rights, including all rights arising in connection with copyrights, patents, service marks, trade dress, trade secrets, trademarks, trade names or mask works.

"Interest Payment Date" is defined in Section 2.7(a).

"Interim Borrowing Order" means an order entered by the Bankruptcy Court in substantially the form of **Exhibit E** hereto and otherwise in form and substance satisfactory to the Lender.

"Inventory" shall have the meaning given it under the UCC.

"Inventory Advance Rate" means (a) up to 23.9% with respect to raw materials, (b) up to 53.4% with respect to work in process, and (c) up to 50.6% with respect to finished goods.

"Investment Property" shall have the meaning given it under the UCC.

"IRC" means the Internal Revenue Code of 1986, as amended from time to time.

-10-

"L/C Amount" means the sum of (a) the Aggregate Face Amount, plus (b) the amount of each Obligation of Reimbursement that either remains unreimbursed or has not been paid through a Revolving Advance under the Credit Facility.

"L/C Application" means an application for the issuance of standby or documentary letters of credit pursuant to the terms of a Letter of Credit Agreement, such application to be in form acceptable to the Lender.

"Lender" means Wells Fargo Bank, National Association in its broadest and most comprehensive sense as a legal entity, and is not limited in its meaning to the Lender's Wells Fargo Business Credit operating division, or to any other operating division of the Lender.

"Letter of Credit" is defined in Section 2.3(a).

"Letter of Credit Agreement" means an agreement governing the issuance of documentary or standby letters of credit by the Lender entered into between the Borrower, as applicant, and the Lender, as issuer.

"Licensed Intellectual Property" is defined in Section 5.11(c).

"Lien" means any security interest, mortgage, deed of trust, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device, including the interest of each lessor under any capitalized lease and the interest of any bondsman under any payment or performance bond, in, of or on any assets or properties of a Person, whether now owned or subsequently acquired and whether arising by agreement or operation of law.

"Loan Documents" means this Agreement, the Revolving Note, each Guaranty, each L/C Application, each Letter of Credit Agreement, the Noteholders Intercreditor Agreement, each other Subordination Agreement, the Security Documents, each Borrowing Base Certificate, each Budget and the Financing Orders, together with every other agreement, note, document, certificate, contract or instrument to which the Borrower now or in the future may be a party and which is required by the Lender.

"Lockbox" has the meaning ascribed to such term in the Lockbox Agreement.

"Lockbox Agreement" means the Wholesale Lockbox and Collection Account Agreement by and between the Borrower and the Lender.

"Material Adverse Effect" means any of the following:

(a)    a material adverse effect on the Post-Petition business, operations, results of operations, prospects, assets, liabilities or financial condition of the Borrower;

(b)    a material adverse effect on the ability of the Borrower to perform its Post-Petition obligations under the Loan Documents;

(c)    a material adverse effect on the Post-Petition ability of the Lender to enforce the Indebtedness or to realize the intended benefits of the Loan Documents,

-11-

including a material adverse effect on the validity or enforceability of any Loan Document or of any rights against any Guarantor, or on the status, existence, perfection, priority (subject to Permitted Liens) or enforceability of any Lien securing payment or performance of the Indebtedness or the Pre-Petition Obligations; or

        (d)       any Post-Petition claim against the Borrower or threat of litigation which if determined adversely to the Borrower could reasonably be expected to result in the occurrence of an event described in clauses (a), (b) or (c) above.

"Maturity Date" means December 31, 2009.

"Maximum Line Amount" means $11,500,000.

"Multiemployer Plan" means a multiemployer plan (as defined in Section 4001(a)(3) of ERISA) to which the Borrower or any ERISA Affiliate contributes or is obligated to contribute.

"Net Cash Proceeds" means in connection with any asset sale, the cash proceeds (including any cash payments received by way of deferred payment whether pursuant to a note, installment receivable or otherwise, but only as and when actually received) from such asset sale, net of (a) attorneys' fees, accountants' fees, investment banking fees, brokerage commissions and amounts required to be applied to the repayment of any portion of the indebtedness (other than the Indebtedness) secured by a Lien not prohibited hereunder on the asset which is the subject of such sale, (b) taxes paid or reasonably estimated to be payable as a result of such asset sale, and (c) a reasonable reserve for indemnification payments attributable to the Borrower's representations, warranties and covenants to purchase with respect to such asset sale.

"Net Orderly Liquidation Value" means a professional opinion of the estimated most probable Net Cash Proceeds which could typically be realized at a properly advertised and professionally managed liquidation sale, conducted under orderly sale conditions for an extended period of time (usually six to nine months), under the economic trends existing at the time of the appraisal.

"Note Purchase Agreement" means that certain Note and Securities Purchase Agreement dated as of April 8, 2008 among the Borrower, Country Coach Holdings LLC, the Noteholders Agent and the Noteholders.

"Noteholders" means each "Purchaser" under and as defined in the Note Purchase Agreement.

"Noteholders Agent" means Riley Investment Management LLC, a Delaware limited liability company, in its capacity as agent for the Noteholders under the Noteholders Documents.

"Noteholders Documents" means the Note Purchase Agreement and all other loan agreements, notes, security agreements, deeds of trust, guaranties and other agreements, instruments and documents executed and/or delivered in connection with the Borrower's indebtedness to any Noteholder.

"Noteholders Intercreditor Agreement" means that certain Debt Subordination and Intercreditor Agreement among the Borrower, the Lender, the Noteholders Agent and the Noteholders dated on or about April 8, 2008 (as amended, modified, or supplemented from time to time).

"Obligation of Reimbursement" means the obligation of the Borrower to reimburse the Lender pursuant to the terms of one or more Letter of Credit Agreements and any applicable L/C Application.

"OFAC" is defined in <u>Section 6.10(c)</u>.

"Officer" means with respect to the Borrower, an officer if the Borrower is a corporation, a manager if the Borrower is a limited liability company, or a partner if the Borrower is a partnership.

"Overadvance" means the amount, if any, by which the aggregate outstanding principal balance of Revolving Advances plus the L/C Amount is in excess of the then-existing Borrowing Base.

"Owned Intellectual Property" is defined in <u>Section 5.11(a)</u>.

"Owner" means with respect to the Borrower, each Person having legal or beneficial title to an ownership interest in the Borrower or a right to acquire such an interest.

"Pass-Through Tax Liabilities" means the amount of (a) the current year's taxable income of the Borrower allocated to the Borrower's owners multiplied by (b) the highest marginal combined federal and state income tax rate (taking into account the deductibility of state income taxes in computing federal income taxes) applicable to a corporation doing business solely in the State of California.

"Patent and Trademark Security Agreement" means the Patent and Trademark Security Agreement dated on or about the Agreement Date executed by the Borrower in favor of the Lender.

"Pension Plan" means a pension plan (as defined in Section 3(2) of ERISA) maintained for employees of the Borrower or any ERISA Affiliate and covered by Title IV of ERISA.

"Permitted Lien" and "Permitted Liens" are defined in <u>Section 6.3(a)</u>.

"Permitted Overadvance Amount" means (a) from the Agreement Date through and including the four week anniversary of the Agreement Date, $1,100,000, (b) from and including the day immediately following the four week anniversary of the Agreement Date through and including the eight week anniversary of the Agreement Date, on a one-time basis commencing upon written notice to the Lender from the Borrower and continuing for five Business Days after such notice, $500,000, and (c) at all times after the eight week anniversary of the Agreement Date, $0.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date" has the meaning set forth in the Recitals of this Agreement.

"Plan" means an employee benefit plan (as defined in Section 3(3) of ERISA) maintained for employees of the Borrower or any ERISA Affiliate.

"Post-Petition" means after the Petition Date.

"Pre-Petition Credit Agreement" has the meaning set forth in the Recitals of this Agreement.

"Pre-Petition Lender" has the meaning set forth in the Recitals of this Agreement.

"Pre-Petition Loan Documents" means the Pre-Petition Credit Agreement and each of the "Loan Documents" as defined therein in the form existing on the Petition Date.

"Pre-Petition Obligations" has the meaning set forth in the Recitals of this Agreement.

"Pre-Petition Revolving Advances" means the "Revolving Advances" under and as defined in the Pre-Petition Credit Agreement.

"Premises" means all locations where the Borrower conducts its business or has any rights of possession, including the locations legally described in **Exhibit F** attached hereto.

"Prime Rate" means at any time the rate of interest most recently announced by the Lender at its principal office as its Prime Rate, with the understanding that the Prime Rate is one of the Lender's base rates, and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto, and is evidenced by the recording thereof in such internal publication or publications as the Lender may designate. Each change in the rate of interest shall become effective on the date each Prime Rate change is announced by the Lender.

"Real Property" means the real estate and all improvements thereon as described in **Exhibit G** hereto.

"Reorganization Plan" shall mean a plan of reorganization proposed by the Borrower or any other Person (including the Lender) in the Chapter 11 Case.

"Reportable Event" means a reportable event (as defined in Section 4043 of ERISA), other than an event for which the 30-day notice requirement under ERISA has been waived in regulations issued by the Pension Benefit Guaranty Corporation.

"Revolving Advance" is defined in Section 2.1.

-14-

"Revolving Note" means the Borrower's revolving promissory note, payable to the order of the Lender in substantially the form of **Exhibit H** hereto, as same may be renewed and amended from time to time, and all replacements thereof.

"Sale Order" means a final non-appealable order approved by the Bankruptcy Court approving the Borrower's execution and performance of an asset purchase agreement, pursuant to Section 363 of the Bankruptcy Code, providing for a sale of all or substantially all of the Borrower's assets.

"Security Documents" means this Agreement, the Lockbox Agreement, the Patent and Trademark Security Agreement, any mortgage or deed of trust, and any other document delivered to the Lender from time to time to secure the Indebtedness.

"Security Interest" is defined in <u>Section 3.1</u>.

"Special Account" means a specified cash collateral account maintained with the Lender or another financial institution acceptable to the Lender in connection with Letters of Credit, as contemplated by <u>Section 2.4</u>.

"Subordinated Creditor" means each Noteholder and any other Person now or in the future who agrees to subordinate indebtedness of the Borrower held by that Person to the payment of the Indebtedness and/or the Pre-Petition Obligations.

"Subordination Agreement" means the Noteholders Intercreditor Agreement or any other subordination agreement executed by a Subordinated Creditor in favor of the Lender, acknowledged by the Borrower and accepted in writing by the Lender.

"Subsidiary" means any Person of which more than fifty percent (50%) of the outstanding ownership interests having general voting power under ordinary circumstances to elect a majority of the board of directors or the equivalent of such Person, regardless of whether or not at the time ownership interests of any other class or classes shall have or might have voting power by reason of the happening of any contingency, is at the time directly or indirectly owned by the Borrower, by the Borrower and one or more other Subsidiaries, or by one or more other Subsidiaries.

"Termination Date" means the earliest of (a) the Maturity Date, (b) the date the Borrower terminates the Credit Facility, (c) the date the Lender demands payment of the Indebtedness following an Event of Default pursuant to <u>Section 7.2</u> (it being understood that the Lender has made demand for payment of the Pre-Petition Obligations and that such demand remains effective), (d) the effective date of any Acceptable Plan or the date of entry of a Confirmation Order with respect to any other Reorganization Plan, (e) the date of closing of any sale of all or substantially all of the Collateral, or (f) the date on which the Pre-Petition Lender or the Lender is granted relief from the automatic stay.

"UCC" means the Uniform Commercial Code as in effect in the State of Georgia, or in any other state whose laws are held to govern this Agreement or any portion of this Agreement.

"Unused Amount" is defined in <u>Section 2.6(b)</u>.

Section 1.2 <u>Other Definitional Terms; Rules of Interpretation</u>. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All accounting terms not otherwise defined herein have the meanings assigned to them in accordance with GAAP. All terms defined in the UCC and not otherwise defined herein have the meanings assigned to them in the UCC. References to Articles, Sections, subsections, Exhibits, Schedules and the like, are to Articles, Sections and subsections of, or Exhibits or Schedules attached to, this Agreement unless otherwise expressly provided. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". Unless the context in which used herein otherwise clearly requires, "or" has the inclusive meaning represented by the phrase "and/or". Defined terms include in the singular number the plural and in the plural number the singular. Reference to any agreement (including the Loan Documents), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof (and, if applicable, in accordance with the terms hereof and the other Loan Documents), except where otherwise explicitly provided, and reference to any promissory note includes any promissory note which is an extension or renewal thereof or a substitute or replacement therefor. Reference to any law, rule, regulation, order, decree, requirement, policy, guideline, directive or interpretation means as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect on the determination date, including rules and regulations promulgated thereunder. Any reference herein or in any other Loan Document to the "Budget", unless otherwise stated, shall be deemed to be a reference to the Budget, as of the date of determination, most recently submitted by the Borrower to the Lender and accepted in writing by the Lender, it being understood that the Lender shall have no obligation to accept any Budget which is not satisfactory to the Lender in its discretion.

## ARTICLE II

## <u>AMOUNT AND TERMS OF THE CREDIT FACILITY</u>

Section 2.1    <u>Revolving Advances</u>. The Lender agrees, subject to the terms and conditions of this Agreement and the Financing Orders, and subject to the limitations described in Section 6.2 with respect to the Budget, to make advances ("Revolving Advances") to the Borrower from time to time from the Closing Date until (but not including) the Termination Date in an amount not in excess of the Maximum Line Amount. The Lender shall have no obligation to make a Revolving Advance to the extent that the amount of the requested Revolving Advance exceeds Availability. The Borrower's obligation to pay the Revolving Advances shall be evidenced by the Revolving Note and shall be secured by the Collateral. In addition to the other repayment requirements set forth herein, the Revolving Advances, together with all accrued interest thereon and all other Indebtedness and the Pre-Petition Obligations, shall be due and payable in full on the Termination Date. The Indebtedness and Pre-Petition Obligations shall also be due and payable as and when provided in the Financing Orders. The provisions of the Financing Orders shall govern in the event of any conflict between this Agreement and the Financing Orders regarding application of any proceeds of Collateral as

between the Pre-Petition Obligations and the Indebtedness.  Within the limits set forth in this Section 2.1, the Borrower may borrow, prepay pursuant to Section 2.9, and reborrow.

Section 2.2    <u>Procedures for Requesting Advances</u>.  The Borrower shall comply with the following procedures in requesting Revolving Advances:

(a)    **Time for Requests**.  The Borrower shall request each Revolving Advance not later than the Cut-off Time on the Business Day on which the Advance is to be made.  Each request that conforms to the terms of this Agreement shall be effective upon receipt by the Lender, shall be in writing or by telephone or telecopy transmission, and shall be confirmed in writing by the Borrower if so requested by the Lender, by (i) an Officer of the Borrower; or (ii) a Person designated as the Borrower's agent by an Officer of the Borrower in a writing delivered to the Lender; or (iii) a Person whom the Lender reasonably believes to be an Officer of the Borrower or such a designated agent.  The Borrower shall repay all Advances even if the Lender does not receive such confirmation and even if the Person requesting an Advance was not in fact authorized to do so.  Any request for an Advance, whether written or telephonic, shall be deemed to be a representation by the Borrower that the conditions set forth in <u>Section 4.3</u> have been satisfied as of the time of the request.

(b)    **Disbursement**.  Upon fulfillment of the applicable conditions set forth in **Article IV**, the Lender shall disburse the proceeds of the requested Advance by crediting the same to the Borrower's demand deposit account maintained with the Lender unless the Lender and the Borrower shall agree in writing to another manner of disbursement.

Section 2.3    <u>Letters of Credit</u>.

(a)    The Lender agrees, subject to the terms and conditions of this Agreement, to issue, at any time after the Funding Date and prior to the Termination Date, one or more irrevocable standby or documentary letters of credit (each, a "Letter of Credit") for the Borrower's account.  The Lender will not issue any Letter of Credit if the face amount of the Letter of Credit to be issued would exceed the lesser of:

(i)    $900,000 less the L/C Amount, or

(ii)    Availability.

Each Letter of Credit, if any, shall be issued pursuant to a separate L/C Application made by the Borrower to the Lender, which must be completed in a manner satisfactory to the Lender.  The terms and conditions set forth in each such L/C Application shall supplement the terms and conditions of the applicable Letter of Credit Agreement.

(b)    No Letter of Credit shall be issued with an expiry date later than one (1) year from the date of issuance or the Maturity Date in effect as of the date of issuance, whichever is earlier.

(c)    Any request for issuance of a Letter of Credit shall be deemed to be a representation by the Borrower that the conditions set forth in <u>Section 4.3</u> have been satisfied as of the date of the request.

-17-

(d)      If a draft is submitted under a Letter of Credit when the Borrower is unable, because a Default Period exists or for any other reason, to obtain a Revolving Advance to pay the Obligation of Reimbursement, the Borrower shall pay to the Lender, on demand and in immediately available funds, the amount of the Obligation of Reimbursement together with interest, accrued from the date of the draft until payment in full, at the Default Rate. Notwithstanding the Borrower's inability to obtain a Revolving Advance for any reason, the Lender is irrevocably authorized, in its sole discretion, to make a Revolving Advance in an amount sufficient to discharge the Obligation of Reimbursement and all accrued but unpaid interest thereon.

(e)      On the Closing Date, all outstanding Letters of Credit under and as defined in the Pre-Petition Credit Agreement shall be deemed to constitute Letters of Credit hereunder.

Section 2.4   Special Account. If the Credit Facility is terminated for any reason while any Letter of Credit is outstanding, the Borrower shall thereupon pay the Lender in immediately available funds for deposit in the Special Account an amount equal to the L/C Amount plus any anticipated fees and costs. If the Borrower fails to promptly make any such payment in the amount required hereunder, then the Lender may make a Revolving Advance against the Credit Facility in an amount sufficient to fulfill this obligation and deposit the proceeds to the Special Account. The Special Account shall be an interest bearing account either maintained with the Lender or with a financial institution acceptable to the Lender. Any interest earned on amounts deposited in the Special Account shall be credited to the Special Account. The Lender may apply amounts on deposit in the Special Account at any time or from time to time to the Indebtedness or the Pre-Petition Obligations in the Lender's sole discretion. The Borrower may not withdraw any amounts on deposit in the Special Account as long as the Lender maintains a security interest therein. The Lender agrees to transfer any balance in the Special Account to the Borrower when the Lender is required to release its security interest in the Special Account under applicable law.

Section 2.5   Interest; Default Interest Rate; Application of Payments; Participations; Usury.

(a)      **Interest**.  Except as provided in Section 2.5(b) and Section 2.5(e), the principal amount of each Revolving Advance shall bear interest at rate per annum equal to the Prime Rate plus three and one quarter of one percent (3.25%).

(b)      **Default Interest Rate**.  At any time during any Default Period or following the Termination Date, in the Lender's sole discretion and without waiving any of its other rights or remedies, the principal of the Advances shall bear interest at the Default Rate or such lesser rate as the Lender may determine, effective as of the first day of the month in which any Default Period begins through the last day of such Default Period, or any shorter time period that the Lender may determine. The decision of the Lender to impose a rate that is less than the Default Rate or to not impose the Default Rate for the entire duration of the Default Period shall be made by the Lender in its sole discretion and shall not be a waiver of any of its other rights and remedies, including its right to retroactively impose the full Default Rate for the entirety of any such Default Period or following the Termination Date.

-18-

(c)     **Application of Payments**.  Payments shall be applied to the Indebtedness or the Pre-Petition Obligations on the Business Day of receipt by the Lender in the Lender's general account, but the amount of principal paid shall continue to accrue interest at the interest rate applicable under the terms of this Agreement from the calendar day the Lender receives the payment, and continuing through the end of the first Business Day following receipt of the payment.

(d)     **Participations**.  If any Person shall acquire a participation in the Advances or the Obligation of Reimbursement, the Borrower shall be obligated to the Lender to pay the full amount of all interest calculated under this <u>Section 2.5</u>, along with all other fees, charges and other amounts due under this Agreement, regardless if such Person elects to accept interest with respect to its participation at a lower rate than that calculated under this <u>Section 2.5</u>, or otherwise elects to accept less than its pro rata share of such fees, charges and other amounts due under this Agreement.

(e)     **Usury**.  In any event no rate change shall be put into effect which would result in a rate greater than the highest rate permitted by law.  Notwithstanding anything to the contrary contained in any Loan Document, all agreements which either now are or which shall become agreements between the Borrower and the Lender are hereby limited so that in no contingency or event whatsoever shall the total liability for payments in the nature of interest, additional interest and other charges exceed the applicable limits imposed by any applicable usury laws.  If any payments in the nature of interest, additional interest and other charges made under any Loan Document are held to be in excess of the limits imposed by any applicable usury laws, it is agreed that any such amount held to be in excess shall be considered payment of principal hereunder, and the indebtedness evidenced hereby shall be reduced by such amount so that the total liability for payments in the nature of interest, additional interest and other charges shall not exceed the applicable limits imposed by any applicable usury laws, in compliance with the desires of the Borrower and the Lender.  This provision shall never be superseded or waived and shall control every other provision of the Loan Documents and all agreements between the Borrower and the Lender, or their successors and assigns.

Section 2.6     <u>Fees</u>.

(a)     **Commitment Fee**.  The Borrower shall pay the Lender a commitment fee of $180,000 payable in monthly installments equal to $20,000 (each an "**Commitment Fee Payment**").  The initial Commitment Fee Payment shall be due and payable on the later of April 1, 2009 and the first day when Lender makes Revolving Advances to Borrower under this Agreement, and each subsequent Commitment Fee Payment shall be due and payable on the first (1st) day of each calendar month until the Termination Date.  To the extent that the Termination Date occurs prior to the payment in full of the Commitment Fee, the remaining unpaid Commitment Fee Payments shall not be collected.  Each Commitment Fee Payment shall be fully earned and non-refundable on the date that it becomes due and payable.

(b)     **Unused Line Fee**.  For the purposes of this <u>Section 2.6(b)</u>, "Unused Amount" means the Maximum Line Amount reduced by the aggregate outstanding amount of Revolving Advances.  The Borrower agrees to pay to the Lender an unused line fee at the rate of one quarter

-19-

of one percent (0.25%) per annum on the average daily Unused Amount from the Agreement Date to and including the Termination Date, due and payable monthly in arrears on the first day of the month and on the Termination Date.  The Lender hereby acknowledges and agrees that the unused line fee contemplated by Section 2.9(b) of the Pre-Petition Credit Agreement shall not be charged to the Borrower so long as the unused line fee contemplated by this <u>Section 2.6(b)</u> remains in effect.

(c)     **Collateral Exam Fees**.  The Borrower shall pay the Lender fees in connection with any collateral exams, audits or inspections conducted by or on behalf of the Lender (including through any third-party consultant engaged by the Lender) of any Collateral or the Borrower's operations or business at the rates established from time to time by the Lender as its collateral exam fees (which fees are currently $950 per day per collateral examiner), together with all actual out-of-pocket costs and expenses incurred in conducting any such collateral examination or inspection.

(d)     **Letter of Credit Fees**.  The Borrower shall pay to the Lender a fee with respect to each Letter of Credit that has been issued, if any, which fee shall be calculated on a per diem basis at an annual rate equal to two percent (2.0%) of the Aggregate Face Amount, from and including the date of issuance of the Letter of Credit until the date that the Letter of Credit terminates or is returned to the Lender, which fee shall be due and payable monthly in arrears on the first day of each month and on the date that the Letter of Credit terminates or is returned to the Lender; <u>provided</u>, <u>however</u>, effective as of the first day of the month in which any Default Period begins through the last day of such Default Period, or any shorter time period that the Lender may determine, in the Lender's sole discretion and without waiving any of its other rights and remedies, such fee shall increase to four percent (4.0%) of the Aggregate Face Amount.  The foregoing fee shall be in addition to any and all other fees, commissions and charges imposed by Lender with respect to or in connection with such Letter of Credit.  The Lender hereby acknowledges and agrees that the letter of credit fee contemplated by Section 2.9(d) of the Pre-Petition Credit Agreement shall not be charged to the Borrower so long as the letter of credit fee contemplated by this <u>Section 2.6(d)</u> remains in effect.

(e)     **Letter of Credit Administrative Fees**.   The Borrower shall pay all administrative fees charged by the Lender in connection with the honoring of drafts under any Letter of Credit, amendments thereto, transfers thereof and all other activity with respect to the Letters of Credit at the then – current rates published by the Lender for such services rendered on behalf of customers of the Lender generally.

(f)     **Other Fees and Charges**.  The Lender may from time to time impose additional fees and charges reasonably incurred as a result of Advances made in excess of Availability or for other events that constitute an Event of Default or a Default hereunder, including fees and charges for the administration of Collateral by the Lender, and fees and charges for the late delivery of reports, which may be assessed in the Lender's sole discretion on either an hourly, periodic, or flat fee basis, and in lieu of or in addition to imposing interest at the Default Rate.

Section 2.7    Time for Interest Payments; Payment on Non-Business Days; Computation of Interest and Fees.

(a)    **Time For Interest Payments**.  Accrued and unpaid interest accruing on the Advances shall be due and payable on the first day of each month and on the Termination Date (each an "Interest Payment Date"), or, if any such day is not a Business Day, on the next succeeding Business Day.  Interest will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the date of advance to the Interest Payment Date.

(b)    **Payment on Non-Business Days**.  Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest on the Advances or the fees hereunder, as the case may be.

(c)    **Computation of Interest and Fees**.  Interest accruing on the outstanding principal balance of the Advances and fees hereunder outstanding from time to time shall be computed on the basis of actual number of days elapsed in a year of 360 days.

Section 2.8    Lockbox and Collateral Account; Sweep of Funds.

(a)    **Lockbox and Collateral Account**.

(i)    The Borrower shall instruct all account debtors to pay all Accounts directly to the Lockbox.  If, notwithstanding such instructions, the Borrower receives any payments on Accounts, the Borrower shall deposit such payments into the Collateral Account.  The Borrower shall also deposit all other cash proceeds of Collateral regardless of source or nature directly into the Collateral Account.  Until so deposited, the Borrower shall hold all such payments and cash proceeds in trust for and as the property of the Lender and shall not commingle such property with any of its other funds or property.  All deposits in the Collateral Account shall constitute proceeds of Collateral and shall not constitute payment of the Indebtedness or the Pre-Petition Obligations.

(ii)    All items deposited in the Collateral Account shall be subject to final payment.  If any such item is returned uncollected, the Borrower will immediately pay the Lender, or, for items deposited in the Collateral Account, the bank maintaining such account, the amount of that item, or such bank at its discretion may charge any uncollected item to the Borrower's commercial account or other account.  The Borrower shall be liable as an endorser on all items deposited in the Collateral Account, whether or not in fact endorsed by the Borrower.

(b)    **Sweep of Funds**.  The Lender shall from time to time, in accordance with the Lockbox Agreement, cause funds in the Collateral Account to be transferred to the Lender's general account for payment of the Indebtedness and/or the Pre-Petition Obligations .  Amounts deposited in the Collateral Account shall not be subject to withdrawal by the Borrower, except after payment in full and discharge of all Indebtedness and all Pre-Petition Obligations.

Section 2.9    <u>Voluntary Prepayment; Termination of the Credit Facility by the Borrower</u>.  Except as otherwise provided herein, the Borrower may prepay the Advances in whole at any time or from time to time in part.  The Borrower may terminate the Credit Facility at any time if it gives the Lender at least 5 days advance written notice prior to the proposed Termination Date.  If the Borrower terminates the Credit Facility, all Indebtedness and Pre-Petition Obligations shall be immediately due and payable.

Section 2.10    <u>Mandatory Prepayment</u>.  Without notice or demand, unless the Lender shall otherwise consent in a written agreement that sets forth the terms and conditions which the Lender in its discretion may deem appropriate, including without limitation the payment of an Overadvance fee, if an Overadvance shall at any time exist with respect to the Credit Facility, then the Borrower shall (a) first, immediately prepay the Revolving Advances to the extent necessary to eliminate such excess; and (b) if prepayment in full of the Revolving Advances is insufficient to eliminate such excess (due, for example, to the L/C Amount), pay to the Lender immediately available funds for deposit in the Special Account an amount equal to the remaining excess.  Any voluntary or mandatory prepayment received by the Lender under this Agreement may be applied to the Indebtedness or the Pre-Petition Obligations, in such order and in such amounts as the Lender in its sole discretion may determine from time to time.

Section 2.11    <u>Revolving Advances to Pay Indebtedness; Protective Advances</u>.  Notwithstanding the terms of Section 2.1, the Lender may, in its discretion at any time or from time to time, without the Borrower's request and even if the conditions set forth in Section 4.3 would not be satisfied, make Revolving Advances (a) to pay any portion of the Indebtedness from time to time due and payable, and (b) to preserve or protect the Collateral, or any portion thereof, and/or to enhance the likelihood of, or maximize the amount of, repayment of the Advances and other Indebtedness.

Section 2.12    <u>Use of Proceeds</u>.  The Borrower shall use the proceeds of Advances and each Letter of Credit for the purpose of funding Post-Petition operations in accordance with the Budget.  No proceeds of any Advance may be utilized by the Borrower to finance in any way any professional fees, disbursements, costs or expenses incurred in connection with asserting, investigating, or preparing for any claims or causes of action against the Pre-Petition Lender under the Pre-Petition Credit Agreement or its counsel or advisors (including advisors to their counsel) and/or investigating, challenging or raising any defenses to the Pre-Petition Obligations or any Liens under or in connection with the Pre-Petition Credit Agreement.

Section 2.13    <u>Liability Records</u>.  The Lender may maintain from time to time, at its discretion, records as to the Indebtedness and the Pre-Petition Obligations.  All entries made on any such record shall be presumed correct until the Borrower establishes the contrary.  Upon the Lender's demand, the Borrower will admit and certify in writing the exact principal balance of the Indebtedness and the Pre-Petition Obligations that the Borrower then asserts to be outstanding.  Any billing statement or accounting rendered by the Lender shall be conclusive and fully binding on the Borrower unless the Borrower gives the Lender specific written notice of exception within 30 days after receipt.

-22-

Section 2.14    Single Loan.    All Advances to the Borrower and all of the other Indebtedness of the Borrower arising under this Agreement and the other Loan Documents shall constitute one general obligation of the Borrower secured by all of the Collateral.

Section 2.15    Grants, Rights and Remedies.    The Liens, security interests and the administrative priority granted pursuant to **Article III** may be independently granted by the Loan Documents and by other Loan Documents hereafter entered into.    This Agreement, the Interim Borrowing Order, the Final Borrowing Order and such other Loan Documents supplement each other, and the grants, priorities, rights and remedies of the Lender hereunder and thereunder are cumulative.

Section 2.16    [Intentionally omitted]

Section 2.17    Waiver of any Priming Rights and Violative Use of Cash Collateral. Upon the Closing Date, and on behalf of itself and the Estate, and for so long as any Pre-Petition Obligation or any Indebtedness shall be outstanding, the Borrower hereby irrevocably waives any right pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise to grant any Lien of equal or greater priority than the Lien securing the Pre-Petition Obligations and the Indebtedness, or to approve a claim of equal or greater priority than the Pre-Petition Obligations or the Indebtedness, or to seek use of the Pre-Petition Lender's cash collateral except as expressly set forth in this Agreement or otherwise agreed to in writing by the Pre-Petition Lender.    Notwithstanding the foregoing, the Borrower may seek financing for the sole purpose of satisfying all of the Pre-Petition Obligations and the Indebtedness in full in cash.

Section 2.18    Waiver of Claims to Surcharge.    In accordance with the Financing Orders, the Borrower, its Subsidiaries and Affiliates and the Estate hereby waive, and shall cause each of their respective Subsidiaries to waive, any claims to surcharge the Collateral under Section 506(c) of the Bankruptcy Code.

# ARTICLE III

## SECURITY INTEREST; OCCUPANCY; SETOFF

Section 3.1 Grant of Security Interest. The Borrower hereby pledges, assigns and grants to the Lender a lien and security interest (collectively referred to as the "Security Interest") in the Collateral, as security for the payment and performance of: (a) all present and future Indebtedness of the Borrower to the Lender, including, to the extent approved by the Bankruptcy Court, the Pre-Petition Obligations; (b) all obligations of the Borrower and rights of the Lender under this Agreement and the other Loan Documents; and (c) all present and future obligations of the Borrower to the Lender of other kinds.    Upon request by the Lender, the Borrower will grant to the Lender a security interest in all commercial tort claims that the Borrower may have against any Person.

Section 3.2    Lien Perfection; Further Assurances.    The Liens granted to the Lender pursuant to the provisions of this Agreement and the other Loan Documents shall be in addition to all Liens conferred upon the Lender pursuant to the terms of the Financing Orders.    The Interim Borrowing Order, and, if and when it becomes effective, the Final Borrowing Order,

shall be sufficient and conclusive evidence of the validity, perfection and priorities of the Lender's Liens upon the Collateral, without the necessity of filing or recording any financing statement, assignment, mortgage, deed of trust, preferred mortgages (formerly known as preferred ship mortgages) or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Liens of the Lender in and to the Collateral or to entitle the Lender to the priorities granted herein; provided, however, that the Borrower shall, promptly following the request of the Lender, execute such instruments, assignments, mortgages, deeds of trust, ship mortgages, or documents as are necessary to perfect Lender's liens upon any of the Collateral and shall take such other action as may be required to perfect or to continue the perfection of the Lender's Liens upon the Collateral.  The Borrower hereby irrevocably authorizes the Lender at any time and from time to time to file in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as "all assets" of the Borrower or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of the State of Georgia or such jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) contain any other information required by part 5 of Article 9 of the UCC of the State of the Borrower's location for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether the Borrower is an organization, the type of organization and any organization identification number issued to the Borrower, and, (ii) in the case of a financing statement filed as a fixture filing or indicating Collateral as as-extracted collateral or timber to be cut, a sufficient description of real property to which the Collateral relates.  The Borrower agrees to furnish any such information to the Lender promptly upon request.  The Borrower also ratifies its authorization for the Lender to have filed in any UCC jurisdiction any like initial financing statements or amendments thereto if filed prior to the date hereof.  No such filing or recordation shall be necessary or required in order to create or perfect any such Lien.  The parties agree that a carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in any appropriate office in lieu thereof.  At the Lender's request, the Borrower shall also promptly execute or cause to be executed and shall deliver to Lender any and all documents, instruments and agreements deemed necessary by Lender to give effect to or carry out the terms or intent of the Loan Documents.

Section 3.3    Superpriority Administrative Expense Claim.  The Indebtedness shall constitute, in accordance with Section 364(c)(1) of the Bankruptcy Code, a superpriority administrative claim having priority over any and all administrative expenses of and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.  The Lender shall have a superpriority administrative expense claim against the Estate pursuant to Section 364(c)(1) of the Bankruptcy Code for the Indebtedness and all related costs and expenses, which shall be prior, senior and superior to any other claim, including any other superpriority administrative expense claim of any kind or nature, except as provided herein and/or in the Financing Orders.  The Indebtedness is a claim to be afforded priority over administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code, as provided herein and/or in the Financing Orders and secured by liens pursuant to Section 364 of the Bankruptcy Code as provided herein.

-24-

Section 3.4    <u>Notification of Account Debtors and Other Obligors</u>.  The Lender may at any time (whether or not a Default Period then exists) notify any account debtor or other Person obligated to pay any Account or any other amount owing to the Borrower that such right to payment has been assigned or transferred to the Lender for security and shall be paid directly to the Lender.  The Borrower will join in giving such notice if the Lender so requests.  At any time after the Borrower or the Lender gives such notice to an account debtor or other obligor, the Lender may, but need not, in the Lender's name or in the Borrower's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such right to payment, or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligations (including collateral obligations) of any such account debtor or other obligor.  The Lender may, in the Lender's name or in the Borrower's name, as the Borrower's agent and attorney-in-fact, notify the United States Postal Service to change the address for delivery of the Borrower's mail to any address designated by the Lender, otherwise intercept the Borrower's mail, and receive, open and dispose of the Borrower's mail, applying all Collateral as permitted under this Agreement and holding all other mail for the Borrower's account or forwarding such mail to the Borrower's last known address.

Section 3.5    <u>Assignment of Insurance</u>.  As additional security for the payment and performance of the Indebtedness and the Pre-Petition Obligations, the Borrower hereby assigns to the Lender any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Borrower with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto, and the Borrower hereby directs the issuer of any such policy to pay all such monies directly to the Lender.  At any time, whether or not a Default Period then exists, the Lender may (but need not), in the Lender's name or in the Borrower's name, execute and deliver proof of claim, receive all such monies, endorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy.  Any monies received as payment for any loss under any insurance policy mentioned above (other than liability insurance policies) or as payment of any award or compensation for condemnation or taking by eminent domain, shall be paid over to the Lender to be applied, at the option of the Lender, to the prepayment of the Indebtedness or the Pre-Petition Obligations in such order as the Lender may elect or shall be disbursed to the Borrower under staged payment terms reasonably satisfactory to the Lender for application to the cost of repairs, replacements, or restorations.  Any such repairs, replacements, or restorations shall be effected with reasonable promptness and shall be of a value at least equal to the value of the items or property destroyed prior to such damage or destruction.

Section 3.6    <u>Occupancy</u>.    (a)    The Borrower hereby irrevocably grants to the Lender the right to take exclusive possession of the Premises at any time during a Default Period without notice or consent.

(b)    The Lender may use the Premises only to hold, process, manufacture, sell, use, store, liquidate, realize upon or otherwise dispose of goods that are Collateral and for other purposes that the Lender may in good faith deem to be related or incidental purposes.

(c)     The Lender's right to hold the Premises shall cease and terminate upon the earlier of (i) payment in full and discharge of all Indebtedness and the Pre-Petition Obligations and termination of the Credit Facility, and (ii) final sale or disposition of all goods constituting Collateral and delivery of all such goods to purchasers.

(d)     The Lender shall not be obligated to pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises; provided, however, that if the Lender does pay or account for any rent or other compensation for the possession, occupancy or use of any of the Premises, the Borrower shall reimburse the Lender promptly for the full amount thereof.  In addition, the Borrower will pay, or reimburse the Lender for, all taxes, fees, duties, imposts, charges and expenses at any time incurred by or imposed upon the Lender by reason of the execution, delivery, existence, recordation, performance or enforcement of this Agreement or any other Loan Document or the provisions of this Section 3.6.

Section 3.7     License.  Without limiting the generality of any other Security Document, the Borrower hereby grants to the Lender a non-exclusive, worldwide and royalty-free license to use or otherwise exploit all Intellectual Property Rights of the Borrower for the purpose of:  (a) completing the manufacture of any in-process materials during any Default Period so that such materials become saleable Inventory, all in accordance with the same quality standards previously adopted by the Borrower for its own manufacturing and subject to the Borrower's reasonable exercise of quality control; and (b) selling, leasing or otherwise disposing of any or all Collateral during any Default Period.

Section 3.8     Financing Statement.  The Borrower authorizes the Lender to file from time to time, such financing statements against collateral described as "all personal property" or "all assets" or describing specific items of collateral including commercial tort claims as the Lender deems necessary or useful to perfect the Security Interest.  All financing statements filed before the date hereof to perfect the Security Interest were authorized by the Borrower and are hereby re-authorized.  A carbon, photographic or other reproduction of this Agreement or of any financing statements signed by the Borrower is sufficient as a financing statement and may be filed as a financing statement in any state to perfect the security interests granted hereby.  For this purpose, the Borrower represents and warrants that the following information regarding the Borrower is true and correct:

>           Name:  Country Coach LLC
>           Address:  135 East First Avenue, Junction City, Oregon  97448
>           State of Organization:  Delaware
>           Organizational Identification Number:  4301560
>           Federal Employer Identification Number:  20-8447794
>           Type of Organization:  Limited Liability Company

Section 3.9     Further Assurances.  The Borrower shall (a) promptly notify the Lender in writing upon the Borrower's obtaining any Collateral consisting of deposit accounts, Investment Property, letter-of-credit rights or electronic chattel paper and, upon the Lender's request, shall promptly execute such agreements and do such other acts or things deemed appropriate by the Lender to confer upon the Lender control with respect to such Collateral, (b) promptly notify the Lender in writing upon the Borrower's obtaining any Collateral consisting of documents or

-26-

instruments and, upon the Lender's request, shall promptly execute such agreements and do such other acts or things deemed appropriate by the Lender to deliver to it possession of such documents as are negotiable and instruments, and, with respect to non-negotiable documents, to have such non-negotiable documents issued in the name of the Lender, and (c) with respect to Collateral in the possession of a third party, other than certificated securities and Inventory covered by a document, use its commercially reasonable efforts to obtain an acknowledgment from the third party that is in possession of such Collateral that such third party holds such Collateral for the benefit of the Lender.

Section 3.10    <u>Setoff</u>.  The Lender may at any time or from time to time, at its sole discretion and without demand and without notice to anyone, setoff any liability owed to the Borrower by the Lender, whether or not due, against any Indebtedness, whether or not due.  In addition, each other Person holding a participating interest in any Indebtedness shall have the right to appropriate or setoff any deposit or other liability then owed by such Person to the Borrower, whether or not due, and apply the same to the payment of said participating interest, as fully as if such Person had lent directly to the Borrower the amount of such participating interest.

Section 3.11    <u>Collateral</u>.  This Agreement does not contemplate a sale of accounts, contract rights or chattel paper, and, as provided by law, the Borrower is entitled to any surplus and shall remain liable for any deficiency.  The Lender's duty of care with respect to Collateral in its possession (as imposed by law) shall be deemed fulfilled if it exercises reasonable care in physically keeping such Collateral, or in the case of Collateral in the custody or possession of a bailee or other third Person, exercises reasonable care in the selection of the bailee or other third Person, and the Lender need not otherwise preserve, protect, insure or care for any Collateral.  The Lender shall not be obligated to preserve any rights the Borrower may have against prior parties, to realize on the Collateral at all or in any particular manner or order or to apply any cash proceeds of the Collateral in any particular order of application.  The Lender has no obligation to clean-up or otherwise prepare the Collateral for sale.  The Borrower waives any right it may have to require the Lender to pursue any third Person for any of the Indebtedness or any Pre-Petition Obligations.

Section 3.12    <u>Survival</u>.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Lender pursuant to this Agreement, the Financing Orders and the other Loan Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of indebtedness by the Borrower (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever.  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission:

(a)    no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the Lender against the Borrower in respect of any Obligation;

-27-

(b)    The Liens in favor of the Lender set forth in <u>Section 3.1</u> hereof shall constitute valid and perfected first-priority Liens, subject only to junior Permitted Liens and a senior Lien in favor of the Noteholders in the Real Property, and shall be prior to all other Liens and security interests, now existing or hereafter arising, in favor of any other creditor or any other Person whatsoever (other than a senior Lien in favor of the Noteholders in the Real Property); and

(c)    the Liens in favor of the Lender set forth herein and in the other Loan Documents shall continue to be valid and perfected without the necessity that the Lender file or record financing statements, mortgages or otherwise perfect its Lien under applicable non-bankruptcy law.

## ARTICLE IV

## <u>CONDITIONS OF LENDING</u>

Section 4.1    <u>Conditions Precedent to the Initial Advances and Letters of Credit</u>.  The Lender's obligation to make the initial Advances or to cause any Letter of Credit to be issued or renewed shall be subject to the condition precedent that the Lender shall have received all of the following, each properly executed by the appropriate party and in form and substance satisfactory to the Lender:

(a)    This Agreement.

(b)    The Revolving Note.

(c)    An amendment to the Noteholders Intercreditor Agreement.

(d)    A certificate of the Borrower's Secretary or Assistant Secretary certifying that attached to such certificate are (i) the resolutions of the Borrower's Directors and, if required, Owners, authorizing the execution, delivery and performance of the Loan Documents, (ii) true, correct and complete copies of the Borrower's Constituent Documents, and (iii) examples of the signatures of the Borrower's Officers or agents authorized to execute and deliver the Loan Documents and other instruments, agreements and certificates, including Advance requests, on the Borrower's behalf.

(e)    A current certificate issued by the Secretary of State of Delaware, certifying that the Borrower is in compliance with all applicable organizational requirements of the State of Delaware.

(f)    Evidence that the Borrower is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it Post-Petition makes such licensing or qualification necessary.

(g)    A certificate of an Officer of the Borrower confirming the representations and warranties set forth in **Article V**.

-28-

(h)    Certificates of the insurance required hereunder, with all hazard insurance containing a lender's loss payable endorsement in the Lender's favor and with all liability insurance naming the Lender as an additional insured.

(i)    The initial Budget in the form of the Budget attached hereto as **Exhibit B**, with such modifications (if any) as are agreed to in writing by the Borrower and the Lender.

(j)    An agreement with the Borrower's landlord for its facility located at or around 135 E. 1st Avenue, Junction City, Oregon regarding the maturity date of the Borrower's lease, arrangements for the repair of the facility and such other matters as the Lender may require.

(k)    Such other documents as the Lender in its sole discretion may require.

(l)    The Interim Borrowing Order shall have been entered by the Bankruptcy Court, and such order shall be in full force and effect and shall not have been reversed, modified, amended, subject to a pending appeal, stayed or vacated (other than by the Final Borrowing Order) absent the prior written consent of the Lender.

Section 4.2    <u>Additional Conditions Precedent to the Advances</u>.  In addition to the items described in <u>Section 4.1</u>, the Lender's obligation to make Advances or to cause any Letter of Credit to be issued or renewed from time to time shall be subject to the satisfaction of the following conditions precedent in a manner and pursuant to documentation acceptable to the Lender:

(a)    The Bankruptcy Court shall have entered a cash management order and such other orders as the Lender may require, each of which shall be in form and substance acceptable to the Lender in its discretion.

(b)    The Borrower shall cooperate with the Lender in order to cause the Bankruptcy Court to permit the $795,000 that is held in escrow to be paid to the Lender for application to the Pre-Petition Obligations.

(c)    There shall not be pending any motion which, if granted by the Bankruptcy Court, would result in an Event of Default.

(d)    The Borrower shall within two Business Days of entry of the Interim Borrowing Order transfer all funds in its deposit accounts to the Borrower's operating account maintained at Wells Fargo Bank, National Association, other than the $795,000 that is held in escrow by Muhlheim Boyd, LLP.

(e)    The Borrower shall have delivered to the Lender within ten Business Days of entry of the Interim Borrowing Order an accounting for all cash received by the Borrower since the Petition Date which was spent by the Borrower.

(f)    The Borrower shall have acknowledged its liability for the full amount of the Pre-Petition Obligations and shall have executed a release in favor of the Lender with respect to any and all claims and defenses that may be asserted by the Borrower as of the entry of the Interim Borrowing Order.

Section 4.3    Conditions Precedent to All Advances and Letters of Credit.  The Lender's obligation to make each Advance or to cause the issuance or renewal of a Letter of Credit shall be subject to the further conditions precedent that:

(a)    the representations and warranties contained in **Article V** are correct on and as of the date of such Advance or issuance or renewal of a Letter of Credit as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date;

(b)    no event has occurred and is continuing, or would result from such Advance or issuance or renewal of a Letter of Credit which constitutes a Default or an Event of Default;

(c)    the making of such Advance shall not contravene any law, rule or regulation applicable to the Lender;

(d)    the Lender shall have received such other agreements, instruments, approvals, and other documents, each in form and substance satisfactory to the Lender, as the Lender may reasonably request; and

(e)    with respect to Advances to be made subsequent to the earlier of (i) April 30, 2009, and (ii) the conclusion of the final hearing on the Borrower's motion for approval of the financing contemplated by this Agreement, the Final Borrowing Order shall have been entered by the Bankruptcy Court in a form acceptable to the Lender in its sole discretion and such order shall be in full force and effect and shall not have been reversed, stayed, modified or amended absent prior written consent of the Lender.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Lender as follows:

Section 5.1    Existence and Power; Name; Chief Executive Office; Inventory and Equipment Locations; Federal Employer Identification Number and Organizational Identification Number.  The Borrower is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware and is duly licensed or qualified to transact business in all jurisdictions where the character of the property owned or leased or the nature of the business transacted by it makes such licensing or qualification necessary.  The Borrower has all requisite power and authority to conduct its business, to own its properties and to execute and deliver, and to perform all of its obligations under, the Loan Documents.  During its existence, the Borrower has done business solely under the names set forth in **Schedule 5.1**.  The Borrower's chief executive office and principal place of business is located at the address set forth in **Schedule 5.1**, and all of the Borrower's records relating to its business or the Collateral are kept at that location.  All Inventory and Equipment is located at that location or at one of the other locations listed in **Schedule 5.1**.  The Borrower's federal employer identification number and organization identification number are correctly set forth in Section 3.8.

-30-

Section 5.2    Capitalization.  **Schedule 5.2** constitutes a correct and complete list of all ownership interests of the Borrower and rights to acquire ownership interests, including the record holder, number of interests and percentage interests on a fully diluted basis, and an organizational chart showing the ownership structure of each Owner of the Borrower that is not a natural Person.

Section 5.3    Authorization of Borrowing; No Conflict as to Law or Agreements.  The execution, delivery and performance by the Borrower of the Loan Documents and the borrowings from time to time hereunder have been duly authorized by all necessary limited liability company action and do not and will not (a) require any consent or approval of the Borrower's Owners; (b) require any authorization, consent or approval by, or registration, declaration or filing with, or notice to, any governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, or any third party, except such authorization, consent, approval, registration, declaration, filing or notice as has been obtained, accomplished or given prior to the date hereof; (c) violate any provision of any law, rule or regulation (including Regulation X of the Board of Governors of the Federal Reserve System) or of any order, writ, injunction or decree presently in effect having applicability to the Borrower or of the Borrower's Constituent Documents; (d) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Borrower is a party or by which it or its properties may be bound or affected; or (e) result in, or require, the creation or imposition of any Lien (other than the Security Interest) upon or with respect to any of the properties now owned or hereafter acquired by the Borrower.

Section 5.4    Legal Agreements.  This Agreement constitutes and, upon due execution by the Borrower, the other Loan Documents will constitute the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with their respective terms.

Section 5.5    Subsidiaries.  Except as set forth in **Schedule 5.5** hereto, the Borrower has no Subsidiaries.

Section 5.6    Financial Condition; No Adverse Change.

(a)    The Borrower has furnished to the Lender its audited financial statements for its fiscal year ended December 31, 2007 and unaudited financial statements for the fiscal-year-to-date period ended November 30, 2008, and those statements fairly present the Borrower's financial condition on the dates thereof and the results of its operations and cash flows for the periods then ended and were prepared in accordance with GAAP.

(b)    The Borrower has furnished the Budget to the Lender.  The Budget is reasonable and was prepared on a reasonable basis and in good faith by the Borrower and is based on reasonable assumptions based on the best information reasonably available to the Borrower, and the Borrower is not aware of any facts or information that would lead it to believe that the Budget is incorrect or misleading in any material respect.

Section 5.7    Litigation.  There are no actions, suits or proceedings pending or, to the Borrower's knowledge, threatened against or affecting the Borrower or any of its Affiliates or

the properties of the Borrower or any of its Affiliates before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, (i) arising since the Petition Date which, (ii) if determined adversely to the Borrower would result in a final judgment or judgments against the Borrower which could have a Material Adverse Effect, apart from those matters specifically listed in **Schedule 5.7**.

Section 5.8    Regulation U.  The Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System), and no part of the proceeds of any Advance will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

Section 5.9    Taxes.  The Borrower and its Affiliates have paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by each of them.  The Borrower and its Affiliates have filed all federal, state and local tax returns which to the knowledge of the Officers of the Borrower or any Affiliate, as the case may be, are required to be filed, and the Borrower and its Affiliates have paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by any of them to the extent such taxes have become due.

Section 5.10    Titles and Liens.    The Borrower has good and absolute title to all Collateral free and clear of all Liens other than Permitted Liens.  No financing statement naming the Borrower as debtor is on file in any office except to perfect only Permitted Liens.

Section 5.11    Intellectual Property Rights.

(a)    **Owned Intellectual Property**.  **Schedule 5.11** is a complete list of all patents, applications for patents, trademarks, applications to register trademarks, service marks, applications to register service marks, mask works, trade dress and copyrights for which the Borrower is the owner of record (the "Owned Intellectual Property").  Except as disclosed on **Schedule 5.11**, (i) the Borrower owns the Owned Intellectual Property free and clear of all restrictions (including covenants not to sue a third party), court orders, injunctions, decrees, writs or Liens, whether by written agreement or otherwise, (ii) no Person other than the Borrower owns or has been granted any right in the Owned Intellectual Property, (iii) all Owned Intellectual Property is valid, subsisting and enforceable and (iv) the Borrower has taken all commercially reasonable action necessary to maintain and protect the Owned Intellectual Property.

(b)    **Agreements with Employees and Contractors**.  The Borrower has entered into a legally enforceable agreement with each of its employees and subcontractors obligating each such Person to assign to the Borrower, without any additional compensation, any Intellectual Property Rights created, discovered or invented by such Person in the course of such Person's employment or engagement with the Borrower (except to the extent prohibited by law), and further requiring such Person to cooperate with the Borrower, without any additional compensation, in connection with securing and enforcing any Intellectual Property Rights therein; provided, however, that the foregoing shall not apply with respect to employees and

-32-

subcontractors whose job descriptions are of the type such that no such assignments are reasonably foreseeable.

(c)    **Intellectual Property Rights Licensed from Others**.  **Schedule 5.11** is a complete list of all agreements under which the Borrower has licensed Intellectual Property Rights from another Person ("Licensed Intellectual Property") other than readily available, non-negotiated licenses of computer software and other intellectual property used solely for performing accounting, word processing and similar administrative tasks ("Off-the-shelf Software") and a summary of any ongoing payments the Borrower is obligated to make with respect thereto.  Except as disclosed on **Schedule 5.11**, the Borrower's licenses to use the Licensed Intellectual Property are free and clear of all restrictions, Liens, court orders, injunctions, decrees, or writs, whether by written agreement or otherwise.  Except as disclosed on **Schedule 5.11**, the Borrower is not obligated or under any liability whatsoever to make any payments of a material nature by way of royalties, fees or otherwise to any owner of, licensor of, or other claimant to, any Intellectual Property Rights.

(d)    **Other Intellectual Property Needed for Business**.  Except for Off-the-shelf Software and as disclosed on **Schedule 5.11**, the Owned Intellectual Property and the Licensed Intellectual Property constitute all Intellectual Property Rights used or necessary to conduct the Borrower's business as it is presently conducted or as the Borrower reasonably foresees conducting it.

(e)    **Infringement**.  Except as disclosed on **Schedule 5.11**, the Borrower has no knowledge of, and has not received any written claim or notice alleging, any Infringement of another Person's Intellectual Property Rights (including any written claim that the Borrower must license or refrain from using the Intellectual Property Rights of any third party) nor, to the Borrower's knowledge, is there any threatened claim or any reasonable basis for any such claim.

Section 5.12    Plans.  Except as disclosed to the Lender in writing prior to the date hereof, neither the Borrower nor any ERISA Affiliate (a) maintains or has maintained any Pension Plan, (b) contributes or has contributed to any Multiemployer Plan or (c) provides or has provided post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required under Section 601 of ERISA, Section 4980B of the IRC or applicable state law).  Neither the Borrower nor any ERISA Affiliate has received any notice or has any knowledge to the effect that it is not in full compliance with any of the requirements of ERISA, the IRC or applicable state law with respect to any Plan.  No Reportable Event exists in connection with any Pension Plan.  Each Plan which is intended to qualify under the IRC is so qualified, and no fact or circumstance exists which may have an adverse effect on the Plan's tax-qualified status.  Neither the Borrower nor any ERISA Affiliate has (i) any accumulated funding deficiency (as defined in Section 302 of ERISA and Section 412 of the IRC) under any Plan, whether or not waived, (ii) any liability under Section 4201 or 4243 of ERISA for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan or (iii) any liability or knowledge of any facts or circumstances which could result in any liability to the Pension Benefit Guaranty Corporation, the Internal Revenue Service, the Department of Labor or any participant in connection with any Plan (other than routine claims for benefits under the Plan).

-33-

Section 5.13   <u>Default</u>.   The Borrower is in compliance with all provisions of all agreements, instruments, decrees and orders to which it is a party or by which it or its property is bound or affected, the breach or default of which could have a Material Adverse Effect.

Section 5.14   <u>Environmental Matters</u>.

(a)      Except as disclosed on **Schedule 5.14**, there are not present in, on or under the Premises any Hazardous Substances in such form or quantity as to create any material liability or obligation for either the Borrower or the Lender under the common law of any jurisdiction or under any Environmental Law, and no Hazardous Substances have ever been stored, buried, spilled, leaked, discharged, emitted or released in, on or under the Premises in such a way as to create any such material liability.

(b)      Except as disclosed on **Schedule 5.14**, the Borrower has not disposed of Hazardous Substances in such a manner as to create any material liability under any Environmental Law.

(c)      Except as disclosed on **Schedule 5.14**, there have not existed in the past, nor are there any threatened or impending requests, claims, notices, investigations, demands, administrative proceedings, hearings or litigation relating in any way to the Premises or the Borrower, alleging material liability under, violation of, or noncompliance with any Environmental Law or any license, permit or other authorization issued pursuant thereto.

(d)      Except as disclosed on **Schedule 5.14**, the Borrower's businesses are and have in the past always been conducted in accordance with all Environmental Laws and all licenses, permits and other authorizations required pursuant to any Environmental Law and necessary for the lawful and efficient operation of such businesses are in the Borrower's possession and are in full force and effect, nor has the Borrower been denied insurance on grounds related to potential environmental liability.  No permit required under any Environmental Law is scheduled to expire within 12 months and there is no threat that any such permit will be withdrawn, terminated, limited or materially changed.

(e)      Except as disclosed on **Schedule 5.14**, the Premises are not and never have been listed on the National Priorities List, the Comprehensive Environmental Response, Compensation and Liability Information System or any similar federal, state or local list, schedule, log, inventory or database.

(f)      The Borrower has delivered to the Lender all environmental assessments, audits, reports, permits, licenses and other documents describing or relating in any way to the Premises or the Borrower's businesses.

Section 5.15   <u>Submissions to Lender</u>.  All financial and other information provided to the Lender by or on behalf of the Borrower in connection with the Borrower's request for the credit facilities contemplated hereby (i) is true and correct in all material respects, (ii) does not omit any material fact necessary to make such information not misleading and, (iii) as to projections, valuations or proforma financial statements, present a good faith opinion as to such projections, valuations and proforma condition and results.

Section 5.16  Financing Statements.  The Borrower has authorized the filing of financing statements sufficient when filed to perfect the Security Interest and the other security interests created by the Security Documents.  When the Interim Borrowing Order is entered, the Lender will have a valid, perfected, first-priority security interest in all Collateral, regardless of whether or not any financing statement is filed (subject only to a senior Lien on the Real Property in favor of the Noteholders ).  None of the Collateral is or will become a fixture on real estate, unless a sufficient fixture filing is in effect with respect thereto.

Section 5.17  Rights to Payment.  Unless otherwise disclosed to the Lender in writing, each Account designated by the Borrower as an Eligible Account on the most recent Borrowing Base Certificate delivered to the Lender constitutes the valid, genuine and legally enforceable obligation, subject to no defense, setoff or counterclaim, of the account debtor or other obligor named therein or in the Borrower's records pertaining thereto as being obligated to pay such Account.

Section 5.18  Administrative Priority; Lien Priority.

(a)  The Indebtedness constitutes an allowed administrative expense in the Chapter 11 Case, having priority in payment over all other administrative expenses and claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code.

(b)  Pursuant to Section 364(c)(2) of the Bankruptcy Code and the Financing Orders, all Indebtedness is secured by a perfected Lien on the Collateral, subject to no other Lien other than the Adequate Protection Liens (as defined in the Financing Orders) in any of the Collateral which is not encumbered by valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date.

(c)  Pursuant to Section 364(d)(1) of the Bankruptcy Code and the Financing Orders, all Indebtedness is secured by (1) a perfected Lien on the Collateral which came into existence or was acquired by the Borrower on or after the Petition Date, subject to no other Lien other than Liens consisting of (i) the Adequate Protection Liens (as defined in the Financing Orders), (ii) valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date, and (iii) valid Liens in existence at the time of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) or 362(b) of the Bankruptcy Code, and (2) a perfected Lien on the Collateral which came into existence or was acquired by the Borrower prior to the Petition Date, subject to no other Lien other than Liens consisting of (i) the Liens securing the Pre-Petition Obligations, (ii) the Adequate Protection Liens (as defined in the Financing Orders), (iii) valid, perfected, non-avoidable and enforceable Liens in existence as of the Petition Date, including a Lien in favor of the Noteholders which is junior in priority to the Liens of the Lender (except with respect to the Real Property), and (iv) valid Liens in existence at the time of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) or 362(b) of the Bankruptcy Code.

-35-

(d)    On the Closing Date, the Interim Borrowing Order is, and from and after the entry of the Final Borrowing Order, the Final Borrowing Order will be, in full force and effect, and neither Financing Order has been reversed, vacated, modified, amended or stayed, except for modifications and amendments that are reasonably acceptable to the Lender and are not stayed in any respect.

Section 5.19    <u>Appointment of Trustee or Examiner; Liquidation</u>.    No order has been entered or is pending in the Chapter 11 Case (a) for the appointment of a Chapter 11 trustee, (b) for the appointment of an examiner with enlarged powers (beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (c) to convert the Chapter 11 Case to a Chapter 7 case or to dismiss the Chapter 11 Case.

Section 5.20    <u>The Chapter 11 Case</u>.    The Chapter 11 Case was commenced by the filing of an involuntary petition on the Petition Date and the Court entered an order for granting relief under the involuntary petition on March 5, 2009 in accordance with applicable law.  The Chapter 11 Case has not been dismissed.  The motion for approval of this Agreement was proper and sufficient pursuant to the Bankruptcy Code, the Bankruptcy Rules and the rules and procedures of the Bankruptcy Court.

# ARTICLE VI

# COVENANTS

So long as any Indebtedness or any Pre-Petition Obligations shall remain unpaid, or the Credit Facility shall remain outstanding, the Borrower will comply with the following requirements, unless the Lender shall otherwise consent in writing:

Section 6.1    <u>Reporting Requirements</u>.    The Borrower will deliver, or cause to be delivered, to the Lender each of the following, which shall be in form and detail acceptable to the Lender:

(a)    **Collateral Reports**.    Within 10 days after the end of each month or more frequently if the Lender so requires, a Borrowing Base Certificate (including detailed schedules and calculations of Accounts, Inventory, Eligible Accounts and Eligible Inventory), together with agings of the Borrower's Accounts and accounts payable, a detailed Inventory report, and an Inventory certification report, all as at the end of such month or shorter time period.

(b)    **Supplemental Reports**.    No later than 8:00 a.m., Atlanta, Georgia time, on the second Business Day of each week, or more frequently if the Lender so requires or the Borrower so desires, a Borrowing Base Certificate (including detailed schedules and calculations of Accounts, Inventory, Eligible Accounts and Eligible Inventory) and the Borrower's "daily collateral reports", receivables schedules, collection reports, copies of invoices to account debtors in excess of $200,000, signed and dated shipment documents and delivery receipts for goods sold to said account debtors in excess of $200,000.

-36-

(c)      **Litigation**.  Immediately after the commencement thereof, notice in writing of all litigation and of all proceedings before any governmental or regulatory agency affecting the Borrower (i) of the type described in Section 5.14(c), or (ii) of the type described in Section 5.7.

(d)      **Defaults**.   No later than 1 Business Day after any Officer of the Borrower becomes aware of the probable occurrence of any Default or Event of Default, a responsible Officer of the Borrower shall send notice of such occurrence to the Lender, followed by a detailed statement by a responsible Officer of the Borrower of the steps being taken by the Borrower to cure the effect thereof which must be delivered to the Lender no later than 3 Business Days after such Officer of the Borrower becomes aware of any Default or Event of Default.

(e)      **Plans**.  As soon as possible, and in any event within 30 days after the Borrower knows or has reason to know that any Reportable Event with respect to any Pension Plan has occurred, a statement signed by the Officer who is the Borrower's chief financial officer setting forth details as to such Reportable Event and the action which the Borrower proposes to take with respect thereto, together with a copy of the notice of such Reportable Event to the Pension Benefit Guaranty Corporation.  As soon as possible, and in any event within 10 days after the Borrower fails to make any quarterly contribution required with respect to any Pension Plan under Section 412(m) of the IRC, the Borrower will deliver to the Lender a statement signed by the Officer who is the Borrower's chief financial officer setting forth details as to such failure and the action which the Borrower proposes to take with respect thereto, together with a copy of any notice of such failure required to be provided to the Pension Benefit Guaranty Corporation. As soon as possible, and in any event within ten days after the Borrower knows or has reason to know that it has or is reasonably expected to have any liability under Sections 4201 or 4243 of ERISA for any withdrawal, partial withdrawal, reorganization or other event under any Multiemployer Plan, the Borrower will deliver to the Lender a statement of the Borrower's chief financial officer setting forth details as to such liability and the action which the Borrower proposes to take with respect thereto.

(f)      **Disputes**.  Promptly upon knowledge thereof, notice of (i) any disputes or claims by the Borrower's Post-Petition customers exceeding $100,000 individually; (ii) credit memos; and (iii) any goods returned to or recovered by the Borrower.

(g)      **Officers and Directors**.  Promptly upon knowledge thereof, notice of any change in the persons constituting the Borrower's Officers and Directors.

(h)      **Collateral**.  Promptly upon knowledge thereof, notice of any loss of or material damage to any Collateral or of any substantial adverse change in any Collateral or the prospect of payment thereof.

(i)      **Commercial Tort Claims**.  Promptly upon knowledge thereof, notice of any commercial tort claims it may bring against any Person, including the name and address of each defendant, a summary of the facts, an estimate of the Borrower's damages, copies of any complaint or demand letter submitted by the Borrower, and such other information as the Lender may request.

(j)     **Intellectual Property**.

(i)     30 days prior written notice of the Borrower's intent to acquire material Intellectual Property Rights; except for transfers permitted under Section 6.16, the Borrower will give the Lender 30 days prior written notice of its intent to dispose of material Intellectual Property Rights and upon request shall provide the Lender with copies of all proposed documents and agreements concerning such rights.

(ii)     Promptly upon knowledge thereof, notice of (A) any Infringement of its Intellectual Property Rights by others, (B) claims that the Borrower is Infringing another Person's Intellectual Property Rights and (C) any threatened cancellation, termination or material limitation of its Intellectual Property Rights.

(iii)     Promptly upon receipt, copies of all registrations and filings with respect to its Intellectual Property Rights.

(k)     **Reports to Owners**.  Promptly upon their distribution, copies of all financial statements and proxy statements which the Borrower shall have sent to its Owners.

(l)     **SEC Filings**.  Promptly after the sending or filing thereof, copies of all regular and periodic reports which the Borrower shall file with the Securities and Exchange Commission or any national securities exchange.

(m)     **Tax Returns of Borrower**.  As soon as possible, and in any event no later than five days after they are due to be filed, copies of the state and federal income tax returns and all schedules thereto of the Borrower.

(n)     **Tax Returns and Financial Statements of Guarantors**.  As soon as possible, and in any event no later than April 30th of each year, the current financial statement and state and federal income tax returns and all schedules thereto of each Guarantor.

(o)     **Violations of Law**.  Promptly upon knowledge thereof, notice of the Borrower's violation of any law, rule or regulation, the non-compliance with which could have a Material Adverse Effect on the Borrower.

(p)     **Chapter 11 Case Pleadings**.  Promptly (and in any event within two days) after filing thereof, copies of any pleadings, motions, applications, financial information and other papers and documents filed by the Borrower in the Chapter 11 Case, which papers and documents would not otherwise be served on the Lender and the Lender's counsel pursuant to the Bankruptcy Court's appropriate procedures.

(q)     **Committee Reports**.  Promptly after sending thereof, copies of all written reports given by the Borrower to any official or unofficial creditors' committee in the Chapter 11 Case.

(r)     **Other Reports**.  From time to time, with reasonable promptness, any and all receivables schedules, inventory reports, collection reports, deposit records, equipment

schedules, copies of invoices to account debtors, shipment documents and delivery receipts for goods sold, and such other material, reports, records or information as the Lender may request.

Section 6.2    Compliance with Budget; Updated Budget; Variance Reports; Minimum Sales.

(a)    **Compliance with Budget.**  All Advances will be subject to the following tests against the Budget, and the Lender shall not be obligated to make any Advance to the extent that such Advance would cause the Borrower to exceed the budgeted amount for any line item.  On each Tuesday of each week (no later than 8:00 a.m., Atlanta, Georgia time), an Officer of the Borrower shall provide to the Lender a completed Compliance Certificate, together with a report in form and detail satisfactory to the Lender showing (i) sales, actual cash collections and disbursements, in each case on a weekly and cumulative basis through the previous Friday and (ii) a comparison to the same periods in the Budget.  The Budget will be tested on a line-item by line-item basis each week.  For any weekly Budget period, (y) actual disbursements for any line item may not exceed 105% of the amount budgeted for that line item, (z) total disbursements may not exceed 105% of the amount budgeted.  To the extent disbursements set forth in the Budget for a Budget period are not, in fact, disbursed during the Budget period, the budgeted disbursements for subsequent Budget periods shall be amended so that the Borrower may carry forward any unspent budgeted disbursements from prior periods.  To the extent collections set forth in the Budget for a Budget period are, in fact, exceeded during the Budget period, the budgeted collections for subsequent Budget periods shall be amended so that the Borrower may carry forward any excess collections from prior periods.

(b)    **Daily Accounts Reporting.**  By 8:00 a.m. Atlanta, Georgia time on each Business Day, the Borrower shall submit to the Lender a report in form and detail satisfactory to Lender in its sole discretion which fully and accurately describes the current status of all of the Borrower's outstanding accounts payable and Accounts accrued from and after the Petition Date which description shall include, at a minimum: (i) the date each such Account accrued, (ii) the amount of each such Account, and (iii) the Account debtor's name with respect to each such Account.

(e)    **Daily Administrative Expense Reporting.**  By 8:00 a.m. Atlanta, Georgia time on each Business Day, the Borrower shall submit to the Lender a report in form and detail satisfactory to Lender in its sole discretion which fully and accurately describes all of the Borrower's administrative costs incurred in connection with the Chapter 11 Case, which description shall include, at a minimum: (i) the date each such administrative expense was incurred, (ii) the amount of each such administrative expense, and (iii) the creditor's name with respect to each such administrative expense.

(f)    **Minimum Sales.**  The Borrower shall sell not less than the number of completed coaches set forth below during each time period set forth below

| Period | Minimum Number of Coaches Sold |
|---|---|
| Agreement Date through and including the four-week anniversary of the Agreement Date | 3 |
| Agreement Date through and including the eight-week anniversary of the Agreement Date | 10 |
| Agreement Date through and including the twelve-week anniversary of the Agreement Date | 16 |

(g) **Minimum Sales Price.** Each coach sold by the Borrower shall be sold for at least 80% of the Borrower's cost (in all instances for purposes of this Section 6.2(g), Borrower's cost shall be the lower of cost or market in accordance with GAAP) therefor, and the Borrower shall not permit the aggregate sales price for all coaches sold by the Borrower after the Agreement Date to be less than 90% of the Borrower's cost for such coaches; provided, however, in the event that the Rhapsody (serial # Coach #R008 (VIN # 4U7MCFA1681095001)) presently in finished goods inventory ("**Rhapsody 1**") is sold for an amount equal to or greater than 65% Borrower's cost, the sale of Rhapsody 1 shall be excluded from the aggregate sales price calculation contemplated by this provision 6.2(g); provided, further, to extent Rhapsody 1 is sold for less than 65% of Borrower's cost, the sale of Rhapsody 1 will be included in the aggregate sales price calculation contemplated by this provision 6.2(g), however, the Borrower's cost of Rhapsody 1 shall be divided by .72 for purposes of this calculation.

(h) **All Sales For Cash.** The Borrower shall not sell any Inventory on credit or other terms other than cash paid in advance or cash paid contemporaneously with delivery of such item of Inventory to the customer without the Lender's prior written consent.

Section 6.3    Permitted Liens; Financing Statements.

(a) The Borrower will not create, incur or suffer to exist any Lien upon or of any of its assets, now owned or hereafter acquired, to secure any indebtedness; excluding, however, from the operation of the foregoing, the following (each a "Permitted Lien"; collectively, "Permitted Liens"):

(i) in the case of any of the Borrower's property which is not Collateral, covenants, restrictions, rights, easements and minor irregularities in title which do not materially interfere with the Borrower's business or operations as presently conducted;

(ii) Liens in existence on the date hereof and listed in **Schedule 6.3** hereto, securing indebtedness for borrowed money permitted under this Agreement;

(iii) the Security Interest and other Liens in favor of the Lender created by this Agreement and the other Security Documents;

-40-

(iv)    purchase money Liens relating to the acquisition of machinery and equipment of the Borrower not exceeding the lesser of cost or fair market value thereof, not exceeding $350,000 for any one purchase or $1,200,000 in the aggregate during any fiscal year, and so long as no Default Period is then in existence and none would exist immediately after such acquisition;

(v)    Liens for taxes not yet due and payable or the non-payment of which is being contested in good faith, so long as (A) the Borrower has provided notice to the Lender of such contest, and (B) cash reserves in amounts reasonably acceptable to the Lender have been established with respect to such contested taxes (including, if the Lender deems it appropriate, an increase in the Borrowing Base Reserve);

(vi)    so long as the Noteholders Intercreditor Agreement remains in full force and effect and no dispute exists with respect thereto, Liens on the Collateral in favor of the Noteholders Agent, for the benefit of the Noteholders, securing indebtedness owing under the Noteholders Documents to the extent the same is permitted hereunder, which Liens shall be junior to the Security Interest and other Liens of the Lender in all Collateral other than the Real Property;

(vii)    Liens in favor of the Pre-Petition Lender securing the Pre-Petition Obligations under the Pre-Petition Loan Documents; provided, however, that such Liens shall be subordinate to the Lender's Liens in the Collateral;

(viii)    Liens granted to the Pre-Petition Lender for adequate protection under the Financing Orders; provided, however, that such Liens shall be subordinate to the Lender's Liens in the Collateral; and

(ix)    such other Liens as the Lender may hereafter approve in writing.

(b)    The Borrower will not amend any financing statements in favor of the Lender except as permitted by law.  Any authorization by the Lender to any Person to amend financing statements in favor of the Lender shall be in writing.

Section 6.4    Capital Expenditures; Indebtedness.

(a)    The Borrower will not make or incur any Capital Expenditure without the prior written consent of the Lender.

(b)    The Borrower will not incur, create, assume or permit to exist any indebtedness or liability on account of deposits or advances or any indebtedness for borrowed money or letters of credit issued on the Borrower's behalf, or any other indebtedness or liability evidenced by notes, bonds, debentures or similar obligations, except:

(i)    any existing or future Indebtedness or any other obligations of the Borrower to the Lender;

(ii)     any indebtedness of the Borrower in existence on the date hereof and listed in **Schedule 6.4** hereto;

(iii)     any indebtedness relating to Permitted Liens; and

(iv)     so long as the Noteholders Intercreditor Agreement remains in full force and effect and no dispute exists with respect thereto, indebtedness owing to the Noteholders in an aggregate principal amount not to exceed $15,000,000, which permitted amount shall (A) automatically decrease in an amount equal to each principal payment made to any Noteholder by or on behalf of the Borrower, (B) automatically increase in an amount equal to any accrued interest under the which is paid in kind pursuant to the Noteholders Documents, and (C) increase to the extent the Lender consents thereto in writing.

Section 6.5     Guaranties.     The Borrower will not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except:

(a)     the endorsement of negotiable instruments by the Borrower for deposit or collection or similar transactions in the ordinary course of business;

(b)     guaranties, endorsements and other direct or contingent liabilities in connection with the obligations of other Persons, in existence on the date hereof and listed in **Schedule 6.4** hereto; and

(c)     the Borrower's dealer buy-back program described on **Schedule 6.4** hereto.

Section 6.6     Investments and Subsidiaries.     The Borrower will not make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person or Affiliate, including any partnership or joint venture, nor form any new Subsidiary, nor purchase or hold beneficially any stock or other securities or evidence of indebtedness of any other Person or Affiliate, except:

(a)     investments in direct obligations of the United States of America or any agency or instrumentality thereof whose obligations constitute full faith and credit obligations of the United States of America having a maturity of one year or less, commercial paper issued by U.S. corporations rated "A-1" or "A-2" by Standard & Poor's Ratings Services or "P-1" or "P-2" by Moody's Investors Service or certificates of deposit or bankers' acceptances having a maturity of one year or less issued by members of the Federal Reserve System having deposits in excess of $100,000,000 (which certificates of deposit or bankers' acceptances are fully insured by the Federal Deposit Insurance Corporation);

(b)     prepaid rent not exceeding one month or security deposits; and

(c)     current investments in the Subsidiaries in existence on the date hereof and listed in **Schedule 5.5** hereto.

-42-

Section 6.7    <u>Dividends and Distributions</u>.  Except as set forth in this <u>Section 6.7</u>, the Borrower will not declare or pay any dividends (other than dividends payable solely in membership interests of the Borrower) on any class of its membership interests**,** or make any payment on account of the purchase, redemption or other retirement of any of such membership interests or other securities or evidence of its indebtedness or make any distribution in respect thereof, either directly or indirectly.  So long as the Borrower is a "pass-through" tax entity for United States federal income tax purposes, and after first providing such supporting documentation as the Lender may request (including the personal state and federal tax returns (and all schedules thereto) of each Owner) net of any prior year loss carry-forward, the Borrower may pay Pass-Through Tax Liabilities for the year for which such Pass-Through Tax Liabilities are payable.

Section 6.8    <u>Books and Records; Collateral Examination, Inspection and Appraisals</u>.

(a)    The Borrower will keep accurate books of record and account for itself pertaining to the Collateral and pertaining to the Borrower's business and financial condition and such other matters as the Lender may from time to time request in which true and complete entries will be made in accordance with GAAP and, upon the Lender's request, will permit any officer, employee, attorney, accountant or other agent of the Lender to audit, review, make extracts from or copy any and all company and financial books and records of the Borrower at all times during ordinary business hours, to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrower, and to discuss the Borrower's affairs with any of its Directors, Officers, employees or agents.

(b)    The Borrower hereby irrevocably authorizes all accountants and financial advisors to disclose and deliver to the Lender or its designated agent, at the Borrower's expense, all financial information, books and records, work papers, management reports and other information in their possession regarding the Borrower.

(c)    The Borrower will permit the Lender or its employees, accountants, attorneys or agents, to examine and inspect any Collateral or any other property of the Borrower at any time during ordinary business hours.

(d)    The Lender may also, from time to time, no more than once each calendar year, obtain at the Borrower's expense an appraisal of the Collateral by an appraiser acceptable to the Lender in its sole discretion; <u>provided</u>, <u>however</u>, that any such appraisal conducted during a Default Period shall not count against such one-per-year limitation; <u>provided</u>, <u>further</u>, that the Lender may conduct additional appraisals at its own expense.

Section 6.9    <u>Account Verification</u>.

(a)    The Lender or its agent may at any time and from time to time send or require the Borrower to send requests for verification of accounts or notices of assignment to account debtors and other obligors.  The Lender or its agent may also at any time and from time to time telephone account debtors and other obligors to verify accounts.

(b)     The Borrower shall pay when due each account payable due to a Person holding a Permitted Lien (as a result of such payable) on any Collateral.

Section 6.10    Compliance with Laws.

(a)     The Borrower shall (i) comply, and cause each Subsidiary to comply, with the requirements of applicable laws and regulations, the non-compliance with which would materially and adversely affect its business or its financial condition and (ii) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance.

(b)     Without limiting the foregoing undertakings, the Borrower specifically agrees that it will comply, and cause each Subsidiary to comply, with all applicable Environmental Laws and obtain and comply with all permits, licenses and similar approvals required by any Environmental Laws, and will not generate, use, transport, treat, store or dispose of any Hazardous Substances in such a manner as to create any material liability or obligation under the common law of any jurisdiction or any Environmental Law.

(c)     The Borrower shall (i) ensure, and cause each Subsidiary to ensure, that no Owner shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (ii) not use or permit the use of the proceeds of the Advances or any other financial accommodation from the Lender to violate any of the foreign asset control regulations of OFAC or other applicable law, (iii) comply, and cause each Subsidiary to comply, with all applicable Bank Secrecy Act laws and regulations, as amended from time to time, and (iv) otherwise comply with the USA Patriot Act as required by federal law and the Lender's policies and practices.

Section 6.11    Payment of Taxes and Other Claims.  The Borrower will pay or discharge, when due, (a) all taxes, assessments and governmental charges levied or imposed upon it or upon its income or profits, upon any properties belonging to it (including the Collateral) or upon or against the creation, perfection or continuance of the Security Interest, prior to the date on which penalties attach thereto, (b) all federal, state and local taxes required to be withheld by it, and (c) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a Lien upon any properties of the Borrower; provided, however, that the Borrower shall not be required to pay any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings and for which proper reserves have been made.

Section 6.12    Maintenance of Properties.

(a)     The Borrower will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts; provided, however, that nothing in this covenant shall prevent the Borrower from discontinuing the operation and maintenance of any of its properties if such discontinuance is, in the Borrower's judgment, desirable in the conduct of the Borrower's business and not

-44-

disadvantageous in any material respect to the Lender. The Borrower will take all commercially reasonable steps necessary to protect and maintain its Intellectual Property Rights.

(b)    The Borrower will defend the Collateral against all Liens, claims or demands of all Persons (other than the Lender) claiming the Collateral or any interest therein. The Borrower will keep all Collateral free and clear of all Liens except Permitted Liens. The Borrower will take all commercially reasonable steps necessary to prosecute any Person Infringing its Intellectual Property Rights and to defend itself against any Person accusing it of Infringing any Person's Intellectual Property Rights.

Section 6.13    Insurance.  The Borrower will obtain and at all times maintain insurance with insurers acceptable to the Lender, in such amounts, on such terms (including any deductibles) and against such risks as may from time to time be reasonably required by the Lender, but in all events in such amounts and against such risks as is usually carried by companies engaged in similar business and owning similar properties in the same general areas in which the Borrower operates. Without limiting the generality of the foregoing, the Borrower will at all times maintain business interruption insurance, including coverage for force majeure, and keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles) and such other risks and in such amounts as the Lender may reasonably request, with any loss payable to the Lender to the extent of its interest, and all policies of such insurance shall contain a lender's loss payable endorsement for the Lender's benefit. All policies of liability insurance required hereunder shall name the Lender as an additional insured.

Section 6.14    Preservation of Existence.  The Borrower will preserve and maintain its existence and all of its rights, privileges and franchises necessary or desirable in the conduct of its Post-Petition business in compliance with the Budget and shall conduct its business in an orderly, efficient and regular manner.

Section 6.15    Delivery of Instruments, etc.  Upon request by the Lender, the Borrower will promptly deliver to the Lender in pledge all instruments, documents and chattel paper constituting Collateral, duly endorsed or assigned by the Borrower.

Section 6.16    Sale or Transfer of Assets; Suspension of Business Operations.  The Borrower will not sell, lease, assign, transfer or otherwise dispose of (a) the stock of any Subsidiary, (b) all or a substantial part of its assets, or (c) any Collateral or any interest therein (whether in one transaction or in a series of transactions) to any other Person other than (i) the sale of Inventory in the ordinary course of business for cash and not on credit. The Borrower will not liquidate, dissolve or suspend business operations. The Borrower will not transfer any part of its ownership interest in any Intellectual Property Rights and will not permit any agreement under which it has licensed Licensed Intellectual Property to lapse, except that the Borrower may transfer such rights or permit such agreements to lapse if it shall have reasonably determined that the applicable Intellectual Property Rights are no longer useful in its business. If the Borrower transfers any Intellectual Property Rights for value, the Borrower will pay over the proceeds to the Lender for application to the Indebtedness and/or the Pre-Petition Obligations. The Borrower will not license any other Person to use any of the Borrower's Intellectual

Property Rights, except that the Borrower may grant licenses in the ordinary course of its business in connection with sales of Inventory or provision of services to its customers.

Section 6.17   Consolidation and Merger; Asset Acquisitions.  The Borrower will not consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all of the assets of any other Person.

Section 6.18   Sale and Leaseback.  The Borrower will not enter into any arrangement, directly or indirectly, with any other Person whereby the Borrower shall sell or transfer any real or personal property, whether now owned or hereafter acquired, and then or thereafter rent or lease as lessee such property or any part thereof or any other property which the Borrower intends to use for substantially the same purpose or purposes as the property being sold or transferred.

Section 6.19   Restrictions on Nature of Business.  The Borrower will not engage in any line of business materially different from that presently engaged in by the Borrower and will not purchase, lease or otherwise acquire assets not related to its business.

Section 6.20   Accounting.  The Borrower will not adopt any material change in accounting principles other than as required by GAAP.  The Borrower will not adopt, permit or consent to any change in its fiscal year, provided, however, the Borrower shall comply with the Post-Petition accounting requirements of the Office of the United States Trustee.

Section 6.21   Discounts, etc.  After notice from the Lender during a Default Period, the Borrower will not grant any discount, credit or allowance to any customer of the Borrower or accept any return of goods sold.  The Borrower will not at any time modify, amend, subordinate, cancel or terminate the obligation of any account debtor or other obligor of the Borrower.

Section 6.22   Plans.  Except as disclosed to the Lender in writing prior to the date hereof, neither the Borrower nor any ERISA Affiliate will (a) adopt, create, assume or become a party to any Pension Plan, (b) incur any obligation to contribute to any Multiemployer Plan, (c) incur any obligation to provide post-retirement medical or insurance benefits with respect to employees or former employees (other than benefits required by law), or (d) amend any Plan in a manner that would materially increase its funding obligations.

Section 6.23   Place of Business; Name.  The Borrower will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business location.  The Borrower will not permit any tangible Collateral or any records pertaining to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest.  The Borrower will not change its name or jurisdiction of organization.

Section 6.24   Constituent Documents; Limited Liability Company Status.  The Borrower will not amend its Constituent Documents to change its name, jurisdiction of

-46-

organization or type of organization or in any other manner adverse to the Lender. The Borrower shall not change or rescind its status as a limited liability company.

Section 6.25    Adequate Protection Payments.  Notwithstanding anything herein to the contrary, unless otherwise directed by the Lender during a Default Period, the Borrower shall be permitted to make adequate protection payments to the Pre-Petition Lender in accordance with the Financing Orders.

Section 6.26    Financing Orders; Administrative Priority; Lien Priority; Payment of Claims.

(a)    The Borrower will not, at any time, seek, consent to or suffer to exist any reversal, modification, amendment, stay or vacation of any of the Financing Orders, except for modifications and amendments agreed to in writing by the Lender.

(b)    The Borrower will not, at any time, suffer to exist a priority for any administrative expense or unsecured claim against the Borrower or the Estate (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c) 726 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Lender in respect of the Indebtedness.

(c)    The Borrower will not, at any time, suffer to exist any Lien on the Collateral having a priority equal or superior to the Lien in favor of the Lender in respect of the Collateral (other than a senior Lien in the Real Property in favor of the Noteholders).

(d)    To the extent having applicability to the Borrower, the Borrower shall comply with the Interim Borrowing Order, the Final Borrowing Order and all other orders entered by the Bankruptcy Court in the Chapter 11 Case.

Section 6.27    Performance by the Lender.  If the Borrower at any time fails to perform or observe any of the foregoing covenants contained in this **Article VI** or elsewhere herein, the Lender may, but need not, perform or observe such covenant on behalf and in the name, place and stead of the Borrower (or, at the Lender's option, in the Lender's name) and may, but need not, take any and all other actions which the Lender may reasonably deem necessary to cure or correct such failure (including the payment of taxes, the satisfaction of Liens, the performance of obligations owed to account debtors or other obligors, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and the Borrower shall thereupon pay to the Lender on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Lender, together with interest thereon from the date expended or incurred at the Default Rate.  To facilitate the Lender's performance or observance of such covenants of the Borrower, the Borrower hereby irrevocably appoints the Lender, or the Lender's delegate, acting alone, as the Borrower's attorney in fact (which appointment is coupled with an interest) with the right (but

-47-

not the duty) from time to time to create, prepare, complete, execute, deliver, endorse or file in the name and on behalf of the Borrower any and all instruments, documents, assignments, security agreements, financing statements, applications for insurance and other agreements and writings required to be obtained, executed, delivered or endorsed by the Borrower hereunder.

## ARTICLE VII

## EVENTS OF DEFAULT, RIGHTS AND REMEDIES

Section 7.1    Events of Default.   "Event of Default", wherever used herein, means any one of the following events:

(a)    default in the payment of any Revolving Advance, any other Advance, any other amount due under the Revolving Note, any Obligation of Reimbursement or any other Indebtedness as such Indebtedness becomes due and payable;

(b)    default in the performance, or breach, of any covenant or agreement of the Borrower contained in this Agreement, any Financing Order or any other Loan Document, or any other default or event of default under any Financing Order or any other Loan Document;

(c)    an Overadvance arises as the result of any reduction in the Borrowing Base, or arises in any manner on terms not otherwise approved of in advance by the Lender in writing; provided, however, that in the event that an Overadvance arises as a direct result of (i) an increase in the Borrowing Base Reserve by the Lender, (ii) a decrease in the Accounts Advance Rate by the Lender, (iii) a decrease in the Inventory Advance Rate by the Lender, (iv) the Lender's election pursuant to clause (p) of the definition of "Eligible Accounts" to exclude one or more Accounts from the Borrowing Base that would otherwise constitute Eligible Accounts, or (v) the Lender's election pursuant to clause (k) of the definition of "Eligible Inventory" to exclude one or more items of Inventory from the Borrowing Base that would otherwise constitute Eligible Inventory, no Event of Default shall exist under this clause (c) unless the Borrower fails to eliminate such Overadvance within two Business Days following notice from the Lender of the Lender's action(s) described in clauses (i)-(v) of this paragraph, as the case may be;

(d)    a Change of Control shall occur;

(e)    any representation or warranty made by the Borrower in this Agreement, by any Guarantor in any Guaranty, or by the Borrower (or any of its Officers) or any Guarantor in any Budget, any Borrowing Base Certificate, any other Loan Document, or in any other agreement, certificate, instrument or financial statement or other statement contemplated by or made or delivered pursuant to or in connection with this Agreement or any such Guaranty shall be incorrect in any material respect;

(f)    the rendering against the Borrower of an arbitration award, a final judgment, decree or order for the payment of money in excess of $50,000 and the continuance of such arbitration award, judgment, decree or order unsatisfied and in effect for any period of 30 consecutive days without a stay of execution;

-48-

(g)     a default under any bond, debenture, note or other evidence of material indebtedness of the Borrower owed to any Person other than the Lender, or under any indenture or other instrument under which any such evidence of indebtedness has been issued or by which it is governed, or under any material lease or other contract, and the expiration of the applicable period of grace, if any, specified in such evidence of indebtedness, indenture, other instrument, lease or contract;

(h)     any Reportable Event, which the Lender determines in good faith might constitute grounds for the termination of any Pension Plan or for the appointment by the appropriate United States District Court of a trustee to administer any Pension Plan, shall have occurred and be continuing 30 days after written notice to such effect shall have been given to the Borrower by the Lender; or a trustee shall have been appointed by an appropriate United States District Court to administer any Pension Plan; or the Pension Benefit Guaranty Corporation shall have instituted proceedings to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan; or the Borrower or any ERISA Affiliate shall have filed for a distress termination of any Pension Plan under Title IV of ERISA; or the Borrower or any ERISA Affiliate shall have failed to make any quarterly contribution required with respect to any Pension Plan under Section 412(m) of the IRC, which the Lender determines in good faith may by itself, or in combination with any such failures that the Lender may determine are likely to occur in the future, result in the imposition of a Lien on the Borrower's assets in favor of the Pension Plan; or any withdrawal, partial withdrawal, reorganization or other event occurs with respect to a Multiemployer Plan which results or could reasonably be expected to result in a material liability of the Borrower to the Multiemployer Plan under Title IV of ERISA;

(i)     an event of default shall occur under any Security Document or any other Loan Document;

(j)     default in the payment of any amount owed by the Borrower to the Lender other than any Indebtedness arising hereunder;

(k)     any Guarantor shall repudiate, purport to revoke or fail to perform any obligation under any Guaranty in favor of the Lender, any individual Guarantor shall die or any other Guarantor shall cease to exist;

(l)     the Borrower shall take or participate in any action which would be prohibited under the provisions of any Subordination Agreement or make any payment with respect to indebtedness that has been subordinated pursuant to any Subordination Agreement which is not permitted by such Subordination Agreement;

(m)     the Lender believes in good faith that the prospect of payment in full of any part of the Indebtedness, or that full performance by the Borrower under the Loan Documents, is impaired, or that an event which has had or which could have a Material Adverse Effect has occurred;

(n)     there has occurred any breach, default or event of default by, or attributable to, any Affiliate under any agreement between the Affiliate and the Lender;

-49-

(o)    the indictment of any Director, Officer, Guarantor, or any Owner of at least twenty (20%) of the issued and outstanding membership interests of the Borrower for a felony offense under state or federal law;

(p)    The Borrower shall fail to comply or shall default in the performance of any term of the Financing Orders or any other "Event of Default" under and as defined in either of the Financing Orders shall occur;

(q)    The Borrower or any other person other than the Lender (except following the Lender's prior written request or with the Lender's express prior written consent, and no such consent shall be implied from any other action, inaction, or acquiescence of the Lender) shall file a motion with the Bankruptcy Court or any other court with jurisdiction in the matter seeking an order, or an order is otherwise entered, modifying, reversing, revoking, staying, rescinding, vacating, or amending the Financing Orders or any of the Loan Documents;

(r)    The Borrower shall file any motion seeking Bankruptcy Court approval of, or any other Person shall obtain Bankruptcy Court approval of, a Bidding Procedures Order, Sale Order, or similar such order, or a Disclosure Statement or a Plan of Reorganization other than an Acceptable Plan, unless the Lender has expressly joined in or consented to such plan, such order, or such motion in writing;

(s)    The Borrower shall file any motion or application, or the Bankruptcy Court allows the motion or application of any other Person, which seeks approval for or allowance of (i) the authority to use any cash collateral, or (ii) any claim, Lien, or security interest ranking junior, equal or senior in priority to the claims, Liens and security interests granted to the Lender under the Financing Orders or the Loan Documents or any such equal or prior claim, Lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the Financing Orders;

(t)    The Bankruptcy Court shall not have entered the Final Borrowing Order by April 30, 2009, or any Financing Order shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court;

(u)    The appointment in the Chapter 11 Case of a trustee, or any other fiduciary for the Borrower or any property of the Estate, or of any examiner;

(v)    The entry of an order dismissing the Chapter 11 Case or converting the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or the filing of any motion requesting any such order of dismissal or conversion be filed;

(w)    The entry of an order which provides relief from the automatic stay otherwise imposed pursuant to Section 362 of the Bankruptcy Code, which order permits any creditor, other than the Lender or the Pre-Petition Lender, to realize upon, or to exercise any right or remedy with respect to, any asset of the Borrower (or to terminate any license, franchise, or similar agreement) with a book value in excess of $100,000 in any single instance or $250,000 in the aggregate;

-50-

(x)    If any creditor of the Borrower receives any adequate protection payment which is not fully acceptable to the Lender in its sole discretion, or any Lien is granted as adequate protection other than as set forth in the Interim Borrowing Order or the Final Borrowing Order;

(y)    The entry of an order for the substantive consolidation of the Borrower or the Estate with any other Person;

(z)    The Borrower shall not have sufficient Availability on any date to pay, or shall otherwise fail to pay as and when due and payable, all costs and expenses of administration that are incurred by the Borrower in the Chapter 11 Case;

(aa)    The Borrower, any committee or any other Person shall file a pleading in the Bankruptcy Court or any court of competent jurisdiction (i) challenging the validity, perfection or priority of any Liens of the Pre-Petition Lender securing the Pre-Petition Obligations, (ii) challenging the validity or enforceability of any Pre-Petition Loan Document, or (iii) asserting any claims against the Pre-Petition Lender;

(bb)    Any deadline contained in the Interim Borrowing Order or the Final Borrowing Order is not met; or

(cc)    The Borrower shall file with the Bankruptcy Court or enter into any asset purchase agreement with any third party unless such asset purchase agreement has been approved by the Lender in the Lender's sole discretion.

Section 7.2    Rights and Remedies.    During any Default Period, the Lender may exercise any or all of the following rights and remedies in accordance with and subject to the terms of the Financing Orders:

(a)    the Lender may, by notice to the Borrower, declare the Commitment to be terminated, whereupon the same shall forthwith terminate;

(b)    the Lender may, by notice to the Borrower, declare the Indebtedness to be forthwith due and payable, whereupon all Indebtedness shall become and be forthwith due and payable, without presentment, notice of dishonor, protest or further notice of any kind, all of which the Borrower hereby expressly waives;

(c)    the Lender may, without notice to the Borrower and without further action, (i) apply any and all money owing by the Lender to the Borrower to the payment of the Indebtedness, (ii) apply any certificate of deposit or other cash collateral pledged to or held by the Lender to the payment of the Indebtedness and/or the Pre-Petition Obligations, and (iii) draw on any letter of credit in favor of the Lender with respect to the Indebtedness and apply the amount received to the Indebtedness;

(d)    the Lender may exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including the right to take possession of Collateral, or any evidence thereof, proceeding without judicial process or by judicial process (without a prior hearing or notice thereof, which the Borrower hereby expressly waives) and the

-51-

right to sell, lease or otherwise dispose of any or all of the Collateral (with or without giving any warranties as to the Collateral, title to the Collateral or similar warranties), and, in connection therewith, the Borrower will on demand assemble the Collateral and make it available to the Lender at a place to be designated by the Lender which is reasonably convenient to both parties;

(e)     the Lender may cancel any insurance policy of the Borrower in exchange for a refund of the unearned premium with respect thereto, and the Borrower hereby authorizes any insurance company which has issued any such policy to make such payment directly to the Lender for application to the Indebtedness;

(f)     the Lender may make demand upon the Borrower and, forthwith upon such demand, the Borrower will pay to the Lender in immediately available funds for deposit in the Special Account pursuant to Section 2.4 an amount equal to the aggregate maximum amount available to be drawn under all Letters of Credit then outstanding, assuming compliance with all conditions for drawing thereunder;

(g)     the Lender may exercise and enforce its rights and remedies under the Loan Documents;

(h)     the Lender may without regard to any waste, adequacy of the security or solvency of the Borrower, apply for the appointment of a receiver of the Collateral, to which appointment the Borrower hereby consents, whether or not foreclosure proceedings have been commenced under the Security Documents and whether or not a foreclosure sale has occurred;

(i)     the Lender may, by notice to the Borrower, prohibit the transfer, delivery or other conveyance of any manufacturer's certificate of origin or any similar item with respect to any Inventory (including any goods that have previously been sold by the Borrower) to any floor plan lender, any dealer or any other Person unless and until the Borrower has received payment in full with respect to the item to which such manufacturer's certificate of origin or similar document relates;

(j)     The Lender shall be entitled to seek the appointment of a Chapter 11 trustee and have an expedited hearing with respect to such request, on not more than three (3) Business Days notice, subject to the Bankruptcy Court's calendar;

(k)     The Lender may seek relief from the automatic stay from the Bankruptcy Court; and

(l)     the Lender may exercise any other rights and remedies available to it by law or agreement.

If the Lender sells any of the Collateral on credit, the Indebtedness will be reduced only to the extent of payments actually received.  If the purchaser fails to pay for the Collateral, the Lender may resell the Collateral and shall apply any proceeds actually received to the Indebtedness.

Section 7.3     Certain Notices.  If notice to the Borrower of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice

shall be deemed commercially reasonable if given (in the manner specified in <u>Section 8.3</u>) at least ten calendar days before the date of intended disposition or other action.

Section 7.4    <u>Waiver of Marshaling</u>.  Recourse to the Collateral or other security for the Indebtedness will not at any time be required, and the Borrower hereby waives any right of marshaling the Borrower may have.

**ARTICLE VIII**

**<u>MISCELLANEOUS</u>**

Section 8.1    <u>No Waiver; Cumulative Remedies; Compliance with Laws</u>.  No failure or delay by the Lender in exercising any right, power or remedy under the Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy under the Loan Documents.    The remedies provided in the Loan Documents are cumulative and not exclusive of any remedies provided by law.  The Lender may comply with any applicable state or federal law requirements in connection with a disposition of the Collateral and such compliance will not be considered adversely to affect the commercial reasonableness of any sale of the Collateral.

Section 8.2    <u>Amendments, Etc</u>.  No amendment, modification, termination or waiver of any provision of any Loan Document or consent to any departure by the Borrower therefrom or any release of a Security Interest shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances.

Section 8.3    <u>Notices; Communication of Confidential Information; Requests for Accounting</u>.  Except as otherwise expressly provided herein, all notices, requests, demands and other communications provided for under the Loan Documents shall be in writing and shall be (a) personally delivered, (b) sent by first class United States mail, (c) sent by overnight courier of national reputation, or (d) transmitted by telecopy, in each case delivered or sent to the party to whom notice is being given to the business address or telecopier number set forth below or, as to each party, at such other business address or telecopier number as it may hereafter designate in writing to the other party pursuant to the terms of this Section.  All such notices, requests, demands and other communications shall be deemed to be an authenticated record communicated or given on (w) the date received if personally delivered, (x) when deposited in the mail if delivered by mail, (y) the date delivered to the courier if delivered by overnight courier, or (z) the date of transmission if sent by telecopy, except that notices or requests delivered to the Lender pursuant to any of the provisions of Article II shall not be effective until received by the Lender.  All notices, financial information, or other business records sent by either party to this Agreement may be transmitted, sent, or otherwise communicated via such medium as the sending party may deem appropriate and commercially reasonable; provided, however, that the risk that the confidentiality or privacy of such notices, financial information, or other business records sent by either party may be compromised shall be borne exclusively by

-53-

the Borrower.  All requests for an accounting under Section 9-210 of the UCC (i) shall be made in a writing signed by a Person authorized under Section 2.2(a), (ii) shall be personally delivered, sent by registered or certified mail, return receipt requested, or by overnight courier of national reputation, (iii) shall be deemed to be sent when received by the Lender and (iv) shall otherwise comply with the requirements of Section 9-210.  The Borrower requests that the Lender respond to all such requests which on their face appear to come from an authorized individual and releases the Lender from any liability for so responding.  The Borrower shall pay the Lender the maximum amount allowed by law for responding to such requests.  Unless and until any party hereto notifies the other party as provided above, notices shall be sent in accordance with the following information:

| | |
|---|---|
| If to the Borrower: | Country Coach LLC |
| | 135 East First Avenue |
| | Junction City, Oregon  97448 |
| | Attention:  Mark Andersen |
| | Telecopier:  541-998-9273 |
| | |
| With a copy to: | David B. Levant, Esq. |
| | Stoel Rives LLP |
| | 600 University Street, Suite 3600 |
| | Seattle, WA  98101 |
| | Telecopier:  206-385-7500 |
| | |
| -and- | |
| | |
| | Thomas A. Huntsberger, Esq. |
| | Thomas A. Huntsberger, P.C. |
| | 870 West Centennial Boulevard |
| | Springfield, OR 97477 |
| | Telecopier: 541-746-3201 |
| | |
| If to the Lender: | Wells Fargo Bank, National Association, acting through its |
| | Wells Fargo Business Credit operating division |
| | MAC N2642-060 |
| | 400 Northridge Road, Suite 600 |
| | Atlanta, Georgia  30350 |
| | Attention:  Portfolio Manager |
| | Telecopier:  770-992-4720 |
| | |
| With a copy to: | David B. Kurzweil, Esq. |
| | Greenberg Traurig, LLP |
| | 3290 Northside Parkway, Suite 400 |
| | Atlanta, Georgia  30327 |
| | Telecopier:  678-553-2681 |
| | |
| -and- | |

-54-

Wilson Muhlheim, Esq.
Muhlheim Boyd, LLP
88 East Broadway
Eugene, OR 97401
Telecopier: 541-868-8004

Section 8.4    Further Documents.  The Borrower will from time to time and subject to the requirements of the Financing Orders, execute, deliver, endorse and authorize the filing of any and all instruments, documents, conveyances, assignments, security agreements, financing statements, control agreements and other agreements and writings that the Lender may reasonably request in order to secure, protect, perfect or enforce the Security Interest or the Lender's rights under the Loan Documents (but any failure to request or assure that the Borrower executes, delivers, endorses or authorizes the filing of any such item shall not affect or impair the validity, sufficiency or enforceability of the Loan Documents and the Security Interest, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).

Section 8.5    Costs and Expenses.  The Borrower shall pay on demand all out-of-pocket costs and expenses, including reasonable attorneys' fees, incurred by the Lender in connection with the Indebtedness, this Agreement, the Loan Documents, any Letter of Credit and any other document or agreement related hereto or thereto, and the transactions contemplated hereby, including all such costs, expenses and fees incurred in connection with the negotiation, preparation, execution, amendment, administration, performance, collection and enforcement of the Indebtedness and all such documents and agreements, as well as the creation, perfection, protection, satisfaction, foreclosure or enforcement of the Security Interest.  The Borrower shall also pay to the Lender on demand the Lender's standard wire transfer fees for all wire transfers sent and received by the Lender in connection with this Agreement and the Lender's standard processing fees in connection with the processing of Collateral reports by any third party (which processing fees are currently $100 per month) in connection with this Agreement.

Section 8.6    Indemnity.  In addition to the payment of expenses pursuant to Section 8.5, the Borrower shall indemnify, defend and hold harmless the Lender, and any of its participants, parent corporations, subsidiary corporations, affiliated corporations, successor corporations, and all present and future officers, directors, employees, attorneys and agents of the foregoing (the "Indemnitees") from and against any of the following (collectively, "Indemnified Liabilities"):

(i)    Any and all transfer taxes, documentary taxes, assessments or charges made by any governmental authority by reason of the execution and delivery of the Loan Documents or the making of the Advances;

(ii)    Any claims, loss or damage to which any Indemnitee may be subjected if any representation or warranty contained in Section 5.14 proves to be incorrect in any respect or as a result of any violation of the covenant contained in Section 6.10(b); and

(iii)    Any and all other liabilities, losses, damages, penalties, judgments, suits, claims, costs and expenses of any kind or nature whatsoever (including the reasonable

fees and disbursements of counsel) in connection with the foregoing and any other investigative, administrative or judicial proceedings, whether or not such Indemnitee shall be designated a party thereto, which may be imposed on, incurred by or asserted against any such Indemnitee, in any manner related to or arising out of or in connection with the making of the Advances and the Loan Documents or the use or intended use of the proceeds of the Advances. Notwithstanding the foregoing, the Borrower shall not be obligated to indemnify any Indemnitee for any Indemnified Liability caused by the gross negligence or willful misconduct of such Indemnitee.

If any investigative, judicial or administrative proceeding arising from any of the foregoing is brought against any Indemnitee, upon such Indemnitee's request, the Borrower, or counsel designated by the Borrower and satisfactory to the Indemnitee, will resist and defend such action, suit or proceeding to the extent and in the manner directed by the Indemnitee, at the Borrower's sole costs and expense. Each Indemnitee will use its best efforts to cooperate in the defense of any such action, suit or proceeding. If the foregoing undertaking to indemnify, defend and hold harmless may be held to be unenforceable because it violates any law or public policy, the Borrower shall nevertheless make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law. The Borrower's obligations under this <u>Section 8.6</u> shall survive the termination of this Agreement and the discharge of the Borrower's other obligations hereunder.

Section 8.7    <u>Participants</u>. The Lender and its participants, if any, are not partners or joint venturers, and the Lender shall not have any liability or responsibility for any obligation, act or omission of any of its participants. All rights and powers specifically conferred upon the Lender may be transferred or delegated to any of the Lender's participants, successors or assigns.

Section 8.8    <u>Execution in Counterparts; Telefacsimile or E-Mail Execution</u>. This Agreement and other Loan Documents may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument. Delivery of an executed counterpart of this Agreement or any other Loan Document by telefacsimile or e-mail shall be equally as effective as delivery of an original executed counterpart of this Agreement or such other Loan Document. Any party delivering an executed counterpart of this Agreement or any other Loan Document by telefacsimile or e-mail also shall deliver an original executed counterpart of this Agreement or such other Loan Document, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement or such other Loan Document.

Section 8.9    <u>Retention of Borrower's Records</u>. The Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices, agings, or other papers delivered to the Lender by the Borrower or in connection with the Loan Documents for more than 30 days after receipt by the Lender. If there is a special need to retain specific records, the Borrower must inform the Lender of its need to retain those records with particularity, which must be delivered in accordance with the notice provisions of <u>Section 8.3</u> within 30 days of the Lender taking control of same.

-56-

Section 8.10    <u>Binding Effect; Assignment; Complete Agreement; Sharing Information</u>. The Loan Documents shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns (including any trustee or examiner for the Borrower or the Estate), except that the Borrower shall not have the right to assign its rights thereunder or any interest therein without the Lender's prior written consent.  To the extent permitted by law, the Borrower waives and will not assert against any assignee any claims, defenses or set-offs which the Borrower could assert against the Lender.  This Agreement shall also bind all Persons who become a party to this Agreement as a borrower.  This Agreement, together with the Financing Orders and the Loan Documents, comprises the complete and integrated agreement of the parties on the subject matter hereof and supersedes all prior agreements, written or oral, on the subject matter hereof.  To the extent that any provision of this Agreement contradicts other provisions of the Loan Documents, this Agreement shall control. To the extent that any provision of this Agreement contradicts any provisions of the Financing Orders, the Financing Orders shall control. Without limiting the Lender's right to share information regarding the Borrower and its Affiliates with the Lender's participants, accountants, lawyers and other advisors, the Lender may share any and all information it may have in its possession regarding the Borrower and its Affiliates with the Lender's subsidiaries and Affiliates, and the Borrower waives any right of confidentiality it may have with respect to such sharing of information.

Section 8.11    <u>Severability of Provisions</u>.  Any provision of this Agreement which is prohibited or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.

Section 8.12    <u>Headings</u>.  Article, Section and subsection headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 8.13    <u>Governing Law; Jurisdiction, Venue</u>.  This Agreement and the other Loan Documents shall be governed by and construed in accordance with the substantive laws (other than conflict of law provisions and principles) of the State of Georgia.  The Borrower hereby consents to the exclusive jurisdiction of the Bankruptcy Court in any action, suit or other proceeding arising out of or relating to this Agreement or any of the other Loan Documents, and the Borrower irrevocably agrees that all claims and demands in respect of any such action, suit or proceeding may be heard and determined in the Bankruptcy Court and irrevocably waives any objection it may now or hereafter have as to the venue of any such action, suit or proceeding brought in the Bankruptcy Court or that the Bankruptcy Court is an inconvenient forum.  The Borrower waives personal service of any and all process upon it and consents that all such service of process may be made by registered mail (return receipt requested) directed to the Borrower at the Borrower's address for notices pursuant to this Agreement, and service so made shall be deemed to be completed five (5) days after the same shall have been so deposited in the United States mails.  Nothing herein shall limit the right of the Lender to bring proceedings against the Borrower or any of its Affiliates in the courts of any other jurisdiction.  Any judicial proceeding commenced by the Borrower against the Lender or any other holder of any Indebtedness, or any Affiliate of the Lender or any other holder of any Indebtedness, involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan

-57-

Document shall be brought only in the Bankruptcy Court. Nothing in this Agreement shall be deemed or operate to affect the right of the Lender to serve legal process in any other manner permitted by law or to preclude the enforcement by the Lender of any judgment or order obtained in such forum or the taking of any action under this Agreement or any other Loan Document to enforce same in any other appropriate forum or jurisdiction.

Section 8.14    Release of Claims. Upon payment in full of the Indebtedness, and prior to the Lender's release of any Liens or security interest securing the Indebtedness, the Borrower shall execute a release, in form and substance acceptable to the Lender in its sole discretion, releasing any and all claims which the Borrower has or may have, whether existing, known or unknown, against the Lender and the Lender's successors and assigns and any of Lender's past, current or future officers, agents, and attorneys.

Section 8.15    Lender as Party-in-Interest. The Borrower hereby stipulates and agrees that the Lender is and shall remain a party in interest in the Chapter 11 Case and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith. Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Lender's rights or remedies under applicable law or documentation. Without limitation of the foregoing, the Lender shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Loans, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), provided that the Lender will not exercise such right if the action or inaction by the Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 8.16    Waiver of Right to Obtain Alternative Financing. In consideration of the Advances to be made to the Borrower by the Lender, the Borrower hereby waives any right it may have to obtain an order by the Bankruptcy Court authorizing the Borrower to obtain financing pursuant to Section 364 of the Bankruptcy Code from any Person other than the Lender, unless such financing would result in Full Payment of all of the Indebtedness and the Pre-Petition Obligations.

Section 8.17    Credit Bids. The Lender shall maintain its right to credit bid the Lender's claims under the this Agreement or the Final Borrowing Order pursuant to Section 363(k) of the Bankruptcy Code, and the Borrower agrees that it shall not object to the Lender's right to credit bid.

**THE BORROWER AND THE LENDER WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION AT LAW OR IN EQUITY OR IN ANY OTHER PROCEEDING BASED ON OR PERTAINING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT.** Borrower's Initials _____ Lender's Initials _____

[SIGNATURES ON FOLLOWING PAGE]

-58-

ATL 17,092,721v6

IN WITNESS WHEREOF, the parties hereto have caused this Debtor-in-Possession Credit and Security Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

COUNTRY COACH LLC

By:_____
      Mark Andersen, Chief Financial Officer


WELLS FARGO BANK, NATIONAL ASSOCIATION, acting through its Wells Fargo Business Credit operating division

By:_____
Charles F. Liles, Vice President

## Table of Exhibits and Schedules

| | |
|---|---|
| Exhibit A | Form of Borrowing Base Certificate |
| Exhibit B | Initial Budget |
| Exhibit C | Form of Compliance Certificate |
| Exhibit D | Final Borrowing Order |
| Exhibit E | Interim Borrowing Order |
| Exhibit F | Premises |
| Exhibit G | Real Property |
| Exhibit H | Form of Revolving Note |
| Schedule 5.1 | Trade Names, Chief Executive Office, Principal Place of Business, and Locations of Collateral |
| Schedule 5.2 | Capitalization |
| Schedule 5.5 | Subsidiaries |
| Schedule 5.7 | Litigation Matters |
| Schedule 5.11 | Intellectual Property Disclosures |
| Schedule 5.14 | Environmental Matters |
| Schedule 6.3 | Permitted Liens |
| Schedule 6.4 | Permitted Indebtedness and Guaranties |

**Exhibit A to Debtor-in-Possession Credit and Security Agreement**

**Form of Borrowing Base Certificate**

A-1

**Exhibit B to Debtor-in-Possession Credit and Security Agreement**

**Initial Budget**

B-1

**Exhibit C to Debtor-in-Possession Credit and Security Agreement**

**Form of Compliance Certificate**

**<u>COMPLIANCE CERTIFICATE</u>**

To:           Wells Fargo Bank, National Association
Date:        **[_____, 200____]**
Subject:    Financial Statements of Country Coach LLC (the "Borrower")

     In accordance with our Debtor-in-Possession Credit and Security Agreement dated as of March ___, 2009 (as amended, restated or otherwise modified from time to time, the "Credit Agreement"), attached is the most recent Budget **[and the financial statements of the Borrower]** as of and for **[_____, 200__]** (the "Reporting Date").  All terms used in this certificate have the meanings given in the Credit Agreement.

     I certify that the information submitted herewith has been prepared in accordance with GAAP, subject to year-end audit adjustments, and fairly presents the Borrower's financial condition as of the date thereof.

     I further hereby certify as follows: <u>Events of Default</u>.  (Check one):

☐     The undersigned does not have knowledge of the occurrence of a Default or Event of Default under the Credit Agreement except as previously reported in writing to the Lender.

☐     The undersigned has knowledge of the occurrence of a Default or Event of Default under the Credit Agreement not previously reported in writing to the Lender and attached hereto is a statement of the facts with respect to thereto.  The Borrower acknowledges that pursuant to <u>Section 2.5(b)</u> of the Credit Agreement, the Lender may impose the Default Rate at any time during the resulting Default Period.

<u>Material Adverse Change in Litigation Matters of the Borrower</u>.  I further hereby certify as follows (check one):

☐     The undersigned has no knowledge of any material adverse change to the litigation exposure of the Borrower or any of its Affiliates or of any Guarantor.

☐     The undersigned has knowledge of material adverse changes to the litigation exposure of the Borrower or any of its Affiliates or of any Guarantor not previously disclosed in **Schedule 5.7**.  Attached to this Certificate is a statement of the facts with respect thereto.

C-1

Budget.  I further hereby certify that included herewith is all information required by the Credit Agreement with respect to the Budget, including an updated Budget and a variance report with respect to the immediately preceding Budget, and that all calculations with respect thereto are true and correct.

COUNTRY COACH LLC


By:_____
    Its Chief Financial Officer

C-2

**Exhibit D to Debtor-in-Possession Credit and Security Agreement**

**Final Borrowing Order**

D-1

Seattle-3503554.2 0049218-00002
*ATL 17,092,721v6*

**Exhibit E to Debtor-in-Possession Credit and Security Agreement**

**Interim Borrowing Order**

E-1

**Exhibit F to Debtor-in-Possession Credit and Security Agreement**

**Premises**

F-1

**Exhibit G to Debtor-in-Possession Credit and Security Agreement**

**Real Property**

G-1

**Exhibit H to Debtor-in-Possession Credit and Security Agreement**

**REVOLVING NOTE**

$11,500,000.00                                                    March ___, 2009

     For value received, the undersigned, COUNTRY COACH LLC, a Delaware limited liability company (the "Borrower"), hereby promises to pay to the order of WELLS FARGO BANK, NATIONAL ASSOCIATION (the "Lender"), acting through its Wells Fargo Business Credit operating division, on the Termination Date referenced in the Debtor-in-Possession Credit and Security Agreement of even date herewith between the Lender and the Borrower (as amended, restated or otherwise modified from time to time, the "Credit Agreement"), at the Lender's office located at Atlanta, Georgia, or at any other place designated at any time by the holder hereof, in lawful money of the United States of America and in immediately available funds, the principal sum of Eleven Million Five Hundred Thousand Dollars ($11,500,000) or the aggregate unpaid principal amount of all Revolving Advances made by the Lender to or for the account of the Borrower under the Credit Agreement, together with interest on the principal amount hereunder remaining unpaid from time to time, computed on the basis of the actual number of days elapsed and a 360-day year, from the date hereof until this Revolving Note is fully paid at the rate from time to time in effect under the Credit Agreement.

     This Revolving Note is the Revolving Note referenced in the Credit Agreement and is subject to the terms of the Credit Agreement, which provides, among other things, for acceleration hereof. Principal and interest due hereunder shall be payable as provided in the Credit Agreement, and this Revolving Note may be prepaid only in accordance with the terms of the Credit Agreement. This Revolving Note is secured, among other things, pursuant to the Credit Agreement and the Security Documents as therein defined, and may now or hereafter be secured by one or more other security agreements, mortgages, deeds of trust, assignments or other instruments or agreements.

     The Borrower shall pay all costs of collection, including reasonable attorneys' fees and legal expenses, if this Revolving Note is not paid when due, whether or not legal proceedings are commenced.

     Acceptance, notice of acceptance, presentment or other demand for payment, notice of dishonor and protest are expressly waived.

COUNTRY COACH LLC

By:_____
Name: _____
Title: _____

H-1

**Schedule 5.1 to Debtor-in-Possession Credit and Security Agreement**

<u>TRADE NAMES, CHIEF EXECUTIVE OFFICE, PRINCIPAL PLACE OF BUSINESS,
AND LOCATIONS OF COLLATERAL</u>

<u>TRADE NAMES</u>

**[To be completed by Borrower]**

<u>CHIEF EXECUTIVE OFFICE/PRINCIPAL PLACE OF BUSINESS</u>

**[To be completed by Borrower]**

<u>OTHER INVENTORY AND EQUIPMENT LOCATIONS</u>

**[To be completed by Borrower]**

Seattle-3503554.2 0049218-00002
*ATL 17,092,721v6*

**Schedule 5.2 to Debtor-in-Possession Credit and Security Agreement**

## CAPITALIZATION

| Holder | Type of Rights/Stock | No. of shares (after exercise of all rights to acquire shares) | Percent interest on a fully diluted basis |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |

**[This Schedule needs to trace the ownership of the Borrower back to natural persons. Thus, if Country Coach Holding LLC owns 100% of Borrower, show ownership of Country Coach Holding LLC (presumably Riley Investment Management LLC) and ownership of Riley Investment Management LLC as well]**

**[To be completed by Borrower]**

S-5.2-1

**Schedule 5.5 to Debtor-in-Possession Credit and Security Agreement**

**<u>SUBSIDIARIES</u>**

**[To be completed by Borrower]**

S-5.5-1

**Schedule 5.7 to Debtor-in-Possession Credit and Security Agreement**

**<u>LITIGATION MATTERS IN EXCESS OF $10,000.00</u>**

**[To be completed by Borrower]**

S-5.7-1

Seattle-3503554.2 0049218-00002
*ATL 17,092,721v6*

**Schedule 5.11 to Debtor-in-Possession Credit and Security Agreement**

<u>**INTELLECTUAL PROPERTY DISCLOSURES**</u>

**[To be completed by Borrower]**

S-5.11-1

**Schedule 5.14 to Debtor-in-Possession Credit and Security Agreement**

**<u>ENVIRONMENTAL MATTERS</u>**

**[To be completed by Borrower]**

S-5.14-1

**Schedule 6.3 to Debtor-in-Possession Credit and Security Agreement**

<u>**PERMITTED LIENS**</u>

| <u>Creditor</u> | <u>Collateral</u> | <u>Jurisdiction</u> | <u>Filing Date</u> | <u>Filing No.</u> |
|---|---|---|---|---|

**[To be completed by Borrower]**

S-6.3-1

**Schedule 6.4 to Debtor-in-Possession Credit and Security Agreement**

**Permitted Indebtedness and Guaranties**

## INDEBTEDNESS

| Creditor | Principal Amount | Maturity Date | Monthly Payment | Collateral |
|---|---|---|---|---|

**[To be completed by Borrower]**

## GUARANTIES

| Primary Obligor | Amount and Description of Obligation Guaranteed | Beneficiary of Guaranty |
|---|---|---|

**[To be completed by Borrower]**

S-6.4-1

EXHIBIT B

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF OREGON

In re:

**Country Coach, LLC**, a Delaware limited
liability company,

Debtor.

Case No. **09-60419-aer11**

**INTERIM ORDER (I) AUTHORIZING
DEBTOR (A) TO OBTAIN POST-
PETITION FINANCING PURSUANT
TO 11 U.S.C. §§105, 361, 362, 364(c)(1),
364(c)(2), 364(c)(3) AND 364(d)(1) AND
(B) TO UTILIZE CASH
COLLATERAL PURSUANT TO
11 U.S.C. §363, (II) GRANTING
ADEQUATE PROTECTION TO
LENDER PURSUANT TO 11 U.S.C.
§§361, 362 AND 363 (III) MODIFYING
AUTOMATIC STAY, (IV)
PROVIDING OTHER RELIEF, AND
(V) SCHEDULING FINAL HEARING
PURSUANT TO BANKRUPTCY
RULE 4001(B) AND (C)**

Upon the motion (the "**Motion**"), dated March 19, 2009 by Country Coach, LLC
as Debtor and Debtor-in-Possession (the "**Borrower**" or "**Debtor**"), pursuant to Sections
105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 503, 507(b) and
1146(c) of the United States Bankruptcy Code, 11 U.S.C. §§101, *et. seq.* (the
"**Bankruptcy Code**"), and Rules 2002, 4001 and 9014 of the Federal Rules of
Bankruptcy Procedure (the "**Bankruptcy Rules**"), seeking, among other things:

(a)     authorization for the Debtor to obtain post-petition financing (hereinafter,

the "**DIP Financing**") not to exceed an aggregate principal amount of

$11,500,000 on a revolving basis (the actual available principal amount at

any time being subject to conditions precedent as set forth herein and in

the DIP Credit Agreement, as defined below), from Wells Fargo Bank,

National Association, acting through its Wells Fargo Business Credit operating division (hereinafter, the "**Senior Lender**");

(b)    the granting of adequate protection to the Senior Lender, in its capacity as pre-petition lender, to secure all of the Debtor's obligations to the Senior Lender incurred, prior to the Petition Date;

(c)    the granting of adequate protection to Riley Investment Management, LLC (the "**Junior Agent**" or "**Junior Creditor**"), in its capacity as collateral agent, to secure all of the Debtor's obligations to Junior Agent incurred, prior to the Petition Date,

(d)    authorization for the use by the Debtor of Cash Collateral (as such term is defined in Section 363(a) of the Bankruptcy Code) in which the Senior Lender has a security interest;

(d)    pursuant to Bankruptcy Rule 4001, that an interim hearing (hereinafter, the "**Interim Hearing**") on the Motion be held for this Court to consider entry of the proposed interim order annexed to the Motion (the "**Interim Order**") (i) authorizing the Borrower, on an interim basis, to immediately begin borrowing from the Senior Lender (under the DIP Credit Agreement, as defined below) up to an aggregate principal amount of $11,500,000, on a revolving basis in compliance with the DIP Budget (as defined below) pending the Final Hearing (as defined below), (ii) authorizing the use by the Debtor of Cash Collateral for the purposes set forth below and in the DIP Budget (as defined below), (iii) granting to the Senior Lender, in its capacity as pre-petition lender, the adequate

protection described herein, (iv) granting to Junior Creditor the adequate protection described herein, and (v) granting the Senior Lender a superpriority administrative claim and certain priming liens and security interests in connection with the DIP Financing; and

(f)     that this Court schedule a final hearing (the "**Final Hearing**") to be held approximately fifteen (15) days after entry of the Interim Order (subject to the Court's calendar) to consider entry of a Final Order authorizing continued borrowings under the DIP Credit Agreement on a final basis (the "**Final Order**") pending the Termination Date or a closing of the proposed sale of substantially all the assets of the Debtor.

## Summary of Loan History

### Senior Lender

The Senior Lender and the Debtor are parties to that certain Credit and Security Agreement, dated as of May 18, 2007, by and between the Borrower and the Senior Lender (as amended and modified from time to time, the "**Pre-Petition Credit Agreement**").  The Senior Lender made advances to the Debtor under the Pre-Petition Credit Agreement which are evidenced by, *inter alia,* that certain Revolving Note in the original principal amount of $25,000,000, dated as of May 18, 2007, executed by Borrower in favor of the Senior Lender (as amended and modified from time to time, the "**Senior Revolving Note**") and certain other documents pursuant to which the Senior Lender has continued to make advances to the Borrower from and after May 18, 2007 to the Petition Date (as defined in the Motion) (each such document and arrangement as heretofore amended, supplemented or otherwise modified, collectively the "**Ancillary**

**Pre-Petition Credit Agreements**"). The Pre-Petition Credit Agreement, the Senior Revolving Note, the Ancillary Pre-Petition Credit Agreements, and the other loan documentation executed in connection therewith, each such document as heretofore amended, supplemented or otherwise modified, are collectively referred to herein as the "**Existing Senior Credit Agreements**").

Pursuant to the terms of the Existing Senior Credit Agreements, the Debtor granted first priority liens and security interests in favor of Senior Lender in substantially all of the Debtor's personal property assets (the "**Senior Lender's Pre-Petition Collateral**"). In addition, the Debtor granted and a lien in favor of the Senior Lender on the Junior Creditor Pre-Petition Real Property Collateral (as defined below). Collectively, all liens and security interests granted by the Debtor in favor of the Senior Lender prior to the Petition Date shall be referred to as the "**Senior Lender Pre-Petition Liens**".

## Junior Creditor

Pursuant to that certain Note and Securities Purchase Agreement, dated as of April 8, 2008, by and among the Borrower, Junior Agent (as collateral agent and lender), and certain other entities (together with Junior Agent, the "**Junior Lenders**") (as amended and modified from time to time, the "**Junior Loan Agreement**"), the Junior Lenders made certain loans to the Debtor. The loans made pursuant to the Junior Loan Agreement are evidenced by, *inter alia*, certain promissory notes in the original aggregate principal amount of $7,000,000 executed by Borrower in favor of Junior Lenders (each as amended, supplemented or otherwise modified, the "**Junior Notes**"). In addition, the Junior Lenders and the Debtor are parties to that certain Security Agreement, dated as of

April 8, 2008, (as amended and modified from time to time, the "**Junior Security Agreement**") and certain other documents pursuant to which the Junior Lenders have continued to make advances to the Debtor from and after April 8, 2008 to the Petition Date (as defined in the Motion) (each such document and arrangement as heretofore amended, supplemented or otherwise modified, collectively the "**Ancillary Junior Pre-Petition Credit Agreements**").  The Junior Loan Agreement, the Junior Notes, the Junior Security Agreement, the Ancillary Junior Pre-Petition Credit Agreements, and the other loan documentation executed in connection therewith, each such document as heretofore amended, supplemented or otherwise modified, are collectively referred to herein as the "**Existing Junior Credit Agreements**".

Pursuant to the terms of the Existing Junior Credit Agreements, the Debtor granted the Junior Creditor a first priority lien on certain real property located in Lane County, Oregon as more particularly described in the Subordination Agreement (as defined below) (the "**Junior Creditor Pre-Petition Real Property Collateral**"; collectively, the Senior Lender Pre-Petition Collateral and the Junior Creditor Pre-Petition Real Property Collateral shall be referred to as the "**Pre-Petition Collateral**"). In addition, the Debtor granted the Junior Creditor liens and security interests in the Senior Lender Pre-Petition Collateral  Collectively, all liens granted by the Debtor to the Junior Creditor shall be referred to as the "**Junior Creditor Pre-Petition Liens**" (collectively, the Senior Lender Pre-Petition Liens and the Junior Creditor Pre-Petition Liens shall be referred to as the "**Pre-Petition Liens**").

**Subordination Agreement between Junior Lenders and the Senior Lender**

The Senior Lender and the Junior Lenders are parties to that certain Debt Subordination and Intercreditor Agreement, dated as of April 8, 2008 (as amended, supplemented or otherwise modified, the "**Subordination Agreement**"). Pursuant to the terms of the Subordination Agreement, the Junior Creditor Pre-Petition Liens are subordinate to the Senior Lender Pre-Petition Liens in the Senior Lender Pre-Petition Collateral. In addition, pursuant to the Subordination Agreement, the Senior Lender Pre-Petition Liens are subordinate to the Junior Creditor Pre-Petition Liens in the Junior Creditor Pre-Petition Real Property Collateral.

**Procedural Background**

The Debtor having filed its *Ex Parte* Motion to Set Hearing on Certain Motions on Shortened Time [Docket No. 92] (the "**Motion to Shorten Time**"); and

The Interim Hearing having been held by this Court on March 23, 2009 pursuant to the Debtor's request in the Motion to Shorten Time; and

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing having been served by the Debtor on the twenty largest unsecured creditors of the Debtor, the Senior Lender, Junior Agent, other parties in interest entitled to notice and on the United States Trustee for the District of Oregon; and

Upon the Court's review of the Motion and all the pleadings filed in connection with the Interim Hearing, including all responses and objections to the Motion; having considered all the evidence presented at the Interim Hearing, including the representations of counsel for the Debtor, the Senior Lender, the Junior Agent, and other parties in interest; and the Court having noted the appearances of all parties in interest

present at the Interim Hearing and in the record of the Court; and the objections, if any, to the relief requested in the Motion having been withdrawn, continued to the date of the Final Hearing, resolved or overruled by the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor,

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction, Venue and Statutory Basis*.  This Court has jurisdiction over the Debtor's Chapter 11 case (the "**Case**") and the parties and property affected hereby pursuant to 28 U.S.C. §§l57(b) and 1334.  Venue is proper in this District pursuant to 28 U.S.C. §§1408 and 1409.  Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(A), (D), (G), (M) and (O).  The statutory basis for the relief granted herein is pursuant to 11 U.S.C. §§105, 361, 362(d), 363, 364(c), (d), (e), 503, 507(b) and 1146(c).

2.      *Notice*.  Under the circumstances, the notice given by the Debtor of the Motion and the Interim Hearing constitutes due and sufficient notice thereof within the requirements of Rule 4001.

3.      *Debtor's Stipulations*.  Without prejudice to the rights of any other party other than the Debtor (but subject to the limitations thereon contained in Paragraphs 15, 16 and 27 below), the Debtor stipulates and agrees that:

(a)      **Senior Lender Pre-Petition Debt** (i) as of the Petition Date, the Debtor was indebted and liable to the Senior Lender, without defense, counterclaim or offset of any kind, (A) in an aggregate amount exceeding $9,000,000 in respect of pre-petition loans and advances made to the Debtor by the Senior Lender pursuant to the Existing Senior Credit Agreements plus all fees and expenses, due and owing thereunder,

including, without limitation, an early termination fee due and owing pursuant to the Pre-Petition Credit Agreement (the "**Early Termination Fee**") in an amount equal to one-half of one percent (0.50%) of the sum of (y) the maximum line limit for revolving advances under the Pre-Petition Credit Agreement, and (z) the maximum line limit for capital expenditure advances under the Pre-Petition Credit Agreement ($889,423.03 of this amount is comprised of certain letter of credit obligations payable by Senior Lender as advances under the Pre-Petition Credit Agreement (the "**Letter of Credit Obligations**; which Letter of Credit Obligations will become obligations under the DIP Financing pursuant to the terms of the DIP Credit Agreement) plus (B) any additional fees, costs, expenses, and credit card obligations owed by the Debtor to the Senior Lender under the Existing Senior Credit Agreements (collectively, the "**Senior Lender Pre-Petition Debt**"), (ii) no portion of the Senior Lender Pre-Petition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code, or applicable nonbankruptcy law, and (iii) the Debtor does not have, and hereby forever releases, any claims, counterclaims, causes of action, defenses or offset rights, whether arising under the Bankruptcy Code or otherwise, against the Senior Lender and its respective affiliates, agents, officers, directors, employees and attorneys relating to the Senior Lender Pre-Petition Debt or the Existing Senior Credit Agreements;

(b)    **Senior Lender Pre-Petition Liens** the Senior Lender Pre-Petition Liens are (i) valid, perfected, enforceable, first-priority liens and security interests in the Senior Lender Pre-Petition Collateral and a lien on the Junior Creditor Pre-Petition Real Property Collateral which property constitutes virtually all of the Debtor's assets, (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy

Code, or applicable nonbankruptcy law, and (iii) subject only to (A) the post-petition liens and security interests granted to the Senior Lender pursuant to this Interim Order and the DIP Credit Agreement (the "**DIP Liens**") and (B) any Prior Liens (as defined below).

(c)    As used herein, the term "**Prior Liens**" means only valid, enforceable, and non-avoidable liens and security interests that were perfected prior to the Petition Date, which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Senior Lender Pre-Petition Liens under applicable law and after giving effect to any subordination or inter-creditor agreements, including, without limitation the Subordination Agreement.

(d)    the Senior Lender Pre-Petition Collateral includes all cash of the Debtor, including, without limitation, all amounts held in the trust account of Muhlheim Boyd, LLP ("**Muhlheim Boyd**") pursuant to the Court's Order Granting Wells Fargo's Motion to Prohibit and Objection to Use of Cash Collateral and Denying Wells Fargo's Motion for Relief from the Automatic Stay entered February 25, 2009 [Docket No. 47] (the "**Escrowed Sale Proceeds**"), all amounts held in the Debtor's bank account at US Bank (the "**US Bank Account Funds**"), all amounts held in the Debtor's bank account at Citizen's Bank (the "**Citizens Bank Account Funds**"), all amounts held in the Wells Fargo bank account that is subject of the writ of garnishment entered on December 19, 2008 by the District Court of Tarrant County, Texas in favor of Southern Holdings, LLC (the "**Garnished Account Funds**"), and all amounts constituting proceeds of the Senior Lender's Pre-Petition Collateral held in any other account of the Debtor (the

"**Unidentified Funds**"; collectively, the Escrowed Sale Proceeds, the US Bank Account Funds, the Citizens Bank Account Funds, the Garnished Bank Account Funds, and the Unidentified Funds shall be referred to as the "**Pre-Petition Senior Lender Proceeds**");

(e)　　Prior to the Petition Date, the Senior Lender filed a motion for relief from the automatic stay with respect to the Pre-Petition Collateral consisting of the Debtor's personal property assets (the "**Senior Lender's Stay Relief Motion**"), and the Debtor had no valid defense to the Senior Lender's Stay Relief Motion and did not file an objection thereto;

(f)　　As of the Petition Date, the Senior Lender is oversecured in that the value of the Pre-Petition Collateral exceeds the amount of the Senior Lender Pre-Petition Debt;

(g)　　as of the Petition Date, the Debtor was indebted and liable to Junior Agent in an aggregate amount exceeding $15,000,000 (the "**Junior Creditor Pre-Petition Debt**").

4.　　*Preliminary Findings Regarding the DIP Financing.*

(a)　　Good cause has been shown for the entry of this Interim Order. The Debtor requires the DIP Financing and use of Cash Collateral in connection therewith in order to operate and reorganize the Debtor's business.

(b)　　The Debtor has an immediate need to obtain the DIP Financing and use of Cash Collateral in order to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors and suppliers, and to satisfy other ordinary working capital needs. The ability of the Debtor to obtain sufficient working capital and liquidity through the use and turnover

of Cash Collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the Debtor and a successful reorganization of the Debtor.

(c)       The Debtor is unable to obtain adequate unsecured credit allowable under Section 503(b)(l) of the Bankruptcy Code as an administrative expense.  A post-petition credit facility in the amount and on the terms provided by the DIP Financing is unavailable to the Debtor without the Debtor granting to the Senior Lender the DIP Liens, the DIP Obligation Superpriority Claim (as defined below), the Senior Lender Adequate Protection Claim  (as defined below), the Senior Lender Adequate Protection Liens (as defined below), the Junior Creditor Adequate Protection Superpriority Claim (as defined below), and the Junior Creditor Adequate Protection Liens (as defined below).  Further, the Senior Lender is unwilling to allow the Debtor to use its Cash Collateral on different terms than are contained herein, and there is no basis under which to provide the Senior Lender with adequate protection of its interest in the Pre-Petition Collateral outside the terms of this Interim Order.

(d)       Based upon the limited record before the Court and the Debtor's representations, the Court concludes that the terms of the DIP Financing on an interim basis are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty and are supported by reasonably equivalent value and fair consideration.

(e)       The DIP Financing has been negotiated in good faith and at arm's-length between the Debtor and the Senior Lender, and any advances and loans made to the Debtor by the Senior Lender pursuant to the Debtor-in-Possession Credit and Security

Agreement substantially in the form attached as **Exhibit A** to the Motion, as such may have been modified as of the date hereof (the Debtor-in-Possession Credit and Security Agreement and all documents related thereto, are referred to as the "**DIP Credit Agreement**"), shall be deemed to have been extended by the Senior Lender in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

(f)      As of the Petition Date, the Senior Lender is oversecured such that the liquidation value of the Senior Lender Pre-Petition Collateral exceeds the amount of the Senior Lender Pre-Petition Debt.

(g)      The Debtor has requested entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtor's estate will be immediately and irreparably harmed.  Consummation of the DIP Financing in accordance with this Interim Order and the DIP Credit Agreement is therefore in the best interest of the Debtor's estate.

5.      *Authorization of the DIP Financing and the DIP Credit Agreement.*

(a)      The Debtor is hereby authorized to borrow pursuant to the DIP Credit Agreement up to an aggregate principal amount of $11,500,000 on an interim basis up until the time of the Final Hearing, in accordance with the terms of the DIP Credit Agreement and pursuant to the DIP Budget (as defined below), which shall be used, among other things, for the purpose of providing the Debtor working capital necessary for the successful reorganization of the Debtor.

(b)      In furtherance of the foregoing, the Debtor is authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of amended security agreements

and replacement financing statements), and to pay all fees, that may be reasonably required or necessary for the Debtor's performance of the DIP Financing, including, without limitation:

(i)       the execution, delivery and performance of the DIP Credit Agreement and any exhibits attached thereto, and any other security documents contemplated thereby or requested by Senior Lender in connection therewith,

(ii)      performance of all other acts required under or in connection with the DIP Credit Agreement and this Interim Order.

(c)       Upon execution and delivery, the DIP Credit Agreement shall constitute a valid and binding obligation of the Debtor, enforceable against Debtor in accordance with its terms.  No obligation, payment, transfer or grant of security under the DIP Credit Agreement shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code, or under any applicable law, or be subject to any defense, reduction, offset or counterclaim.

(d)       The Debtor is hereby authorized to borrow, repay and re-borrow under the DIP Credit Agreement, subject to the limitations provided in the DIP Budget and this Interim Order.  Upon final approval and entry of the Final Order, provided the DIP Financing has not otherwise been terminated due to the occurrence of an Event of Default (as defined below), the term of the DIP Financing will end on the earlier of: (y) December 31, 2009, and (z) the date on which on the Court enters an order confirming a plan of reorganization acceptable to Senior Lender (the "**Termination Date**").  The Senior Lender shall not have any obligation or responsibility to monitor the Debtor's use of the DIP Financing and may rely on the Debtor's reporting and representations that the

amount of the DIP Financing requested at any time, and the use thereof, is in accordance with the requirements of the DIP Credit Agreement, the DIP Budget and this Interim Order.

(e)    Pursuant to the DIP Credit Agreement, Borrower shall pay Lender a Commitment Fee of $180,000 (the "**Commitment Fee**") payable in monthly installments equal to $20,000 (each a "**Commitment Fee Payment**").   The initial Commitment Fee Payment shall be due and payable on April 1, 2009, and each subsequent Commitment Fee Payment shall be due and payable on the first (1st) day of each calendar month until the Termination Date.  To the extent that the Termination Date occurs prior to the due date of any Commitment Fee Payment, such Commitment Fee Payment shall not be collected by the Lender.  Each Commitment Fee Payment shall be fully earned as of the date such Commitment Fee Payment is due and owing and shall not be subject to refund or rebate.

(f)    The DIP Financing may be used by the Debtor through and including the Termination Date, for the purposes and in amounts not to exceed those set forth in the DIP Budget (as defined below) for operating and working capital purposes and for any other expenses approved by the Court and the Senior Lender in accordance with the terms and conditions of this Interim Order and the DIP Credit Agreement.  The budget attached hereto as **Exhibit A** (the "**Initial DIP Budget**") may be replaced, modified, or supplemented upon the Debtor's request with a subsequent budget approved by Senior Lender in Senior Lender's sole discretion and without further order from this Court (the Initial DIP Budget or any such subsequent budget approved by Senior Lender shall be referred to as the "**DIP Budget**").  During the term of this Interim Order (and

following final approval), the Debtor shall comply with the terms of the DIP Budget in accordance with the terms of the DIP Credit Agreement.  Any failure by the Debtor to so comply with the DIP Budget shall be an Event of Default pursuant to Paragraph 24 below.  To the extent the DIP Budget presently anticipates any "out of formula advances" the Debtor is hereby authorized and permitted to obtain such advance only so long as it complies with the DIP Budget as provided by the DIP Credit Agreement and the Senior Lender consents in writing thereto.

(g)    The DIP Obligations shall bear interest at the rates, and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Credit Agreement, in each case without further notice, motion or application to, order of, or hearing before, this Court.  The Debtor shall pay on demand all fees, costs, expenses and other charges payable under the terms of the DIP Credit Agreement, including, without limitation, those fees, costs and expenses described in section 2.6 (Fees), section 8.5 (Costs and Expenses), and section 8.6 (Indemnity) of the DIP Credit Agreement.  None of such fees, costs and expenses shall be subject to Court approval or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, that the Senior Lender shall submit copies of its professional fee invoices to the Debtor, the U.S. Trustee and counsel for any official committee of unsecured creditors appointed in the Case (the "**Committee**") the Committee (and any subsequent trustee of the Debtors' estates).  Such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such

invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine. The U.S. Trustee and the Committee (and any subsequent trustee of the Debtor's estate) may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted by the Senior Lender; provided that, any such objection shall be forever waived and barred unless (i) it is filed with this Court and served on counsel to the Senior Lender no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice and (ii) it describes with particularity the items or categories of fees, costs and expenses that are the subject of the objection and provides the specific basis for the objection to each such item or category of fees, costs and expenses. Any hearing on an objection to payment of any fees, costs and expenses of the Senior Lender set forth in a professional fee invoice shall be limited to the reasonableness or necessity of the particular items of categories of the fees, costs and expenses which are the subject of such objection. The Debtor shall indemnify the Senior Lender to the extent set forth in the DIP Credit Agreement, including, without limitation, as provided in Section 8.6 (Indemnity) of the DIP Credit Agreement. All such unpaid fees, costs, expenses, charges and indemnities that have not been disallowed by this Court on the basis of an objection filed by the U.S. Trustee or the Committee (or any subsequent trustee of the Debtors' estates) in accordance with the terms hereof shall constitute DIP Obligations and shall be secured by the DIP Collateral and the Pre-Petition Collateral as specified in this Interim Order. Any and all fees, commissions, costs and expenses paid prior to the Petition Date by the Debtor to the Senior Lender in connection with or with respect to the DIP Facility or DIP Credit Agreement are hereby approved in full.

(h)      As part of the DIP Budget and the Debtor's request to use Cash Collateral, the Debtor proposes to create and fund a trust fund for professionals on a post-petition basis in order to pay the Debtor's and the Committee's professional fees and costs as the Court may authorize and allow by subsequent order following notice and hearing ("**Professional Fund**").  The DIP Budget provides for scheduled payments of professional fees and expenses for the Debtor's professionals and the Committee's professionals (each a "**Scheduled Professionals Payment**") The Debtor proposes to deposit each Scheduled Professionals Payment into the Professional Fund in accordance with the amounts provided in the DIP Budget; provided, however, the Debtor shall not deposit any funds into the Professional Fund with respect to any professional fees and costs incurred after the Termination Date.  All amounts in the Professional Fund shall be deposited into a trust account maintained by Stoel Rives LLP in trust for payment of allowed fees and costs to the Debtor's professionals and the Committee's professionals, and any amounts payable pursuant to any other order entered by this Court authorizing interim periodic payment of professional fees, subject to final allowance of such fees and costs.  All funds so deposited shall be considered carved-out of and free of any security interest or claims of the Senior Lender, the Junior Creditor or other lien holders and shall be used solely for payment of allowed fees and costs of the Debtor's or the Committee's Chapter 11 professionals to the extent such amounts are specifically provided by the DIP Budget and were deposited with respect to professional fees and costs incurred prior to the Termination Date.  To the extent the funds deposited into the

Professional Fund exceed the total of all allowed Chapter 11 fees and costs of the

Debtor's and Committee's professionals, such funds shall be paid to the Lender.

6. *DIP Financing Superpriority Claims.*

Pursuant to Section 364(c)(l) of the Bankruptcy Code, all of the Debtor's

obligations, indebtedness and liabilities arising under or in respect of the DIP Financing,

the DIP Credit Agreement, and this Interim Order (collectively, the "**DIP Obligations**")

shall constitute obligations of the Debtor with priority over any and all administrative

expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code,

and over any and all administrative expenses or other claims under Sections 105, 326,

328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 552, 726, 1114, or other similar

section of the Bankruptcy Code (the "**DIP Obligation Superpriority Claim**"); provided,

however, the DIP Obligation Superpriority Claim shall be subordinate to the Senior

Lender Adequate Protection Claim . Notwithstanding the foregoing, to the extent any

payment by the Debtor, to any professional or otherwise, was made (i) in accordance with

the DIP Budget and (ii) prior to any Event of Default, then Senior Lender may not seek

disgorgement of the payment on account of the DIP Obligation Superpriority Claim.

7. *DIP Liens.* As security for the DIP Obligations, effective and perfected

upon the date of this Interim Order and without the necessity of the execution by the

Debtor of additional security agreements or otherwise, and without recording any

financing statement, mortgage or similar instrument or agreement, the following

additional security interests and liens are hereby granted to the Senior Lender (all

property identified in clauses (a), (b) and (c) below being collectively referred to as the

"**DIP Collateral**").

(a)	<u>First-Priority Lien on Cash Balances and Unencumbered Property</u>. Pursuant to Section 364(c)(2) of the Bankruptcy Code, the Senior Lender is hereby granted a perfected security interest in and lien, senior to all other liens, claims, and interests other than the Senior Lender Adequate Protection Liens, upon any and all cash of the Debtor, each bank account of the Debtor and any investment of the funds contained therein, and any and all other pre-petition and post-petition property of the Debtor, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "**Unencumbered Property**"), including, without limitation, cash, inventory, accounts, accounts receivable, other rights to payment or refund whether arising before or after the Petition Date, contracts, equipment, goods, general intangibles, documents, instruments, interests in leaseholds, real property, patents, copyrights, trademarks, deposit accounts, investment property, letter of credit rights, fixtures, trade names, other intellectual property, capital stock of subsidiaries, and all proceeds of all the foregoing. Unencumbered Property shall, however, exclude the Debtor's claims, causes of action and recoveries under Sections 502(d), 544, 545, 547, 548, 550, 551 or 553 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code, but shall include any claims, causes of action or recoveries as to any fraudulent conveyances or fraudulent transfers of Senior Lender Pre-Petition Collateral (collectively, the "**Avoidance Actions**").

(b)	<u>Senior Lender's Priming Lien</u>.  Pursuant to Section 364(d)(1) of the Bankruptcy Code, the Senior Lender is hereby granted a perfected, priming security interest in and lien upon all pre-petition and post-petition property of the Debtor

including, without limitation, the Pre-Petition Collateral, DIP Collateral, Cash Collateral, inventory, commercial tort claims, accounts receivable, other rights to payment or refund, contracts, goods, equipment, general intangibles, documents, instruments, interests in leaseholds, real property, patents, copyrights, trademarks, trade names, deposit accounts, investment property, letter of credit rights, fixtures, other intellectual property, capital stock of subsidiaries or affiliates, and the proceeds of all the foregoing, that is subject to the Pre-Petition Liens. Such security interests and liens shall be senior in all respects to: (i) the Junior Creditor Pre-Petition Liens in the Senior Lender Pre-Petition Collateral and (ii) the Junior Creditor Adequate Protection Liens (as defined below) in the DIP Collateral, but shall, pursuant to Section 364(c)(3) of the Bankruptcy Code or otherwise, be subordinate to: (i) any Prior Liens; (ii) the Senior Lender Pre-Petition Liens; (iii) the Senior Lender Adequate Protection Liens; (iv) any valid, perfected and unavoidable security interests in such property arising out of liens to which the liens of the Senior Lender become subject subsequent to the Petition Date solely as permitted by Section 546(b) of the Bankruptcy Code; and (v) the Junior Creditor Pre-Petition Lien in the Junior Lender Pre-Petition Collateral.

(c)    <u>Liens Senior to Certain Other Liens</u>.   The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under Section 551 of the Bankruptcy Code which lien, but for such avoidance would not be senior or equal in priority to the liens granted to the Senior Lender hereunder.

(d)  <u>Prevost</u>.  Nothing contained in this Interim Order shall be deemed to affect or impair the rights of Prevost Car (US), Inc. ("**Prevost**") in any of the Debtor's assets or assets in the Debtor's possession, including, without limitation, the Pre-Petition Collateral.

8.  *Protection of Senior Lender's Rights.*

(a)  So long as the Senior Lender's commitment to make advances under the DIP Credit Agreement shall not have been terminated, the Senior Lender shall take no action to foreclose upon the Senior Lender Pre-Petition Liens pursuant to the Existing Senior Credit Agreements or this Interim Order, or otherwise exercise remedies against the Senior Lender Pre-Petition Collateral or the DIP Collateral, except to the extent authorized by this Interim Order or separate order of this Court; provided, however, the Senior Lender shall be entitled at all times prior to the termination of the DIP Financing to continue to receive the payments from the Debtor contemplated by the DIP Credit Agreement and Paragraph 10(A)(3) below.

(b)  The automatic stay provisions of Section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Senior Lender to exercise all rights and remedies against the DIP Collateral and the Senior Lender Pre-Petition Collateral provided for in the DIP Credit Agreement and/or the Existing Senior Credit Agreements upon the occurrence of any Event of Default after the expiration of any applicable notice and cure period as required by the DIP Credit Agreement and the giving of two (2) business days' prior written notice to the Debtor, Junior Agent, the United States Trustee, and the Committee.  In any hearing after the giving of the aforementioned notice, the only issue that may be raised by the Debtor in opposition

thereto shall be whether, in fact, an Event of Default has occurred, and the Debtor hereby waives its right to seek to reimpose the automatic stay or obtain other injunctive relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the Senior Lender as set forth in this Interim Order or the DIP Credit Agreement and/or the Existing Senior Credit Agreements. In no event shall the Senior Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or any collateral subject to any Senior Lender Pre-Petition Lien.

(c)      Subject to the entry of the Final Order, the automatic stay is hereby further vacated and modified to allow Senior Lender to take possession of the Senior Lender Pre-Petition Proceeds and to apply such amounts to the Senior Lender Pre-Petition Debt, and the Debtor is hereby authorized and directed to take any and all action requested by the Senior Lender to facilitate the Senior Lender taking possession of such funds.

(d)      Except as otherwise provided in the DIP Credit Agreement, the Debtor's right to borrow under this Interim Order and the DIP Credit Agreement or use Cash Collateral (as defined below), as provided in Paragraph 9 below, shall terminate automatically on the earlier of the Termination Date or upon the occurrence and continuation of an Event of Default following the expiration of any applicable cure period as required under the DIP Credit Agreement. Additionally, the Senior Lender shall have no obligation to make any advances under the DIP Credit Agreement to pay any unfunded or underfunded item in the DIP Budget following the Termination Date or upon a termination due to the occurrence of an Event of Default.

(e)    Nothing herein shall preclude the Senior Lender from credit bidding the Senior Lender Pre-Petition Debt and the DIP Obligations pursuant to Section 363(k) of the Bankruptcy Code at any sale of the Pre-Petition Collateral and/or the DIP Collateral.

9.    *Use of Cash Collateral*.  All cash and investment securities of the Debtor, including any proceeds of the Senior Lender Pre-Petition Collateral (including funds on deposit at any bank as of the Petition Date) are Cash Collateral of the Senior Lender within the meaning of Section 363(a) of the Bankruptcy Code.   All such cash and investment securities are referred to herein as "Cash Collateral."  Except as otherwise set forth herein and in the DIP Credit Agreement, the Debtor is hereby authorized to use all Cash Collateral of the Senior Lender in servicing the DIP Financing and making payments on the Senior Lender Pre-Petition Debt as contemplated herein, by the Final Order upon approval, and by the DIP Credit Agreement, provided that the Senior Lender is granted and receives adequate protection as hereinafter set forth.

10.    *Adequate Protection*.  The Senior Lender and Junior Creditor are hereby granted the following adequate protection:

A.    <u>Senior Lender Adequate Protection</u>.  Until the indefeasible repayment in full in cash of the Senior Lender Pre-Petition Debt, as adequate protection for the Senior Lender's interest in the Pre-Petition Collateral, the Senior Lender is hereby granted the following:

1.    <u>Replacement Liens</u>.  Pursuant to sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Senior Lender, is hereby granted by Debtor continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the DIP Collateral (the "**Senior Lender**

**Adequate Protection Liens**").  The Senior Lender Adequate Protection Liens shall (a) be subordinate only to the Prior Liens; and (b) be senior and superior to: (a) the Junior Creditor Adequate Protection Liens; and (b) the DIP Liens.  The Senior Lender Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination, impairment or avoidance, for all purposes in the Case and any subsequent or successor case of the Debtor (any such case shall be referred to as a "**Successor Case**").  Except as described in clause (a) above, no other liens or security interests, whether for adequate protection or otherwise, shall be senior or equal to or pari passu with the Senior Lender Adequate Protection Liens in the Case or any Successor Case without the prior written consent of the Senior Lender (which consent may be withheld in Senior Lender's sole discretion).

2.      Senior Lender Adequate Protection Claim .  Pursuant to section 507(b) of the Bankruptcy Code, the Senior Lender shall have an allowed super-priority administrative expense claim (the "**Senior Lender Adequate Protection Claim**") against the Debtor and its estate.  The Senior Lender Adequate Protection Claim shall be senior and superior to the Junior Creditor Adequate Protection Claim and the Junior Creditor Adequate Protection Lien.  No cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in the Case or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or pari passu with, the Senior Lender Adequate Protection Claim.

3.      Current Payment.  As further adequate protection, and without limiting any rights of the Senior Lender under section 506(b) of the

Bankruptcy Code which are hereby preserved, and in consideration, and as a requirement, for obtaining the consent of the Senior Lender to the entry of this Interim Order and the Debtor's consensual use of Cash Collateral as provided herein, the Debtor shall, on upon the entry of this Interim Order and on a monthly basis thereafter, pay or reimburse the Senior Lender for any and all of its accrued and past-due interest, fees, costs, expenses and charges payable under the Existing Senior Lender Credit Agreements and the DIP Credit Agreement, including without limitation, the reasonable attorneys' and other fees and expenses of the Senior Lender, whether accrued pre-petition or post-petition, all without further notice, motion or application to, order of, or hearing before, this Court within ten (10) days after request for such payment is made.

4.      Senior Lender Adequate Protection Obligations.   The Senior Lender Adequate Protection Liens and Senior Lender Adequate Protection Claim shall secure the payment of the Senior Lender Pre-Petition Debt in an amount equal to any diminution in the value of the Senior Lender's interests in the Pre-Petition Collateral from and after the Petition Date (the amount of such diminution, the "**Senior Lender Adequate Protection Obligations**") including, without limitation, any such diminution resulting from the following: (i) the use by the Debtor of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code or (iii) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Pre-Petition Collateral or otherwise.

B.    <u>Junior Creditor Adequate Protection</u>.  Until the indefeasible repayment in full in cash of the Junior Creditor Pre-Petition Debt, as adequate protection for Junior Agent's interest in the Pre-Petition Collateral, Junior Agent is hereby granted the following:

1.    <u>Replacement Liens</u>.  Pursuant to sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, Junior Agent, for its benefit and the benefit of the Junior Lenders, is hereby granted by the Debtor continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the DIP Collateral (the "**Junior Creditor Adequate Protection Liens**"; collectively, the Senior Lender Adequate Protection Liens and the Junior Creditor Adequate Protection Liens shall be referred to as the "**Adequate Protection Liens**").  The Junior Creditor Adequate Protection Liens shall be entitled to the same rights, priorities, benefits and protections granted to or conferred upon the Senior Lender Adequate Protection Liens under this Interim Order, except that such Junior Creditor Adequate Protection Liens shall be junior and subordinate to the Senior Lender Pre-Petition Liens in the Senior Lender's Pre-Petition Collateral, the Senior Lender Adequate Protection Liens, and the DIP Liens.

2.    <u>Adequate Protection Junior Claim</u>.  Pursuant to section 507(b) of the Bankruptcy Code, Junior Agent, for itself and for the benefit of the Junior Lenders, shall have an allowed super-priority administrative expense claim (the "**Junior Creditor Adequate Protection Claim**") against the Debtor and its estate.  The Junior Creditor Adequate Protection Claim shall be entitled to the same rights, priorities, benefits and protections granted to or conferred upon the Senior Lender Adequate Protection Claim under this Interim Order, except that such Junior

Creditor Adequate Protection Claim shall be junior and subordinate to the Senior Lender Adequate Protection Claim.

4.      <u>Adequate Protection Junior Obligations</u>.    The Junior Creditor Adequate Protection Liens and Junior Creditor Adequate Protection Claim shall secure the payment of the Junior Creditor Pre-Petition Debt in an amount equal to any diminution in the value of Junior Agent's interests in the Pre-Petition Collateral from and after the Petition Date (the amount of such diminution, the "**Junior Creditor Adequate Protection Obligations**") including, without limitation, any such diminution resulting from the following: (i) the use by the Debtor of the Pre-Petition Collateral, including, without limitation, the Cash Collateral, (ii) the imposition of the DIP Liens, which will prime the Junior Creditor Pre-Petition Liens in the Senior Lender Pre-Petition Collateral, (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code or (iv) the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Pre-Petition Collateral or otherwise.

11.    *Proceeds of Collateral*.  The proceeds of the DIP Collateral and the Pre-Petition Collateral shall be disbursed as follows:

A.      <u>Senior Lender Pre-Petition Collateral</u>.    Proceeds of the Senior Lender Pre-Petition Collateral shall be disbursed by the Debtor in the following priority: (i) first, to the Senior Lender for application towards the Senior Lender Pre-Petition Debt; (ii) second, to the Senior Lender for application towards the DIP Obligations; (iii) third, to Junior Agent for application towards the Junior Creditor Pre-Petition Debt; and (iv) fourth, to all other creditors of the Debtor in accordance with the Bankruptcy Code.

B.      Junior Creditor Pre-Petition Real Property Collateral.  Proceeds of the Junior Creditor Pre-Petition Real Property Collateral shall be disbursed by the Debtor in the following priority: (i) first, to Junior Agent for application towards the Junior Creditor Pre-Petition Debt; (ii) second, to the Senior Lender for application towards the Senior Lender Pre-Petition Debt; (iii) third, to the Senior Lender for application towards the DIP Obligations; and (iv) fourth, to all other creditors of the Debtor in accordance with the Bankruptcy Code.

C.      DIP Collateral.  Proceeds of the DIP Collateral shall be disbursed by the Debtor in the following priority: (i) first, to the Senior Lender for application towards the Senior Lender Adequate Protection Obligations; (ii) second, to the Senior Lender for application towards the DIP Obligations; (iii) third, to Junior Agent for application towards the Junior Creditor Adequate Protection Obligations; and (iv) fourth, to all other creditors of the Debtor in accordance with the Bankruptcy Code.

12.     *Reservation of Rights of Senior Lender.*  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including Section 506(b) thereof, the Court finds that the adequate protection provided for herein is reasonable and sufficient to protect the security interests of the Senior Lender and Junior Agent in the Pre-Petition Collateral.  However, this Interim Order shall not preclude the Senior Lender or Junior Agent from seeking further or different adequate protection.

13.     *Perfection of DIP Liens and Adequate Protection Liens.*  The Senior Lender and Junior Agent are hereby authorized to, but shall not be required to, file or record financing statements, notices of lien or similar instruments in any jurisdiction or

take any other action in order to validate and perfect the security interests and liens granted to them pursuant to this Interim Order.  Whether or not the Senior Lender or Junior Agent shall, in their sole discretion, choose to file such financing statements, notices of lien or similar instruments or otherwise confirm perfection of such security interests and liens, the liens and security interests granted herein shall be deemed valid and perfected at the time and on the date of entry of this Interim Order.  The Debtor, upon the request of the Senior Lender or Junior Agent, without any further consent of any party, is authorized to take, execute and deliver such instruments to enable the Senior Lender to further perfect, preserve and enforce the security interests and liens granted to such party by this Interim Order.

14.     *Preservation of Liens and Rights Granted Under the Interim Order.*

(a)     No claim or lien having a priority superior to or *pari passu* with those granted by this Interim Order to the Senior Lender shall be granted while any portion of the DIP Obligations (or any refinancing thereof), the commitments thereunder, the Senior Lender Pre-Petition Debt, or the Senior Lender Adequate Protection Obligations remain outstanding.  The security interests and liens granted to the Senior Lender or Junior Agent hereunder shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under Section 551 of the Bankruptcy Code which lien, but for such avoidance would not be senior or equal in priority to the liens granted to the Senior Lender or Junior Agent hereunder, and (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under Section 364(d) of the Bankruptcy Code or otherwise.

(b)        Unless all obligations and indebtedness owing to the Senior Lender (i) under the DIP Credit Agreement, or (ii) under the Existing Senior Credit Agreements, shall theretofore have been paid in full or in the manner agreed to in connection with any plan of reorganization, the Debtor shall not seek, and it shall constitute an Event of Default if the Debtor seeks, or if there is entered, an order dismissing the Case.  If an order dismissing the Case under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order, to the extent permissible under applicable law, shall provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that (i) DIP Liens, Adequate Protection Liens, and other security interests and replacement liens granted to the Senior Lender and Junior Agent pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations, Senior Lender Adequate Protection Obligations, Junior Creditor Adequate Protection Obligations, Senior Lender Pre-Petition Debt, and Junior Creditor Pre-Petition Debt shall have been paid and satisfied in full in cash (and that such DIP Liens, Adequate Protection Liens and other security interests and replacement liens, shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the liens and security interests referred to in (i) above.

(c)        If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations, Senior Lender Adequate Protection Obligations, and Junior Creditor Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Senior Lender of the effective date of such reversal,

stay, modification or vacation or (ii) the validity and enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement or this Interim Order with respect to any DIP Obligation, Senior Lender Adequate Protection Obligation, or Junior Creditor Adequate Protection Obligation.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral or DIP Obligation incurred by the Debtor prior to the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Senior Lender and Junior Agent shall be entitled to all the rights, remedies, privileges and benefits granted in this Interim Order and/or pursuant to the DIP Credit Agreement with respect to all uses of Cash Collateral, the DIP Obligations, the Senior Lender Adequate Protection Obligations, and the Junior Creditor Adequate Protection Obligations.

(d)        The obligations of the Debtor under this Interim Order and the DIP Credit Agreement shall not be discharged by the entry of an order confirming a plan of reorganization in the Case and, pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived such discharge.

(e)        In no event shall any person or entity who pays (or, through the extension of credit to the Debtor, causes to be paid) any of the DIP Financing or other obligations under the DIP Credit Agreement or the Existing Senior Credit Agreements be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted to or in favor of, or conferred upon, Senior Lender by the terms of the DIP Credit Agreement, the Existing Senior Credit Agreements, this Interim Order or otherwise, until such time as all of the DIP Financing and other obligations under the

DIP Credit Agreement and Existing Senior Credit Agreements are satisfied and paid in full.

(f)        Debtor shall not file any pleading in this Court, or any other court of competent jurisdiction, challenging the validity of or seeking to modify, alter, amend, or vacate any provision of this Interim Order, the Final Order, or the DIP Credit Agreement without the written consent of the Senior Lender.

15.        *Effect of Stipulations on Third Parties.*  The stipulations and admissions contained in this Interim Order, including, without limitation, those in Paragraph 3 of this Interim Order, shall be immediately binding on the Debtor, and thereafter binding upon all other parties in interest, including any Committee, unless (a) the Committee has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including, inter alia, those in Paragraph 16 below) by no later than May 30, 2009 (the "**Challenge Deadline**") (or such later date as has been agreed in writing to by the Senior Lender, or ordered by this Court after notice and a hearing), (i) challenging the validity, enforceability, priority or extent of the Senior Lender Pre-Petition Debt or the Senior Lender Pre-Petition Liens or (ii) otherwise asserting any claims or causes of action against the Senior Lender, and (b) there is a final order or judgment in favor of the Committee in any such timely filed adversary proceeding or contested matter.  If no Committee is formed and no such adversary proceeding or contested matter is timely filed by a party in interest other than the Debtor by the Challenge Deadline, (x) the Senior Lender Pre-Petition Debt, the Senior Lender Pre-Petition Liens and all related obligations of the Debtor shall constitute allowed claims, not subject to counterclaim, offset, subordination, recharacterization, defense or avoidance, for all purposes in the Case and

any subsequent Chapter 7 case, (y) the Pre-Petition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, not subject to recharacterization, subordination or avoidance, and (z) the Senior Lender Pre-Petition Debt and Senior Lender Pre-Petition Liens shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtor's estate, including, without limitation, any successor(s) thereto. If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in Paragraph 3 shall nonetheless remain binding and preclusive (as provided in the second sentence of this Paragraph) except to the extent that such findings and admissions were successfully challenged in such adversary proceeding or contested matter.

16. *Limitation on Use of Financing Proceeds and Collateral*. Notwithstanding anything herein to the contrary, no borrowings or proceeds from the DIP Credit Agreement, the Cash Collateral, the DIP Collateral, or the Senior Lender's Pre-Petition Collateral may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Credit Agreement or the Existing Senior Credit Agreements, or the liens or claims granted under this Interim Order, the DIP Credit Agreement or the Existing Senior Credit Agreements (including without limitation, the DIP Liens and the Senior Lender Pre-Petition Liens), (b) assert any claims, counterclaims, defenses or causes of action against the Senior Lender or its affiliates, (c) prevent, hinder or otherwise delay the Senior Lender's assertion, enforcement or realization on the Cash Collateral, the Pre-Petition Collateral or the DIP Collateral in accordance with the DIP Credit Agreement, the Existing Senior Credit Agreements or this Interim Order, or (d) seek to modify any of the rights granted

to the Senior Lender hereunder, under the DIP Credit Agreement, or under the Existing Senior Credit Agreements, in each of the foregoing cases without the Senior Lender's prior written consent.

17.    *No Surcharge Without Consent*.  As a condition to and as consideration for the obligation of the Senior Lender to provide and continue the DIP Financing, no costs or expenses of any kind incurred in the Case by any party may be imposed upon the Senior Lender or any of the DIP Collateral or the Pre-Petition Collateral pursuant to Section 506(c) of the Bankruptcy Code or otherwise without the Senior Lender's prior written consent, which the Senior Lender may grant or deny in its sole and absolute discretion, and that no such consent be implied or imposed based on any action or inaction of the Senior Lender.

18.    *Limited Authorization to Borrow and Use Post-Petition Financing Proceeds Pending Final Hearing*.  Notwithstanding anything contained in this Interim Order to the contrary, the Debtor is authorized to borrow and use proceeds of the DIP Financing (but not proceeds of any of the DIP Collateral or the Senior Lender's Pre-Petition Collateral without the prior written consent of the Senior Lender) solely for the purposes authorized by the DIP Credit Agreement, the DIP Budget and this Interim Order, pending the Final Hearing on the Motion.  The Senior Lender has no obligation, and shall not be required, to provide any additional post-petition financing or perform any other obligations under the DIP Credit Agreement until entry of, and as set forth in, the Final Order.  As a result of the preliminary authorization contained herein, no transfer of property of Debtor's estate made in accordance with the provisions of this Interim Order or the DIP Credit Agreement shall be avoidable as an unauthorized transfer under Section

549 of the Bankruptcy Code, including, without limitation the transfer of the Escrowed Sale Proceeds to the Senior Lender.

19.    *No Use of Proceeds from DIP Collateral.*   The Debtor may not use proceeds of any of the DIP Collateral (as opposed to advances of the DIP Financing) without the prior written consent of the Senior Lender, which the Senior Lender may grant or deny in its absolute discretion.   Unless otherwise directed by the Senior Lender or as required by the DIP Credit Agreement, the Debtor shall promptly deliver to the Senior Lender, as received, all proceeds or payments constituting proceeds of the DIP Collateral (including any proceeds currently in their possession) in which the Senior Lender holds a first-priority security interest for application in accordance with the terms of the DIP Credit Agreement and this Interim Order.

20.    *No Additional Duty to Lend or Extend Term.*   Nothing contained in this Interim Order shall be construed to require the Senior Lender to make any loan or extension of credit to or for the benefit of the Debtor or its estate other than as expressly provided in this Interim Order, the DIP Budget or the DIP Credit Agreement, and any and all loans and extensions of credit that the Senior Lender shall elect to make shall be in such amounts and made at such times as the Senior Lender may determine the Debtor is allowed pursuant to the DIP Credit Agreement.   Notwithstanding the authority and approvals provided for herein, the Senior Lender may, in its sole and absolute discretion, terminate or extend the term of (or may decline to terminate or extend the term of) the DIP Financing as provided under the DIP Credit Agreement at any time in accordance with the terms thereof and may waive (or in its absolute discretion, withhold any waiver

of) any event of default under the DIP Credit Agreement or this Interim Order, all without further notice or order of this Court.

21.    *Payment; No Setoff.*  All of the Debtor's obligations in connection with the DIP Financing and this Interim Order shall be due and payable, and shall be paid, as and when provided in the DIP Credit Agreement.  In no event shall the Debtor be authorized to offset any amount due or allegedly due or owing by the Senior Lender to the Debtor against any of the obligations under the DIP Credit Agreement or the Existing Senior Credit Agreements without the Senior Lender's prior written consent, which the Senior Lender may grant or deny in its sole and absolute discretion.

22.    *Debtor's Obligations and Transfers to Senior Lender Not Avoidable*.  None of the Debtor's obligations, grants of security interests, liens or superpriority claim status or payments or other transfers to the Senior Lender under the DIP Credit Agreement or to the Senior Lender and/or Junior Agent under this Interim Order shall be avoidable or recoverable as a fraudulent, ultra vires, or unlawful transfer under any applicable law, including, without limitation, the Bankruptcy Code.

23.    *Amendments or Modifications*.  The Debtor and the Senior Lender are hereby authorized to amend or modify the DIP Credit Agreement, in accordance with the terms thereof, without further order of this Court on the following conditions: (i) the amendment or modification must not constitute a material change to the terms of the DIP Credit Agreement (and, for purposes hereof, a "material change" shall mean a change that operates to increase the rate of interest other than as currently provided in the DIP Credit Agreement, add additional specific events of default, increase the aggregate amount of the DIP Financing above the Maximum Line Amount (as defined in the DIP

Credit Agreement) or enlarge the nature and extent of remedies available to the Senior Lender following an Event of Default), and (ii) copies of the amendment or modification must be served by the Debtor on the Senior Lender, Junior Agent, the Committee, the United States Trustee, and any other party as the Court may direct. Any amendment or modification that constitutes a material change, to be effective, must be approved by the Court, upon prior notice and opportunity for hearing as shall be appropriate under the circumstances warranting the material change; provided, however, any such amendment or modification may be deemed effective *nunc pro tunc* to the date the Senior Lender and Debtor agreed thereto. Notwithstanding anything contained herein, Senior Lender, in its sole discretion, may consent to any request by Debtor to modify the DIP Budget; provided, however, any such request from the Debtor and consent from the Senior Lender must be in writing to be effective.

24.    *Events of Default*.  Upon or after the occurrence of (i) the Termination Date, (ii) an Event of Default under the DIP Credit Agreement, and/or if (iii) the Debtor fails to duly and punctually observe, perform or discharge any obligation or duty imposed upon it by this Interim Order or the Final Order, including without limitation, the making of the Adequate Protection Payments in the manner required by Paragraph 10(A)(3) above, (iv) a trustee is appointed in the Case without the Senior Lender's consent, (v) the Case is dismissed or converted to Chapter 7 of the Bankruptcy Code (whether proposed or sought by the Debtor or any other party) without the Senior Lender's consent, (vi) this Interim Order or the Final Order is modified without the prior written consent of the Senior Lender, (vii) the filing of a motion to sell substantially all of the Debtor's assets without the Senior Lender's prior written consent, (viii) if the Debtor fails to provide

Senior Lender with a revised proposed budget in form and detail acceptable to the Senior Lender on the first business day of each week after the entry of this Interim Order which budget must cover the subsequent thirteen (13) week period, (ix) if the Debtor fails to meet any requirements contained in the DIP Credit Agreement regarding sales, collections, or compliance with the DIP Budget (x) if Debtor fails to deliver to Senior Lender any reports required under the DIP Credit Agreement (each, an "**Event of Default**"), then, and, in any such event, the Senior Lender shall be fully authorized, in its sole discretion, to terminate the DIP Financing, to demand payment and satisfaction of all obligations under the DIP Credit Agreement and this Interim Order, and to shall be entitled to relief from the automatic stay in accordance with Paragraph 8(b) of this Interim Order. In no event shall the Debtor be authorized to use any proceeds of DIP Collateral or any proceeds of the DIP Financing to pay any cost or expenses of administration in this Case or in any superseding Chapter 7 case after the occurrence of an Event of Default, until such time as all of the obligations under the DIP Credit Agreement and the Existing Senior Credit Agreements are paid, performed and satisfied in full.

25. *Inspection Rights* Representatives of the Senior Lender shall be authorized to visit and remain on any of the business premises of the Debtor at any time or times to inspect any DIP Collateral, the Pre-Petition Collateral or other assets of the Debtor to verify or to obtain supporting details concerning the financial information to be provided to the Senior Lender hereunder or under the DIP Credit Agreement, including without limitation, compliance with the DIP Budget.

26.    *Survivability; Binding Effect*.  No reorganization plan or other disposition of the property of the estate proposed by the Debtor, any insider of the Debtor, or any third party shall modify or abrogate any of the rights and benefits afforded to the Senior Lender by this Interim Order or the DIP Credit Agreement without the prior written consent of the Senior Lender, which may grant or deny such consent in its sole and absolute discretion.  The provisions of this Interim Order shall be binding upon the Debtor and its buyers, successors and assigns.  In the event that this Case is dismissed, superseded, substantively consolidated with another Chapter 11 case or entity, or the Debtor merges into any other entity under any plan of reorganization, neither the entry of this Interim Order, the dismissal of this Case, nor such consolidation or merger shall affect the rights of the Senior Lender under this Interim Order or the DIP Credit Agreement, and all of the Senior Lender's rights and remedies thereunder and hereunder shall remain in full force and effect.  As a condition to the obligation of the Senior Lender to provide and continue the DIP Financing after the Final Hearing, the provisions of this Interim Order shall survive and be binding upon any successor trustee appointed in the Case or any Chapter 7 case to which the Case may subsequently be converted.

27.    *Remedies Cumulative*.  The rights, remedies, powers and privileges conferred upon the Senior Lender pursuant to this Interim Order shall be in addition to and cumulative with those contained in the DIP Credit Agreement and the Existing Senior Credit Agreements.  Nothing in this Interim Order is intended to limit, restrict, eliminate or modify any rights or remedies provided to the Senior Lender under the DIP Credit Agreement or the Existing Senior Credit Agreements.

28. *Maintenance of Lockbox Agreement*.  Debtor shall be subject to all the terms and provisions of the existing pre-Petition Date dominion account control agreements and lockboxes for purposes of the DIP Financing and shall be authorized and directed to continue in effect their existing cash management system by causing all proceeds of both the Pre-Petition Collateral and DIP Collateral to be remitted or deposited into the existing lockbox account pursuant to said agreements.

29. *No Admissions or Waiver*.  Nothing in this Interim Order shall be deemed to be a waiver by the Senior Lender or Junior Agent of their right to request any other relief or additional and further protection of its interests in any property of the Debtor or property of the estate, to move for relief from the automatic stay with respect to the Senior Lender Adequate Protection Obligations or the Junior Creditor Adequate Protection Obligations or the enforcement of the Pre-Petition Liens on the Pre-Petition Collateral, to seek the appointment of a trustee or examiner in the Case or the dismissal of the Case, or to request any other relief in this case, nor shall anything in this Interim Order, the DIP Credit Agreement, the Existing Senior Credit Agreements, or the Existing Junior Credit Agreements constitute an admission by the Senior Lender or Junior Agent of the quantity, quality or value of the DIP Collateral or Pre-Petition Collateral or constitute a finding of adequate protection with respect to the interest of the Senior Lender or Junior Agent in any of the DIP Collateral or Pre-Petition Collateral.  The Senior Lender and Junior Agent shall be deemed to have reserved all rights to assert entitlement to the protections and benefits of Section 507(b) of the Bankruptcy Code in connection with any use, sale or other disposition of any of the DIP Collateral or Pre-Petition Collateral, to the extent that the superpriority claim status afforded by this

Interim Order to the Senior Lender's and Junior Agent's interests in any DIP Collateral or Pre-Petition Collateral proves to be inadequate.

30.    *Release of Claims.* The Debtor hereby (i) releases and discharges the Senior Lender, together with its respective affiliates, agents, attorneys, members, officers, directors and employees (collectively, the "**Protected Parties**") from any and all claims and causes of action arising out, based upon or related to, in whole or in part, Existing Senior Credit Agreements, any aspect of the pre-petition relationship between, or among, the Protected Parties and the Debtor or any other acts or omissions of the Protected Parties in connection with any of the Existing Senior Credit Agreements or its pre-petition relationship with the Debtor, including, without limitation, any avoidance action available under Chapter 5 of the Bankruptcy Code (or under Section 502(d) of the Bankruptcy Code); (ii) waive any and all claims and/or defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, first priority, enforceability and avoidability (under the Bankruptcy Code or otherwise) of the indebtedness under the Existing Senior Credit Agreements and the security interests in and liens on the collateral securing such indebtedness; and (iii) agree, without further Court order and without the need for filing of any proof of claim, to the allowance of the pre-petition claims of the Senior Lender pursuant to Sections 502 and 506 of the Bankruptcy Code on account of such indebtedness as fully secured claims for principal, plus accrued pre-petition and post-petition interest, fees, expenses and other amounts chargeable under the Existing Senior Credit Agreements.

31.     *Order Governs*.  In the event of any inconsistency between the provisions of this Interim Order and of the DIP Credit Agreement, the provisions of this Interim Order shall govern.

32.     *Binding Effect; Successors and Assigns.*  The DIP Credit Agreement and the provisions of this Interim Order shall be binding upon all parties in interest in this Case, including, without limitation, the Senior Lender, Junior Agent and the Debtor and its successors and assigns (including any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor) and shall inure to the benefit of the Senior Lender, the Debtor and its successors and assigns.

33.     *Final Hearing and Objections*.  Notice is hereby given that the Final Hearing on the Motion shall be held before the Honorable Albert E. Radcliffe, United States Bankruptcy Judge, at the United States Bankruptcy Court, Courtroom #5 , 405 E. 8th Avenue, Eugene, Oregon 97401  at _____ on April __, 2009 (the "**Final Hearing**"). If no objection to the Motion or this Interim Order is timely filed and prosecuted at the Final Hearing, then this Interim Order shall continue in effect in accordance with its terms subject to such modifications as the Court may make in the Final Order following the Final Hearing, and that are acceptable to the Senior Lender.  If any or all of the provisions of this Interim Order are reversed, modified, or vacated or stayed as the result of any objection timely filed and asserted at the Final Hearing, then, without limiting any provisions hereof, the Debtor's obligations under the DIP Credit Agreement incurred prior to the effective date of such reversal, modification, vacation or stay shall be governed in all respects by the original provisions of this Interim Order, and the Senior Lender shall be entitled to the protections afforded under Section 364(e) of the

Bankruptcy Code and to all the rights, remedies, privileges and benefits, including, without limitation, the security interests, liens and priorities, granted herein and pursuant to the DIP Credit Agreement with respect to all such obligations.   The Debtor shall promptly mail copies of this Interim Order to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court and to any Committee members after the same have been appointed, or Committee counsel, if the same shall have been appointed.   Any party in interest objecting to the relief sought at the Final Hearing shall serve and file a written objection; which objections shall be served so to be received no later than April __, 2009 at 5:00 p.m. (Pacific Time) upon (a) David B. Levant, Stoel Rives, LLP, Proposed Counsel for the Debtor, Stoel Rives LLP, 600 University Street, Suite 3600, Seattle, Washington 98101, Telephone: (206) 386-7601, Facsimile: (206) 386-7500; and (b) David B. Kurzweil, Esq., Greenberg Traurig, LLP, 3290 Northside Parkway, Suite 400, Atlanta, Georgia 30327, Telephone: (678) 553-2100, Facsimile: (678) 553-2681; and (c) the Office of the United States Trustee for the District of Oregon, and shall be filed with the Clerk of the United States Bankruptcy Court, District of Oregon.

**EXHIBIT "A"**

**INITIAL DIP BUDGET**

EXHIBIT C

# COUNTRY COACH, LLC
## CASH FLOW BUDGET
Page 1 of 3

| Week Number: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 3/13/09 | 3/20/09 | 3/27/09 | 4/3/09 | 4/10/09 | 4/17/09 | 4/24/09 | 5/1/09 | 5/8/09 | 5/15/09 | 5/22/09 | 5/29/09 | 6/5/09 | 6/12/09 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | |
| Materials Expense | 370,402 | 369,659 | 252,541 | 188,272 | 244,925 | 196,588 | 40,294 | 149,623 | 115,239 | 124,974 | 85,789 | (172,860) | 205,751 | 205,730 |
| Cap Ex | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Warranty & Legal (non bankruptcy) | 700 | 1,136 | 1,556 | 1,556 | 2,396 | 2,816 | 3,656 | 4,076 | 14,916 | 1,556 | 16,176 | 16,596 | 17,436 | 17,856 |
| Admin/Sales/Marketing & related Payroll | 2,016 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 |
| Show/Rallies | 157,703 | 0 | 0 | 76,694 | 3,135 | 0 | 0 | 33,231 | 3,135 | 0 | 0 | 0 | 28,215 | 3,135 |
| MFG/Service | 0 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 |
| Delivery | 45,237 | 2,200 | 2,200 | 0 | 4,400 | 2,200 | 0 | 2,200 | 4,400 | 2,200 | 4,400 | 2,200 | 4,400 | 2,200 |
| Insurance | 0 | 0 | 0 | 0 | 21,671 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Commissions | 160,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 90,000 | 65,014 |
| Payroll Taxes, Benefits, and other | 0 | 2,200 | 0 | 0 | 0 | 0 | 180,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Payroll manufacturing direct | 123,311 | 123,311 | 0 | 123,311 | 0 | 123,311 | 0 | 123,311 | 0 | 123,311 | 0 | 123,311 | 0 | 123,311 |
| Total Operating Outflows | 737,057 | 706,511 | 323,736 | 599,838 | 343,967 | 378,826 | 272,083 | 522,646 | 205,130 | 541,040 | 230,515 | 438,101 | 34,601 | 627,472 |
| **BANKRUPTCY EXPENSES** | | | | | | | | | | | | | | |
| Wells Fargo Interest - all loans | 0 | 0 | 81,300 | 0 | 0 | 0 | 83,600 | 0 | 0 | 0 | 66,500 | 0 | 0 | 0 |
| DIP Facility Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| DIP Sourcing Fee (focalpoint) | 100,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Repayment of Wells Fargo LOC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Legal Fees | 25,000 | 45,000 | 45,000 | 90,000 | 0 | 0 | 180,000 | 0 | 0 | 90,000 | 0 | 90,000 | 0 | 0 |
| Restructuring Professionals | 50,000 | 32,500 | 32,500 | 65,000 | 0 | 0 | 40,500 | 0 | 0 | 0 | 0 | 40,500 | 0 | 0 |
| Creditor Committee Professionals | 31,500 | 0 | 0 | 0 | 0 | 0 | 31,500 | 0 | 0 | 0 | 0 | 31,500 | 0 | 0 |
| Court Fees (Trustee, Claims Agent, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Utilities Deposit | 60,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| One time mailer relating to change of business | 0 | 0 | 70,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Remodel of Sales Ctr | 30,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| One time warranty pmt for 200 after mkt warranties | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Bankruptcy Disbursements | 296,500 | 77,500 | 228,800 | 155,000 | 0 | 0 | 335,600 | 0 | 0 | 0 | 66,900 | 162,000 | 0 | 0 |
| **TOTAL EXPENSES** | 1,033,557 | 784,011 | 552,536 | 754,838 | 343,967 | 378,826 | 607,683 | 522,646 | 205,130 | 541,040 | 297,415 | 600,101 | 34,601 | 627,472 |
| | | | | | | | | | | | | | | |
| **EXPECTED COLLECTIONS** | 0 | 405,600 | 405,600 | 0 | 878,800 | 473,200 | 878,800 | 1,643,200 | 878,800 | 473,200 | 878,800 | 473,200 | 878,800 | 473,200 |
| | | | | | | | | | | | | | | |
| **EXPECTED NUMBER OF UNIT SALES** | | | | | | | | | | | | | | |
| MH Sales 2008/2009 | 0 | 1 | 1 | 0 | 2 | 1 | 2 | 7 | 1 | 1 | 2 | 1 | 1 | 1 |
| MH Sales 2010 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total New Sales | 0 | 1 | 1 | 0 | 2 | 1 | 2 | 7 | 1 | 1 | 2 | 1 | 1 | 1 |
| Cumulative Unit Sales | 0 | 1 | 2 | 2 | 4 | 5 | 7 | 8 | 10 | 11 | 13 | 14 | 16 | 17 |

**COUNTRY COACH, LLC**
**CASH FLOW BUDGET**
Page 2 of 3

| | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Number: | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| Week Ending: | 6/19/09 | 6/26/09 | 7/3/09 | 7/10/09 | 7/17/09 | 7/24/09 | 7/31/09 | 8/7/09 | 8/14/09 | 8/21/09 | 8/28/09 | 9/4/09 | 9/11/09 | 9/18/09 |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | |
| Materials Expense | 176,700 | 135,093 | 72,447 | 52,344 | 44,554 | 38,325 | 54,743 | 40,493 | 33,994 | 136,842 | 134,609 | 241,680 | 189,792 | 216,114 |
| Cap Expo | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 |
| Warranty & Legal (non bankruptcy) | 18,696 | 18,696 | 19,536 | 19,956 | 20,376 | 20,796 | 21,216 | 21,636 | 22,056 | 22,056 | 22,476 | 22,896 | 23,316 | 23,736 |
| Admin/Sales/Marketing & related Payroll | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 |
| Show/Rallies | 0 | | 82,764 | 3,135 | | | | 3,135 | | | | 5,016 | 3,135 | |
| MFG/Service | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,237 | 45,299 | 45,299 | 45,604 | 45,604 |
| Delivery | 4,400 | 4,400 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 |
| Insurance | | | | | | | | | | | | 90,000 | | |
| Commissions | | | | 54,178 | | | | | 85,393 | | | 124,188 | 48,810 | 128,530 |
| Payroll manufacturing-direct | | 123,311 | | 123,311 | | 123,311 | | 123,311 | | 123,311 | | 141,889 | | 137,547 |
| Payroll Taxes, Benefits, and other | | 142,786 | | 142,786 | | 142,786 | | 142,786 | | 142,786 | | 141,889 | | 137,547 |
| Utility Deposit | | | | | | | | | | | | | | |
| Total Operating Outflows | 267,235 | 487,305 | 246,586 | 465,329 | 194,369 | 394,837 | 145,599 | 523,246 | 214,137 | 492,414 | 226,786 | 695,370 | 335,060 | 575,933 |
| **BANKRUPTCY EXPENSES** | | | | | | | | | | | | | | |
| Wells Fargo Interest - all loans | 57,400 | | | | | | | | 45,200 | | | | 44,200 | |
| DIP Facility Fees | | | | | 48,500 | | | | | | | | | |
| DIP Sourcing Fee (Escalpone) | | | | | | | | | | | | | | |
| Repayment of Wells Fargo LOC | | | | | | | | 180,000 | | | | | | |
| Legal Fees | | | 90,000 | | | | | | | | | 90,000 | | |
| Restructuring Professionals | | | 40,500 | | | | | 40,500 | | | | 40,500 | | |
| Creditor Committee Professionals | | | 31,500 | | | | | 31,500 | | | | 31,500 | | |
| Court Fees (Trustee, Claims Agent, etc) | | | | | | | | | | | | | | |
| Utility Deposit | | | | | | | | | | | | | | |
| One time mailer relating to change of business | | | | | | | | | | | | | | |
| Remodel of Sales Ctr | | | | | | | | | | | | | | |
| One time warranty pmt for 200 after mkt warranties | | | | | | | | | | | | | | |
| Total Bankruptcy Disbursements | 57,400 | 0 | 162,000 | 0 | 48,500 | 0 | 0 | 252,000 | 45,200 | 0 | 0 | 162,000 | 44,200 | 0 |
| **TOTAL EXPENSES** | 324,635 | 487,305 | 408,586 | 465,329 | 182,869 | 394,837 | 145,599 | 775,246 | 259,417 | 492,414 | 226,786 | 857,370 | 379,260 | 575,933 |
| | | | | | | | | | | | | | | |
| **EXPECTED COLLECTIONS** | 878,800 | 522,000 | 880,100 | 474,532 | 474,532 | 474,532 | 474,532 | 474,532 | 523,332 | 474,532 | 474,532 | 474,532 | 857,370 | 473,200 |
| | | | | | | | | | | | | | | |
| **EXPECTED NUMBER OF UNIT SALES** | | | | | | | | | | | | | | |
| MH Sales 2008/2009 | 2 | 0 | 2 | 1 | 1 | 1 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 1 |
| MH Sales 2010 | | | | | | | | | | | | | | |
| Total New Sales | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Cumulative Unit Sales | 19 | 19 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 27 | 28 | 29 | 30 | 31 |

**COUNTRY COACH, LLC**
**CASH FLOW BUDGET**
Page 3 of 3

| Week Number: | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending: | 9/25/09 | 10/2/09 | 10/9/09 | 10/16/09 | 10/23/09 | 10/30/09 | 11/6/09 | 11/13/09 | 11/20/09 | 11/27/09 | 12/4/09 | 12/11/09 | 12/18/09 | 12/25/09 | 1/1/10 | |
| **OPERATING EXPENSES** | | | | | | | | | | | | | | | | |
| Materials Expense | 306,589 | 236,460 | 211,182 | 214,733 | 228,486 | 208,154 | 201,861 | 216,240 | 196,748 | 192,750 | 196,096 | 194,554 | 223,969 | 198,000 | | 7,127,931 |
| Cap Exp. | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 86,000 |
| Warranty & Legal (non bankruptcy) | 24,156 | 24,576 | 24,576 | 24,576 | 24,576 | 24,996 | 25,416 | 25,836 | 26,256 | 26,676 | 27,096 | 27,516 | 27,936 | 28,356 | 28,776 | 804,985 |
| Admin/Sales/Marketing & related Payroll | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 20,203 | 1,006,238 |
| Show/Rallies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 391,875 |
| MFG/Service | 20,064 | 20,064 | 627 | 627 | 0 | 0 | 627 | 0 | 0 | 0 | 627 | 0 | 0 | 0 | 0 | |
| Insurance | 46,511 | 46,511 | 45,799 | 45,799 | 47,720 | 47,720 | 47,207 | 47,207 | 46,318 | 46,318 | 46,151 | 46,151 | 46,151 | 46,151 | 46,552 | 1,955,787 |
| Delivery | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 94,600 |
| Commissions | 0 | 0 | 0 | 47,720 | 0 | 159,610 | 0 | 27,139 | 0 | 138,684 | 0 | 90,000 | 0 | 0 | 36,542 | 431,000 |
| Payroll manufacturing direct | 0 | 141,424 | 0 | 0 | 0 | 0 | 0 | 151,323 | 0 | 0 | 55,570 | 0 | 0 | 0 | 0 | 493,271 |
| Payroll Taxes, Benefits, and other | 124,653 | 124,653 | 131,368 | 134,769 | 107,466 | 114,754 | 114,754 | 151,323 | 138,684 | 127,393 | 129,774 | 136,303 | 136,303 | 136,303 | 129,774 | 2,851,210 |
| **Total Operating Outflows** | 401,659 | 618,091 | 304,387 | 643,869 | 322,985 | 583,706 | 349,506 | 592,523 | 313,217 | 560,222 | 291,027 | 705,812 | 292,843 | 588,956 | 287,740 | 17,978,653 |
| **BANKRUPTCY EXPENSES** | | | | | | | | | | | | | | | | |
| Wells Fargo Interest - all loans | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 601,900 |
| DIP Facility Fees | 0 | 0 | 44,900 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100,000 |
| DIP Sourcing Fee (Houlpoint) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 835,000 |
| Repayment of Wells Fargo LOC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 382,500 |
| Legal Fees | 0 | 0 | 0 | 0 | 0 | 0 | 43,700 | 0 | 0 | 0 | 43,000 | 0 | 0 | 0 | 43,200 | 189,000 |
| Restructuring Professionals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 60,000 |
| Creditor Committee Professionals | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70,000 |
| Court Fees (Trustee, Claims Agent, etc.) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 189,000 |
| Utilities Deposit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 90,000 | 0 | 0 | 0 | 60,000 |
| Remodel of Sales Ctr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 70,000 |
| One time mailer relating to change of business | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30,000 |
| One time warranty pmt for 200 after mkt warranties | 0 | 0 | 0 | 0 | 0 | 43,700 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30,000 |
| **Total Bankruptcy Disbursements** | 0 | 0 | 44,900 | 0 | 0 | 43,700 | 43,700 | 0 | 0 | 0 | 43,000 | 0 | 0 | 0 | 43,200 | 2,268,400 |
| **TOTAL EXPENSES** | 401,659 | 618,091 | 349,287 | 643,869 | 322,985 | 583,706 | 349,506 | 592,523 | 313,217 | 560,222 | 334,027 | 705,812 | 292,843 | 588,956 | 330,940 | 20,247,053 |
| | | | | | | | | | | | | | | | | |
| **EXPECTED COLLECTIONS** | 474,532 | 474,532 | 523,332 | 523,332 | 322,985 | 474,532 | 474,532 | 473,200 | 474,532 | 474,532 | 474,532 | 474,532 | 474,532 | 474,532 | 473,200 | 23,551,136 |
| | | | | | | | | | | | | | | | | |
| **EXPECTED NUMBER OF UNIT SALES** | 32 | 33 | 33 | 33 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | |
| MH Sales 2008/2009 | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 9.00 |
| MH Sales 2010 | | | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 34.00 |
| Total New Sales | 1 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 43.00 |
| Cumulative Unit Sales | 32 | 33 | 33 | 33 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | |